## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TRACKTIME, LLC,<br><br>              Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC.,<br>AMAZON.COM LLC,<br>AMZN MOBILE LLC,<br>AMAZON WEB SERVICES, INC.,<br>AMAZON DIGITAL SERVICES LLC, and<br>AUDIBLE, INC.,<br>              Defendants. | CIVIL ACTION NO. 18-cv-1518 (MN)<br><br>PATENT CASE<br><br>JURY TRIAL DEMANDED |

### FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff TrackTime, LLC ("TrackTime" or "Plaintiff") files this First Amended Complaint against Amazon.Com, Inc., Amazon.com LLC, Amzn Mobile LLC, Amazon Web Services, Inc., and Amazon Digital Services LLC (collectively, "Amazon") and Audible, Inc. ("Audible") for infringement of U.S. Patent No. 8,856,638 ("the '638 patent") and U.S. Patent No. 8,862,978 ("the '978 patent") (the "patents-in-suit" or the "asserted patents").  Amazon and Audible are together referred to herein as Defendants.  Plaintiff alleges Defendants willfully infringe the asserted patents.  Plaintiff has been, and continues to be, injured by Defendants' conduct.

### THE PARTIES

1.      Plaintiff TrackTime is a Delaware limited liability company with its principal place of business in Springfield, VA.  TrackTime's registered office in Delaware is 16192 Coastal Highway, Lewes, Delaware, 19958, County of Sussex.

2.      Defendant Amazon.com, Inc. is a Delaware corporation with its principal place of business at 410 Terry Avenue North, Seattle, Washington.  Amazon.com, Inc.'s registered agent for service in Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington,

Delaware 19808.  Amazon.com, Inc. does business across the United States, including in the State of Delaware and in the District of Delaware.

3.     Defendant Amazon.com LLC is a limited liability corporation organized under the laws of Delaware and a wholly-owned subsidiary of Amazon.com, Inc. with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.  Amazon.com LLC's registered agent for service of process in Delaware is Corporate Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Amazon.com LLC does business across the United States, including in the State of Delaware and in the District of Delaware.

4.     Defendant AMZN Mobile LLC is a limited liability corporation organized under the laws of Delaware and a wholly-owned subsidiary of Amazon.com, Inc. with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.  AMZN Mobile LLC's registered agent for service of process in Delaware is Corporate Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  AMZN Mobile, LLC does business across the United States, including in the State of Delaware and in the District of Delaware.

5.     Defendant Amazon Digital Services LLC, is a Delaware limited liability company, an Amazon.com, Inc. subsidiary and controlled affiliate, and a so-called Amazon Group Company with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109. Amazon Digital Services LLC's registered agent for service of process in Delaware is Corporate Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Amazon Digital Services LLC does business across the United States, including in the State of Delaware and in the District of Delaware.

6.     Defendant Amazon Web Services, Inc. is a Delaware corporation, an Amazon.com, Inc. subsidiary and controlled affiliate, and a so-called Amazon Group Company with its principal

2

place of business at 1200 12th Avenue South, Suite 1200, Seattle, Washington.  Amazon Web Services, Inc.'s registered agent for service in Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Amazon Web Services, Inc. does business across the United States, including in the State of Delaware and in the District of Delaware.

7.      Defendant Audible, Inc. is a Delaware corporation, an Amazon.com, Inc. subsidiary and controlled affiliate, and a so-called Amazon Group Company with its principal place of business at One Washington Park, 16th Floor, Newark, New Jersey 07102.  Audible, Inc.'s registered agent for service of process in Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Audible Inc. does business across the United States, including in the State of Delaware and in the District of Delaware.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

9.      The United States Congress enacted the patent laws pursuant to Article 1, Section 8 of the United States Constitution, which says, "The Congress shall have power . . . To promote the Progress of Science and useful Arts. . . by securing for limited Times to . . . Inventors the exclusive Right to their . . . Discoveries."

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as well as §§ 1338(a)-(b) and 1367 (jurisdiction over patent actions).

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  On information and belief, each Defendant is deemed to reside in this judicial district, has committed acts of infringement in this judicial district, has purposely transacted business in

this judicial district, and/or has regular and established places of business in this judicial district. Specifically, each Defendant is incorporated in the State of Delaware.

12.     On information and belief, each Defendant is subject to this Court's specific and general personal jurisdiction, due at least to their substantial and pervasive business in this State and judicial district, including: (a) at least part of their infringing activities alleged herein; and (b) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Delaware residents.

13.     More specifically, Defendants' substantial contacts with the forum include, but are not limited to: (i) the manufacture, marketing, offer for sale, sale, distribution, and use of Amazon mobile computing devices, including those sold under the AMAZON, KINDLE, FIRE, and ECHO trademarks; (ii) the marketing, sale, and provision of Amazon's subscription services, including Amazon Prime, Amazon Music, Amazon Music Unlimited, Audible Audiobooks, Kindle eBooks, Amazon Kindle Unlimited, and various a la carte e-book and audiobook sales; (iii) the marketing and distribution of software for mobile computing devices such as the software and/or features known as Amazon Music, X-Ray Lyrics, X-Ray for Music, the Kindle app, the Audible app, Whispersync for Voice, Kindle Books with Audible Narration, Immersion Reading, and other similar applications and/or software features installed on such devices; and/or (iv) the provision of technical and customer support for the Amazon services and subscriptions described in (ii) above and the software described in (iii) above.

## PATENTS-IN-SUIT

14.     The asserted patents relate generally to novel methods for "seeking" to portions of electronic media using mobile computing devices, and related social networking.  Notably, the claims of the asserted patents cover the use of mobile computing devices to navigate music using

4

synchronized lyrics and to navigate audiobooks using an associated electronic book, among numerous other applications. The inventor is an engineer and patent attorney with over twenty-two years of experience in litigation and litigation support. He derived and developed his inventions when solving technical problems plaguing the legal industry. His solutions include enabling the synchronization and use of mobile computing devices with, for instance, deposition videos and transcripts.

15.    The '638 patent lawfully issued on October 7, 2014 and stems from Application No. 14/099,292, filed on December 6, 2013. The '638 patent is entitled "Methods and System for Remote Control for Multimedia Seeking." The named inventor is Curt Evans of Springfield, Virginia. A copy of the '638 patent is attached hereto as Exhibit 1.

16.    The '638 patent is a continuation of Application No. 13/851,813, filed on March 27, 2013, which is a continuation-in-part of Application No. 13/342,865, filed on January 3, 2012, which claims the benefit of U.S. Provisional Patent Application No. 61/429,399, filed on January 3, 2011.

17.    The claims of the '638 patent encompass novel and non-obvious technology including, but not limited to, the ordered combination of claimed elements comprising a synchronization index comprising an electronic transcript indicating text corresponding to audio from multimedia, and further indicating respective times within multimedia corresponding to when a word or range of words is audible in the multimedia. The '638 patent further teaches and claims embodiments utilizing such a synchronization index for selecting portions of multimedia for display, including various ways in which the synchronization index is used for purposes of "seeking" to a portion of multimedia and delivering it, accordingly. This includes, but is not limited to, the performance of timecode lookups, the provision of information for displaying text

from the synchronization index to a mobile computing device having a viewing screen and a touch-sensitive input interface, and the receipt of a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of a viewing screen corresponding to a displayed word from the synchronization index.

18.     The '978 patent lawfully issued on October 14, 2014 and stems from Application No. 14/099,231, filed on December 6, 2013.  The '638 patent is entitled "Methods and Systems for Facilitating an Online Social Network."  The named inventor is Curt Evans of Springfield, Virginia.  A copy of the '978 patent is attached hereto as Exhibit 2.

19.     The '978 patent is a continuation of Application No. 13/851,813, filed on March 27, 2013, which is a continuation-in-part of Application No. 13/342,865, filed on January 3, 2012, which claims the benefit of U.S. Provisional Patent Application No. 61/429,399, filed on January 3, 2011.

20.     Like the claims of the '638 patent, the '978 patent claims encompass novel and non-obvious technology including, but not limited to, the ordered combination of claimed elements comprising a synchronization index that, in some claims, is an electronic transcript that indicates text corresponding to audio from multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia.  In other claims, the synchronization index comprises an electronic transcript of text corresponding to at least a portion of audio from multimedia and indicates respective times within the multimedia corresponding to a word or range of words, wherein the synchronization index (i) provides association between at least one portion of the electronic transcript and at least one portion of the multimedia, and (ii) is otherwise provided to and/or shared with a plurality of

users via a network.  Further still, the claimed technology facilitates the sharing of annotations across multiple devices utilizing the synchronization index via a set of specific steps.

21.    The '978 patent specification further describes embodiments for, and features and advantages of, utilizing a mobile computing device and a synchronization index with an improved user interface.  This includes the facilitation of annotation responsive to user input received by the mobile computing device, the provision of information for displaying text from the synchronization index to a mobile computing device having a viewing screen and a touch-sensitive input interface, instances where performing a user's selected gesture on a portion of a viewing screen corresponding to a portion of text is recognized by a touch-sensitive input interface; and the transmission or communication of annotations to a second computing device via a network for subsequent retrieval.

22.    The technologies claimed in the '638 and '978 patents consist of ordered combinations of features and functions that were not, alone or in combination, considered well-understood by, and routine, generic, and conventional to, skilled artisans in the industry at the time of invention.  Defendants made contemporaneous, factual public statements to this effect, and Defendant Audible made such statements to the United States Patent and Trademark Office in prosecuting its own patent applications.

23.    Each asserted claim in the '638 and '978 patents is presumed valid.

24.    Each asserted claim in the '638 and '978 patents is directed to patent eligible subject matter under 35 U.S.C. § 101.

25.    The '638 and '978 patent specifications disclose shortcomings in the prior art and then explain, in detail, the technical ways that the patents resolve or overcome those shortcomings. By way of example, each patent's disclosure:

a. Explains that there was no well-understood, routine, and conventional utility on a mobile computing device "for display of smoothly scrolling, synchronized text and multimedia for use on a mobile computing device, where the user may perform a gesture on the text to cause the multimedia to jump to a desired location and begin playback" (col. 1, lines 59-62; col. 3, line 54 – col. 5, line 30)[1];

b. Identifies shortcomings of prior art utilities (col. 6, lines 23-33; col. 9, lines 25-43);

c. Describes problems with prior art media (col. 8, lines 27-34);

d. Sets forth at least thirteen problems with closed captioning, subtitling, and historic uses of text, including a lack of interactivity, such shortcomings being "emblematic of the art before the techniques described throughout this disclosure" (col. 10, line 32 - col. 11, line 24);

e. Describes and teaches solutions to the technical problems (col. 11, line 25 – col. 12, line 13), stating for instance: "By contrast, the synchronization index and software suited for use on a mobile computing device of the present disclosure is characterized by interactivity, meaning that the user is able to use the synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia" (col. 11, lines 25-31); "There is also a need for systems, products, software and methods to facilitate use of mobile computing devices with synchronization indexes and corresponding multimedia for any type of multimedia that can be associated, and manipulated, by corresponding text, such as music and

---

[1] The '638 and '978 patents share a common specification.  Column and line references come from the '638 patent.

lyrics, video/audio books, movies and screenplays, and other multimedia recordings." (col. 11, lines 61-67);

f.   Describes and teaches numerous novel embodiments (*see, generally*, col. 12 – col. 39);

g.   Teaches a technical solution for providing music and interactive, synchronized lyrics on a mobile computing device (col. 39, line 15 – col. 41, line 35; Fig. 35);

h.   Teaches a technical solution for providing an audio book and interactive corresponding text for use on a mobile computing device (col. 47, line 8 – col. 47, line 63; Fig. 36);

i.   Teaches a technical solution for providing social networking functionality in conjunction with text and synchronized media on a mobile computing device (col. 49, line 19 – col. 50, line 25; Fig. 24);

j.   Describes other uses for a synchronization index and associated multimedia operating on a mobile computing device, including music and audio books (col. 50, lines 25-43);

k.   Includes an improved user interface for use of music and interactive, synchronized lyrics on a mobile computing device (Fig. 35, col. 56, lines 47-62; Figs. 1, 3);

l.   Includes an improved user interface for use of book text and a corresponding audio book on a mobile computing device (Fig. 36, col. 56, lines 63 – col 57, line 12; Figs. 1, 3); and

m.  Sets forth numerous benefits of the claimed inventions that are described throughout the specification and also depicted in the figures.

**AMAZON AND AUDIBLE**

9

*Devices*

26.     Amazon has historically sold and/or sells lines of mobile computing devices, including computer tablets and mobile phones.  It sells these devices under the AMAZON, KINDLE, FIRE, and ECHO trademarks (and variants thereof) (collectively, "Kindle Devices"). The Kindle Devices are not "gadgets;" rather they are an integral and "*absolutely essential*" part of Amazon's service offerings (refer to ¶ 27, below).  Amazon makes substantial money, for instance, when consumers use the Kindle Devices to buy goods and services from Amazon's "ecosystem"—a marketplace for products, applications, and subscription services, including Amazon Prime, Amazon Music, Amazon Music Unlimited, Amazon Prime Reading, Kindle eBooks, and Audible Audiobooks, among others.

27.     When certain Kindle Devices were introduced to the market in September 2012, Amazon's CEO Jeff Bezos remarked: "Kindle Fire is a service;" "Our hardware device is a service. That's what people want."  Indeed, he said, "Hardware is a critical part of the service. *Absolutely essential*."  These statements were true then, and are true now.

28.     Amazon also sells through its e-commerce portal (Amazon.com) third-party mobile computing devices, such as tablet computers and mobile phones, intending that purchasers install and use Amazon applications to buy goods and services from the Amazon "ecosystem."  These mobile computing devices include computing products running the Android operating system and computing products running Apple's operating system, called "iOS."

*"Amazon Prime"*

29.     Amazon offers a suite of subscriptions and services that it markets and sells as "Amazon Prime."  Amazon Prime includes access to e-books and audiobooks, as well as music.

Amazon Prime also offers other benefits, such as free or discounted priority shipping on items purchased through, or from, Amazon or Amazon.com.

30.     In a letter to investors dated April 19, 2018, Amazon CEO Jeff Bezos stated that there are now over 100 million Amazon Prime subscribers, and more new Amazon Prime subscribers joined in 2017 than any other year.  *See* https://blog.aboutamazon.com/2017-letter-to-shareholders/

31.     Amazon Prime allows a subscriber to access "Amazon Prime Music," a streaming music service that offers over 2 million songs.  Certain of these songs have associated lyrics.

32.     Amazon offers, via additional subscription, "Amazon Music Unlimited," which is a music service that expands the music library to over 23 million songs.  Certain of these songs have associated lyrics.

33.     Amazon also offers songs for purchase from the Amazon Digital Music Store, and allows Amazon Prime subscribers to import songs purchased elsewhere to their "My Music" library.  Imported songs will be matched to music in the Amazon Digital Music Store catalog. Certain of the songs in the Amazon Digital Music Store have associated lyrics.

34.     One way consumers can access either "Amazon Prime Music" or "Amazon Music Unlimited" is by using a mobile computing device to download and use a software application, or "app," called "Amazon Music."  Amazon offers the Amazon Music app for, at least, the iOS and Android operating systems.  The Amazon Music app is used to access music, including music with associated synchronized lyrics.

35.     Another way consumers can access either "Amazon Prime Music" or "Amazon Music Unlimited" is by using a Kindle Device with the their pre-installed Music app, or similarly functioning software.

36.     The Amazon Music app, and similar software installed on Kindle Devices, includes a feature called "X-Ray Lyrics" or "X-Ray for Music."  This feature allows mobile computing devices to display song lyrics as a song plays, with the lyrics being synchronously displayed with the audio.  X-Ray Lyrics also allows users to scroll through lyrics, for example by "swiping" up or down (a user-selected gesture that users make on their mobile device touch screens).  Further, X-Ray Lyrics allows users to "jump" to another portion of a song by performing a gesture on a part of the touch-screen that corresponds to a line of lyrics, for example by "tapping" a line of lyrics to "jump" the song to that location.

37.     X-Ray Lyrics is promoted by Amazon as a reason to buy Kindle Devices.  Amazon further advertises as distinct benefits of X-Ray Lyrics the fact that that lyrics display and scroll automatically line-by-line as a song plays and that users enjoy the ability to jump to different sections of songs by tapping any line in the lyrics.

38.     X-Ray Lyrics in the Amazon Music app (or similar software pre-installed on Kindle Devices) functions because song lyrics are indexed for synchronization to the lyrics, and the index is used to "jump" to different portions of a song via a user touch screen gesture, for example a "tap" on a line of lyrics.

39.     X-Ray Lyrics is also offered by Amazon to entice consumers to participate in the Amazon "ecosystem" and, thus, to consume Amazon products and services (e.g., buy Kindle Devices, download and use the Amazon Music app, become Amazon Prime subscribers (and use Amazon Music), become Amazon Music Unlimited subscribers, purchase music from the Amazon Digital Music Store, upload songs to be matched to music in the Amazon Digital Music Store catalog, etc.).

40.     X-Ray Lyrics (and its functionality) is prominently advertised as a primary reason

to download the Amazon Music app for both iOS and Android devices.  For example, the Amazon Music app is available for download for iOS devices through the Apple App Store.  In the Apple App Store, Amazon displays a number of screenshots of the Amazon Music app.  These screenshots are intended to entice users to download and use the software.  One of the first three screenshots shows the X-Ray Lyrics feature and is titled, "Never miss a verse with X-Ray lyrics."

41.     On information and belief, the Amazon Music app for iOS has been downloaded over a million times.

42.     Amazon sells iOS devices, including various iterations of the Apple iPhone and iPad, which are capable of running the Amazon Music app with X-Ray Lyrics.

43.     The Amazon Music app is listed by Google as having been downloaded to Android devices between 100 million and 500 million times.

44.     Amazon sells Android devices capable of running the Amazon Music app with X-Ray Lyrics.

45.     In total, the Amazon Music app has been downloaded many millions of times and is a tremendously successful app and service offering that contributes substantial revenue to Amazon's bottom line.

46.     X-Ray Lyrics is a reason that consumers elect Amazon Prime or Amazon's music services over competing streaming music services such as Spotify, Pandora, Apple Music, Google Play Music, or Tidal.  X-Ray Lyrics is also a reason consumers elect Amazon Prime or Amazon's music services over music purchases altogether (e.g., foregoing albums, CDs, or digital music purchases from competitors like Apple iTunes or Google Play Store).

47.     The Amazon Music app, and Kindle Devices, have been used to deliver *billions* of songs to Amazon customers.

48.     The '638 patent discloses and claims methods for "seeking" multimedia, and these claimed methods are infringed by Defendants.

49.     The user interface on the Amazon Kindle Fire with X-Ray Lyrics (shown below) is similar to Fig. 35 of the '638 patent, which is an embodiment relating to synchronized lyrics corresponding to a song.  Song lyrics are displayed and the user is provided functionality to "jump" to a particular portion of a song by performing a gesture on the touch screen that corresponds to a particular word or range of words from the lyrics.



**Amazon Kindle Fire running "X-Ray Lyrics"**

50.     On information and belief, tens of millions of paid customers are now using Amazon Music.  As of April 2018, Amazon Music Unlimited subscriptions grew more than 100% over the last six months.  *See e.g.,* http://phx.corporate-ir.net/phoenix.zhtml?c=97664&p=irol-newsArticle&ID=2345075.

51.     Amazon Prime subscriptions may be purchased monthly or annually.  The inclusion of "digital entertainment services," like Amazon Music, within Amazon Prime increases its benefit to subscribers/members.  Based in part on these "digital benefits," Amazon announced on April

26, 2018, that it is increasing the price of the U.S. annual plan for new members 20%, from $99/year to $119/year. *See e.g.,* https://seekingalpha.com/article/4166644-amazon-com-amzn-q1-2018-results-earnings-call-transcript?part=single#question-answer-session.

52.     Streaming music services are important to the music market in general.  Streaming music services are reported as having achieved "meteoric popularity," overtaking digital downloads as the music industry's main business model in just a few years.  *See* https://www.cnet.com/news/streaming-subscriptions-led-music-sales-to-highest-growth-since-1919/.

***E-books and Audiobooks***

53.     Amazon began its business by selling physical books.  The company would accept online orders through its e-commerce portal, then deliver physical books to the customer.  This became a popular and profitable endeavor, taking substantial business from brick-and-mortar retail book stores.  This "success" often drove competitors out of business.

54.     Over time, Amazon began to sell "e-books," electronic copies of books that are downloaded and read on mobile computing devices, among others.  This, too, became a popular offering.  Electronic distribution of books is quicker and less costly than publishing and delivering physical books, and profit margin is higher as a result.

55.     Amazon offers and sells hardware and stand-alone software used to purchase and read e-books.  Amazon released the "Kindle" brand e-reader in 2007, enabling users to browse, buy, download, and read e-books, newspapers, magazines and other digital media content via wireless networking to the Kindle Store.

56.     Amazon prices its hardware devices at "a very thin margin" (*i.e.*, lower than it otherwise would as compared to competitors like Apple), because Amazon intends to profit when

customers use the devices to purchase other goods and services from the Amazon ecosystem, like music, e-books, and audiobooks.

57.     Amazon offers a software "app" for non-Amazon mobile computing devices, called the "Kindle app."  The Kindle app allows other mobile computing devices and their users to browse, buy, download, and read e-books, newspapers, magazines and other digital media via wireless networking to the Kindle Store.  The Kindle app opens the Amazon ecosystem to third party mobile computing devices, including Apple iOS-based and Android-based products.

58.     Amazon also offers and sells audiobooks.

59.     Defendant Audible operates the website Audible.com and is the world's largest producer and retailer of electronic audiobooks.  Audiobooks are digital multimedia files comprising audio that can be delivered to mobile computing devices, including mobile phones and tablets.  Audible calls itself a "leading destination for digital entertainment and a powerhouse of creative, original spoken-word content." *See* https://www.audiblecareers.com/who-we-are.

60.     Amazon purchased Audible in 2008 for approximately $300 Million.  Audible gained access to, and became an integral part of, the Amazon "ecosystem," making its products and services easily and readily available via Amazon.com.

61.     Audible advertises, "We are an Amazon subsidiary with a startup vibe and small company feel, enjoying a breathtaking growth rate.  [We] creat[e] category-leading products that enrich the lives of millions of people around the world every day."  Audible also says it is a "disruptive, technology-driven company," that it "reinvented a media category," and that it "disrupt[s] the status quo and [] works on projects that shatter preconceptions." *See* https://about.audible.com/; *see also* https://www.audiblecareers.com/who-we-are.

62.     On information and belief, Amazon sells approximately fifty-five percent of all books in the U.S., approximately eighty-two percent of all e-books, and, with Audible.com, approximately ninety-nine percent of all audiobooks.  *See* New York Post, "Tech giants are the robber barons of our time" (Feb. 3, 2018), *available at* https://nypost.com/2018/02/03/big-techs-monopolistic-rule-is-hiding-in-plain-sight/.

63.     Audible offers the Audible app, a mobile computing device software app for buying, downloading, receiving, and playing audiobooks.  This app is available for download for at least the iOS and Android operating systems.  This app, or a similarly functioning software application, also functions on Kindle Devices.

64.     Audible considers the Audible app "one of the best products out there, stating that "[m]illions of customers spend couple hours daily, listening to Audible content (150 minutes, average, daily) besides several million others visiting and browsing our content daily."  Audible represents that its app for iOS has been consistently rated "4+," that "Audible app for Android has 30+ million installed base," and that its "systems currently process 2000+ TPS" (transactions per second).  *See*   Exhibit   3,   Audible   Job   Listing,   formerly   at https://www.amazon.jobs/en/jobs/585896/sdet-manager.

65.     Historically, Amazon sold e-books separately from audiobooks because there was no link between the two.  Now, there is a link between an e-book and an audiobook.  The link between an e-book and an audiobook is beneficial to sales, as opposed to selling standard non-linked copies.

66.     The Audible app and Kindle app are intended to, and do, function in concert with one another.  Amazon and Audible advertise this feature as "Whispersync for Voice" or "Kindle Books with Audible Narration," sometimes including "Immersion Reading."

67.     Whispersync for Voice allows a consumer to navigate to a portion of an audiobook by using the text of an e-book to "jump" to a specific portion of the audio that corresponds to a page of the e-book.

68.     Whispersync for Voice allows customers to move seamlessly between Audible audiobooks and Kindle ebooks, so they can take the story with them wherever they are.  It allows customers to read a little, then listen a little, effectively expanding the time a user spends reading or listening.  This technology and feature is a "*key strategic differentiator*" for Audible.  *See*, *e.g*., https://www.linkedin.com/jobs/view/software-development-engineer-at-audible-inc-721852292 (emphasis added).

69.     When Amazon and Audible refer to Whispersync for Voice as being a "*key strategic differentiator*" for Audible, they are referring at least in part to the technical capacity of use of a graphical user interface displaying a limited set of information from a synchronization index (for example one page from an ebook that is indexed for synchronization to a corresponding audiobook) for navigating text and corresponding media by use of gesture controls, specifically a gesture on a specific portion of a touch sensitive viewing screen on a mobile computing device (prescribed functionality directly related to the graphical user interface's structure).

70.     The '638 patent discloses and claims this feature, which is visually depicted in the patent's Fig. 36—showing a mobile computing device app interface for an e-book and a corresponding audiobook (showing audio controls).  Fig. 36 is an interface enabling readers to switch seamlessly between reading and listening without losing their place.  Similarly, the screenshot below depicts the Whispersync for Voice interface (a co-functioning Kindle app and Audible app) on an iPad, with e-book text, top, and audio controls, bottom.  The interface allows

users to quickly and easily navigate to the portion of the audiobook corresponding to a range of words displayed.



**Kindle app on iPad, showing Whispersync for Voice**

71.     Audible has advertised, "Whispersync for Voice is *an Audible innovation* utilizing Amazon's eBook to audiobook synchronization platform, enabling readers to switch seamlessly between reading and listening without losing their place.  iOS participates in this ecosystem by exchanging book position information at certain key points, ensuring our users always have a great experience."  *See* http://stn.audible.com/ios-meetup/.

72.     When Audible advertises that Whispersync for Voice is an "innovation," they are referring at least in part to the technical capacity of use of a graphical user interface displaying a limited set of information from a synchronization index (for example one page from an ebook that

is indexed for synchronization to a corresponding audiobook) for navigating text and corresponding media by use of gesture controls, specifically a gesture on a specific portion of a touch sensitive viewing screen on a mobile computing device (prescribed functionality directly related to the graphical user interface's structure).

73. When Audible advertises technology to be an "innovation," that means it is not well-understood, routine, and conventional within the industry. Indeed, Amazon and Audible have advertised that Whispersync for Voice is an "innovative feature you won't find anywhere else" (https://www.slideshare.net/jjwu6266/introducing-amazon-kindle-fire-hd-7-inch-14351150?from_action=save, slide 15).

74. Audible considers Whispersync for Voice to be one of its four major milestones, right along with the founding of the company in 1995, the release of a portable "mobileplayer" apparatus in 1997, and Amazon's acquisition of Audible in 2008 for $300 Million. *See* https://about.audible.com/; *see also* https://www.reuters.com/article/us-audible-amazon/amazon-to-buy-audible-for-300-million-idUSN3129158120080131. When Audible refers to Whispersync for Voice as a "milestone," they are referring at least in part to the technical capacity of use of a graphical user interface displaying a limited set of information from a synchronization index (for example one page from an ebook that is indexed for synchronization to a corresponding audiobook) for navigating text and corresponding media by use of gesture controls, specifically a gesture on a specific portion of a touch sensitive viewing screen on a mobile computing device (prescribed functionality directly related to the graphical user interface's structure).

75. Amazon's CEO, Jeff Bezos, gave a Keynote speech in 2012 (https://youtu.be/NRsKS-kSqNI) to launch certain Amazon services. Mr. Bezos used that speech to advertise Kindle Devices as "*absolutely essential*" to Amazon's service offerings, and to

advertise Whispersync for Voice and Amazon Music.  Mr. Bezos remarked, "We *love* to invent.
We love to pioneer. We even like going down alleys that turn out to be blind alleys.  Of course
every once in a while one of those blind alleys opens up into a broad avenue.  And that's *really*
fun." Mr. Bezos reminded the world that, "Once again, invention doesn't stop with the hardware,"
and he went on to describe the Whispersync for Voice feature and why Amazon believed it was
innovative.

76.    Audible.com edited Mr. Bezos' approximately seventy-three minute-long speech
into a single video segment ([https://youtu.be/aBmTtj-uzLQ](https://youtu.be/aBmTtj-uzLQ)), which it uses as a promotional video
to advertise the Whispersync for Voice software feature as a pioneering software invention, a way
to "fuse together" the Audible book and the Kindle book as its "*key strategic differentiator*" in the
e-book and audiobook market.  Audible advertises this feature as one that "revolutionize[s]
reading."

77.    Mr. Bezos further remarked, "People love audiobooks because they can listen to
them in situations where they could never read a book: jogging, driving to work, cleaning, cooking.
It effectively expands their reading time.  So *we* thought, 'I wonder if there is a way to expand
reading time even more?'  There is.  It's called Whispersync for Voice."

78.    The single video segment ([https://youtu.be/aBmTtj-uzLQ](https://youtu.be/aBmTtj-uzLQ)) of Mr. Bezos extolling
the benefits and innovation present in the "fusing together" of an e-book and an audiobook in one
user interface on a mobile computing device was removed from the Audible YouTube Channel
some time after October 1, 2018, the date the original Complaint in this matter was filed.  Mr.
Bezo's statements accurately reflected Amazon's view that a user interface for navigating an
audiobook with an e-book on a mobile computing device was an innovative concept, far from
subject matter considered "well-known, routine, and conventional" in the 2012 timeframe.

79.    A copy of this single video segment, having been saved from when it was still available from Audible's YouTube Channel, can now be found at: https://youtu.be/RgDD0zCyl0I

80.    A transcript of this single video segment of Mr. Bezos touting this user interface as an innovative concept reads as follows:

> Guys, thank you so much for joining us this morning in Santa Monica, beautiful day. We've got a lot to share with you. I hope you enjoyed that new television spot and I hope it captures the spirit of Amazon and I hope it conveys it, too.
> We love to invent. We love to pioneer.
> We even like going down alleys that turn out to be blind alleys.
> Of course every once in a while one of those blind alleys opens up into a broad avenue. And that's *REALLY* fun.
> Okay. Once again, invention doesn't stop with the hardware.
> We've added 100,000 audio books to Kindle Fire HD.
> This would have been impossible if Audible.com wasn't a part of the Amazon family. And Audible's business has really reached a tipping point. If you haven't listened to an audiobook in a while you'll be amazed by the quality of the narration today. They're getting people like Susan Sarandon, Colin Firth, Ann Hathaway to narrate these books.
> People love audiobooks because they can listen to them in situations when they could never read a book: jogging, driving to work, cleaning, cooking. It effectively expands their reading time.
> So we thought, I wonder if there's a way to expand reading time even more. There is. It's called Whispersync for Voice. And here's how it works. Listen to your audiobook on the way home. When you get home, pick up and start reading. Listen a little, read a little. We keep your place between the two media formats. People are going to love this.
> Bimodal reading improves retention and understanding, both with people who have difficulty reading and high-functioning readers. (With blank slide)
> Bimodal reading improves retention and understanding, both with people who have difficulty reading and high-functioning readers. (With slide showing text)
> Watch this. (Demonstration of Whispersync for Voice)
> (Applause) Thank you. The teams will be very grateful for that. A lot of work.
> What if you could fuse together the Kindle book and the Audible book? Well, it turns out you can. We call it Immersion Reading.
> It is going to improve understanding, improve retention, and guess what, it's just fun, too.

*See* https://youtu.be/RgDD0zCyl0I.

81.    The video depicts, behind Mr. Bezos, a "Kindle App" book user interface on a mobile computing device for reading an e-book and a separate "Audible App" audiobook user interface on a mobile computing device for listening to an audiobook, with no link between the

two.  As the video progresses, an animation appears, showing two separate mobile computing devices merging into one mobile computing device where each separate user interface has been "fuse[d] together" into the singular Whispersync for Voice user interface, with the "innovative" feature that the e-book may be used to navigate the audiobook, and vice versa, or "Read a little, listen a little."  It is this feature Mr. Bezos was referring to when he said, "We love to invent.  We love to pioneer," and referring to "blind alleys" of research that turn out on occasion to produce valuable inventions, because invention is something "that's *REALLY* fun."  Amazon was clearly describing a user interface on a mobile computing device to navigate between an e-book (formatted as a synchronization index, where a word or range of words had a corresponding timestamp) and an audiobook via gesture controls to be "innovative" or an inventive concept, not something "well-known, routine, and conventional."  Screenshots of the Amazon product launch are depicted below.





**Audible's depiction of two user interfaces being "fused together" for "innovative" features.**

82.    When  Amazon  stated  publicly  in  2012,  and  in  the  video  at
https://youtu.be/RgDD0zCyl0I that "We love to invent.  We love to pioneer," and that "invention
doesn't stop with the hardware," they were referring at least in part to the technical capacity of use
of a graphical user interface displaying a limited set of information from a synchronization index
(for example one page from an ebook that is indexed for synchronization to a corresponding
audiobook) for navigating text and corresponding media by use of gesture controls, specifically a
gesture on a specific portion of a touch sensitive viewing screen on a mobile computing device
(prescribed functionality directly related to the graphical user interface's structure).

83.    On  information  and  belief,  Amazon  and  Audible  have  correspondence,
presentations, drafts, press releases, documents and things, prepared, generated, and/or kept as a
result of the Whispersync for Voice product launch and the press conference by Mr. Bezos.  On
information and belief, these materials and other marketing materials demonstrate that Amazon
and Audible believed and told the public, in 2012, that a user interface on a mobile computing

24

device to navigate between an e-book (formatted as a synchronization index, where a word or range of words had a corresponding timestamp) and an audiobook via gesture controls to be "innovative" or an inventive concept, not something "well-known, routine, and conventional."

84.    On information and belief, Amazon and Audible have correspondence, presentations, press releases, articles, documents and things, prepared, generated, received, and/or kept as a result of the Whispersync for Voice product launch and/or the press conference by Mr. Bezos, to include reports from magazines, books, newspapers, blogs, websites, trade journals, and/or reports from the press lauding Whispersync for Voice, and more particularly lauding a user interface on a mobile computing device to navigate between an e-book (formatted as a synchronization index, where a word or range of words had a corresponding timestamp) and an audiobook via gesture controls as "innovative" or an inventive concept, not something "well-known, routine, and conventional."

85.    On information and belief, Amazon and Audible have in their possession business records, documents and things that demonstrate the commercial success of 1) Amazon Prime (which subscription provides customers access to Amazon Music), and Amazon Music (and/or "Amazon Music Unlimited") with X-Ray Lyrics/X-ray Music as a user interface on a mobile computing device to navigate between song lyrics (formatted as a synchronization index [or a plurality of lines of lyrics], where a word or range of words had a corresponding timestamp) and a song via gesture controls, which is evidence that this technical improvement to the functioning of a mobile computing device is "innovative" or an inventive concept, not something "well-known, routine, and conventional" and 2) e-books and audiobooks (and sales and subscriptions) using Whispersync for Voice as a user interface on a mobile computing device to navigate between an e-book (formatted as a synchronization index, where a word or range of words had a corresponding

timestamp) and an audiobook via gesture controls, which is evidence that this technical improvement to the functioning of a mobile computing device is a technical and/or financial "milestone," "innovative," and an inventive concept, not something "well-known, routine, and conventional."

86.     At least part of the commercial success of Amazon and Audible is attributable to that which it believed to be "innovative" and "key strategic differentiators," where the commercial success is derived from either 1) Amazon Prime (which subscription provides customers access to Amazon Music), and Amazon Music (and/or "Amazon Music Unlimited") with X-Ray Lyrics/X-ray Music as a user interface on a mobile computing device to navigate between song lyrics (formatted as a synchronization index [or a plurality of lines of lyrics], where a word or range of words had a corresponding timestamp) and a song via gesture controls and/or 2) e-books and audiobooks (and sales and subscriptions) using Whispersync for Voice as a user interface on a mobile computing device to navigate between an e-book (formatted as a synchronization index, where a word or range of words had a corresponding timestamp) and an audiobook via gesture controls.

87.     At least part of the commercial success of Amazon Music (and/or "Amazon Music Unlimited") with X-Ray Lyrics/X-ray Music is attributable to technical improvements to user interfaces on mobile computing devices Amazon believed <u>not</u> to be "well-known, routine, and conventional" as of 2012.

88.     At least part of the commercial success of Whispersync for Voice-enabled e-books and audiobooks, and related subscriptions and a la carte purchases, is attributable to technical improvements to user interfaces on mobile computing devices Amazon and/or Audible believed <u>not</u> to be "well-known, routine, and conventional" as of 2012.

89.     Audible's audiobooks can be accessed via a subscription to Audible, or as a la carte purchases, for example via Amazon.com or Audible.com.  Amazon sells Whipsersync for Voice-enabled e-books, which are often more expensive than a standard e-book.  Whipsersync for Voice-enabled e-books are intended to elicit a purchase of the corresponding audiobook, and vice versa. Indeed, Amazon sells e-books and audiobooks "bundled" or paired together, so the consumer may take advantage of the Whispersync for Voice feature.

90.     Whipsersync for Voice-enabled e-books comprise additional information as compared to the similarly titled standard e-book, because the Whispersync for Voice-enabled version is indexed for synchronization to the corresponding audiobook, whereas the standard e-book is not.  Amazon and Audible's software is configured to use this version indexed for synchronization.

91.     Whispersync for Voice cannot be disabled and otherwise adds value to a customer's reading experience, and raises awareness for an author's titles, by linking the Audible edition to the Kindle edition.

92.     Amazon Prime subscriptions include "Amazon Prime Reading."  Certain e-books available through "Amazon Prime Reading" are Whispersync for Voice-enabled.

93.     Amazon also offers "Amazon Kindle Unlimited," or a service offering of unlimited access to a collection of over 1 million e-books available for an additional subscription price. Thousands upon thousands of e-books available through Amazon Kindle Unlimited are Whispersync for Voice-enabled.

94.     Audible offers a la carte audiobook purchases, as well as subscriptions.

95.     To appreciate the scale of Audible's audiobook distribution, Audible subscribers downloaded about 1.6 billion hours of audio in 2015, almost 2 billion hours of content in 2016,

and nearly 3 billion hours of content in 2018. *See* https://about.audible.com/; https://www.audible.com/about/our-company/. Audible's membership has grown by double digits year over year since at least 2014. *Id.* Over 100,000 titles are Whispersync for Voice-enabled, and Amazon and Audible work every day to expand the number of titles available.

96. The Amazon press release for Whispersync for Voice, dated September 6, 2012, states, "Audible.com, the world's leading provider of digital spoken-word entertainment and a subsidiary of Amazon.com, today announced *two momentous steps forward* for reading: 'Immersion Reading' and 'Whispersync for Voice.'"  It further states, "At Amazon we are missionaries when it comes to inventing on behalf of authors and readers. We're excited today to unveil our latest innovations that will help people read more and retain more of what they read. Reading and listening together has been shown to increase the motivation to read, and it can have meaningful impact on reading retention—Immersion Reading on the new Kindle Fire family sets a new standard for deep reading by engaging the eye and the ear simultaneously with beautifully narrated audiobooks."  *See* https://www.engadget.com/2012/09/06/amazon-audio-whispersync/ (emphasis added).  On information and belief, Amazon believed these statements when it made them in September 2012.  Such statements constitute an unequivocal admission that Amazon deemed Whispersync for Voice a significant advancement in the applicable art.

97. Moreover, Audible advertises its company as being based on "Cutting Edge Technology."  Audible describes, "In pursuit of the idea that technology can transform a culture, we created the first mobile audio player in 1997, four years before the iPod was introduced. Audible's consistent focus on technological innovation and superior programming has earned the company many millions of habituated subscribers. Our innovations include Whispersync for Voice, which enables book lovers to switch seamlessly between reading and listening without

losing their place."  That is, "technological innovation" like Whispersync for Voice is what "has earned the company many millions of habituated subscribers."  *See* https://www.audible.com/about/our-company/

98.     Amazon's Kindle app also has a social networking feature.  Users of the Kindle app, and of certain Kindle Devices, can access text of an e-book and annotate it by adding bookmarks, notes, and highlights.  This annotation feature functions for, among others, e-books that are Whispersync for voice-enabled, or that would be considered "Kindle Books with Audible Narration."  These annotations are backed up to the Kindle Library in the cloud for subsequent retrieval and viewing on Kindle Devices and via Kindle reading apps.  Annotations Backup is automatically enabled on Amazon Fire tablets and cannot be disabled.  Certain of these annotations are designed to be shared, and are actually shared with others, for example via social networking outlets like Goodreads, Twitter, and Facebook.

99.     The Amazon service offerings described above infringe at least one claim of each of the two asserted patents.  This is a violation of the "exclusive Right" Congress enshrined in patent law.  Such a violation has damaged, and continues to damage, Plaintiff.

### The Amazon / Audible Relationship

100.    Audible is a wholly owned subsidiary of Amazon.

101.    Audible identifies itself as "an Amazon company."

102.    Audible has stated that in 2008 it joined the "Amazon Family."

103.    Amazon's website refers users to Audible.  For example, users seeking information on Whispersync are linked from Amazon to Audible's website.

104.    Audible's website refers users to Amazon.   For example, Audible's job opportunities page links a user to Amazon's job board.

105.    Both Amazon and Audible provide detailed help pages and instructions regarding Whispersync.

106.    The Audible Service Conditions of Use, which apply to the "digital spoken word entertainment service operated by Audible (the "Service")," states that "the Service is an Amazon Service for purposes of the Amazon.com Conditions of Use," and that the Service is governed by "the Amazon.com Conditions of Use, the Amazon.com Privacy Notice, and the Amazon.com Internet-Based advertising Policy." *See* https://www.audible.com/legal/conditions-of-use.

107.    The Audible Service Conditions of Use also states that "Any dispute or claim arising from or relating to these Terms or your use of the Service is subject to the binding arbitration, governing law, disclaimer of warranties, limitation of liability and all other terms in the Amazon.com Conditions of Use." *Id*.

108.    Amazon identifies Audible as one of its "controlled US affiliates." *See* https://www.amazon.com/gp/help/customer/display.html/ref=hp_left_v4_sib?ie=UTF8&nodeId=202135380 (linking to list of such affiliates by name at https://www.amazon.com/gp/help/customer/display.html?nodeId=202137190). Other "controlled US affiliates" listed include Amazon Web Services, Inc. and Amazon Digital Services LLC.

109.    On March 23, 2011, Audible filed U.S. Patent Application No. 13/070,422 ("the '422 Application"), titled "Managing Playback of Synchronized Content," which issued to Audible as U.S. Patent No. 8,855,797.

110.    During prosecution of the '422 Application, Audible submitted an invention disclosure document in an effort to swear behind certain prior art references. The invention disclosure document was identified as "Audible/Amazon Proprietary Confidential." On

information and belief, the invention disclosure document relates to Amazon and Audible's Whispersync functionality.

111.    On information and belief, Audible utilized at least Amazon paralegals to assist in patent prosecution and other legal matters.  For example, on December 19, 2011, Audible filed U.S. Patent Application No. 13/330,404 ("the '404 Application"), titled "Presenting Content Related to Primary Audio Content," which issued to Audible as U.S. Patent No. 9,213,705.

112.    During prosecution of the '404 Application, the named inventors on the '404 Application, Guy Story, Jr. and Ajay Arora, filed a declaration to swear behind certain prior art. In that declaration, the named inventors attested that Amazon paralegals coordinated an inventor review call.  This was done at the request of counsel at Knobbe Martens, who was counsel for both Amazon and Audible.

113.    On October 8, 2012, Audible filed U.S. Patent Application No. 13/647,295 ("the '295 Application"), titled "Managing Content Versions," which ultimately issued as U.S. Patent No. 9,244,678.

114.    During prosecution of the '295 Application, the USPTO issued an Office Action on October 12, 2014, rejecting the claims in the '295 Application pursuant to 35 U.S.C. § 102 based on U.S. Patent No. 8,478,662 to Snodgrass (the "Snodgrass Patent").

115.    The Snodgrass Patent was assigned to Amazon.

116.    In response to the October 12, 2014 Office Action, Audible submitted a Statement Concerning Common Ownership, in which Audible argued that the '295 Application and the Snodgrass Patent were subject to common ownership, both being owned by Amazon, because Audible and Amazon Technologies, Inc. are both wholly owned subsidiaries of Amazon.com, Inc.

117.    On March 22, 2012, Audible filed PCT Application No. PCT/US2012/030186, titled "Synchronizing Digital Content," on which Audible and Amazon are listed as co-applicants.

118.    On August 8, 2012, Audible filed U.S. Patent Application No. 13/570,179 ("the '179 Application"), titled "Synchronizing Recorded Audio Content and Companion Content," which issued as U.S. Patent No. 9,697,871.

119.    During prosecution of the '179 Application, on May 14, 2014, the PTO issued a Final Rejection.  Audible appealed the May 14, 2014 Final Rejection.  On December 29, 2016, the Patent Trial and Appeal Board ruled on the appeal and, in response to submissions by Audible, found that due to their relationship both Audible and Amazon Technologies, Inc. were the real parties in interest in the appeal.

120.    This same finding was made by the PTAB during prosecution of several of Audible's patent applications including U.S. Application No. 13/535,240, which issued as U.S. Patent No. 9,703,781, U.S. Application No. 13/535,264, which issued as U.S. Patent No. 9,734,153, and U.S. Patent Application No. 13/553,548, which issued as U.S. Patent No. 9,760,920.

*Willfulness*

121.    On information and belief, Defendants have willfully infringed, and continue to willfully infringe, the asserted patents.

122.    Graphically, the prosecution history for Plaintiff's patents is depicted as follow:



123.    The specifications of the Evans '009 Publication and the Evans '991 Publication are substantially similar to one another and overlap the specification of each asserted patent.

124.    Each named Defendant has had actual knowledge of the '638 Patent and the '978 Patent at least as early as October 1, 2018, the date upon which an original Complaint for patent infringement was filed.  See, D.I. 1.

125.    On information and belief, Amazon and/or Audible, including certain senior executives, knew or should have known about inventor Evans's technology since at least October 2014, when each of the asserted patents issued.  It is believed that examination of Defendants' documents and things in discovery will lead to further facts to support this contention.

126.    Indeed, Amazon.com, Inc.'s subsidiary, Audible, knew about the publication of, and patent applications relating to, the applications leading to issuance of the asserted patents. This includes the Evans '009 Publication and the Evans '991 Publication (together, the "Evans publications").  Audible's own patent prosecution is replete with examples of the USPTO citing the Evans publications as prior art to Audible's applications.  Audible has also cited the Evans publications to the USPTO in numerous Information Disclosure Statements to comply with a duty of candor under 37 C.F.R. 1.56, both before and after the asserted patents issued, putting the USPTO and the public on notice that the Evans publications are prior art to Audible's patent applications.

127.    The publication of Mr. Evans's work was material to the patentability of Audible's own patent applications, and Audible and its attorneys knew it.

128.    In connection with at least twenty-nine of Audible's own patent applications, an Information Disclosure Statement was submitted listing at least one of the Evans publications as prior art, or there was an Office Action citing an Evans publication to reject Audible's claims, or

an Evans publication was discussed with the patent examiner and an interview summary was made of record.

129.    Audible has filed its own patent applications related to the technology of the asserted patents.  In those patent applications, Audible has represented as a matter of fact that these technical advances to the way mobile computing devices function are not well-understood, routine, and conventional in the industry and, thus, are patent eligible advancements.  Audible patents have subsequently issued.

130.    Amazon, via its subsidiary Amazon Technologies, Inc., has filed its own patent applications related to the technology of the asserted patents.  In those patent applications, Amazon has represented as a matter of fact that these technical advances to the way mobile computing devices function are not well-understood, routine, and conventional in the industry and, thus, are patent eligible advancements.  Amazon patents have subsequently issued.

131.    On information and belief, Amazon and Audible believe each of the following of Audible's U.S. patents is valid and enforceable, with each and every claim being directed to patent eligible subject matter: 9,799,336; 9,792,027; 9,632,647; 9,489,360; 9,472,113; 9,367,196; 9,317,486; 9,280,906; 9,244,678; 9,223,830; 9,158,765; 9,760,920; 9,734,153; 9,706,247; 9,703,781; 9,697,871; 9,679,608; 9,536,439; 9,317,500; 9,213,705; 9,141,257; 9,099,089; 9,075,760; 9,037,956; 8,972,265; 8,948,892; 8,862,255; 8,855,797, and; 8,849,676.  No defendant has taken any steps to inform the USPTO or the public that any claim of these patents is invalid or directed to patent ineligible subject matter.

132.    Of the twenty-nine Audible patent applications citing to or referencing at least one of the Evans publications, Audible listed the following inventors:

- Guy Story (Audible's Founding CTO and Chief Scientist);

- Will Lopes (Chief Revenue Officer, Executive VP);

- Beth Anderson (EVP and Publisher);

- Ajay Arora (VP Global Project Management);

- Mugur F. Tolea (Former VP of Engineering);

- Kevin Lester (Senior Software Development Manager);

- Douglas H. Wang (Senior Product Manager);

- Doug S. Goldstein (Global Head of Mobile Web Products);

- Nathan Brothers (Senior Product Manager, Mobile Applications);

- Steven Hatch (Senior Director, Software Development);

- Ed Walloga (VP Customer Experience);

- Steven C. Dzik (Former software development engineer);

- Bruce Israel;

- Alexander Galkin;

- Kevin Scott Lester (Former Senior software development manager);

- Douglas S. Goldstein;

- Douglas Cho Hwang (Former Senior Product Manager);

- Shirley C. Yang; and

- Gregory I. Voynow.

133. Amazon and Audible knew of the Evans '009 Publication by at least March 28, 2013, or shortly thereafter, and therefore also knew of the subject matter of the asserted patents. The Evans '009 Publication was cited by the USPTO (in an Office Action dated March 28, 2013) to reject an Audible patent application listing Audible's CTO, Guy Story, as an inventor. Audible received this Office Action.

134.    On information and belief, Audible's CTO, Guy Story reviewed and studied the Evans publication and discussed it with Audible's legal counsel.

135.    On information and belief, in at least one Audible patent application (No. 13/070422), Audible's CTO, Guy Story, and colleague Bruce Israel, engaged in detailed and specific discussions, including with legal counsel, of parent applications to the asserted patents (including the Evans '009 Publication, the Evans '921 Application, and the Evans Provisional Patent Application, filed January 3, 2011), which Story and Israel understood served as the basis upon which the patent examiner rejected certain of Audible's claims under 35 U.S.C. § 103.

136.    Mr. Story and Mr. Israel then signed a declaration for submission to the USPTO that each had studied the content of the application sufficiently to determine he could swear behind a filing date of January 3, 2011, based on a written disclosure made to Audible's legal department on December 22, 2010.  Nevertheless, Audible continued to cite the Evans publications as prior art in other of its patent applications through 2016.  This makes it plausible that Audible had actual knowledge of the asserted patents, and was citing the Evans publications to the USPTO to comply with a duty of candor, as the Evans publications represented the earliest date that could be relied on by a patent examiner to reject Audible patent claims based on a printed publication.

137.    Only a few weeks earlier than March 28, 2013 (the date the Evans '009 Publication was cited by the USPTO in an Office Action sent to Audible), Mr. Story, spoke at a "Lean Startup Machine Newark" event on or about March 1, 2013.  He explained how he thoroughly documented the development of what became Whispersync for Voice.  Internally, the project was codenamed "Hushpuppy."  For example, before the product could be approved for release, he had to write press releases and make the case for the product feature and why it mattered.  On information and

belief, the business teams evaluated who was reading and who was listening, whether people would buy the feature separately, and how much it would cost, among other things.

138.    Mr. Story told attendees about Audible's approach to "innovation" within the Amazon structure.  He stated, "We are in the middle of tremendous change, and we feel very strongly that unless we innovate we are not going to survive, or grow. … Everyone there feels a sense of urgency that we have to figure out the next big thing, because we don't want to be vulnerable." *See e.g.,* http://njtechweekly.com/art/1852-at-lean-newark-audibles-guy-story-talks-product-launches-the-amazon-way/.

139.    On information and belief, Amazon made the business decision as to whether Audible was permitted to develop and release Whispersync for Voice, a utility to "fuse together" an audiobook (as an Audible offering) and an e-book (as an Amazon offering).  Amazon also made the business decision that this product feature could be sold and made available via its e-commerce portal at Amazon.com.

140.    On information and belief, Amazon, including via its subsidiaries, has followed the Evans Provisional Patent Application and related patent applications and resulting patents.  For example, in the prosecution of U.S. Patent 9,916,382, assigned to Amazon Technologies, Inc., Amazon and its legal counsel knew about and cited the following, which all stem from the Evans Provisional Patent Application: Evans U.S. Patent 8,904,271; Evans U.S. Patent 9,098,841; the Evans '009 Publication; and the Evans '991 Publication.  It is plausible and probable that Amazon also knew about the asserted patents.  The specifications of the Evans '009 Publication, the Evans '991 Publication, and the patents-in-suit are substantially similar to one another and overlap the specification of Evans U.S. Patent 8,904,271 and Evans U.S. Patent 9,098,841.

141.    Despite knowing of the Evans publications and the asserted patents, Defendants have knowingly included the patented features in their service offerings.  Defendants have never contacted the inventor or Plaintiff seeking a license.

142.    Nevertheless, while Defendants knew certain Evans patent applications were pending, Audible founder and CEO Donald Katz said, "Whispersync for Voice customers continue to marvel at how this innovation has changed their lives. Some customers love the feature so much that they are now only buying books that are Whispersync for Voice-enabled.  Whether commuting to work, driving to a soccer game, taking a road trip, exercising or making dinner, Whispersync for Voice allows people to continue enjoying books even when their eyes are busy, so a great story can continue throughout an active day.  It truly is the future of reading."  Beyond that, Amazon has stated, "Whispersync for Voice was *invented by Amazon and Audible* as a way to insert the myriad intellectual and emotional benefits of books into all available moments of a busy life." *See* https://www.webpronews.com/amazon-upgrades-whispersync-for-voice-for-kindle-books-expands-available-titles/ (emphasis added).

143.    Long after Amazon and Audible knew that the Evans publications were prior art to Audible patent applications, and long after Audible was citing the Evans publications to the USPTO (and the USPTO had rejected certain Audible patent applications in light of the Evans publications), Audible's Mr. Katz was still informing the public as of June, 2014, "We're really proud of new inventions like Whispersync for Voice," which he said "basically . . . is creating these power readers who are just racing through books and at a pace and the pleasure factor is unbelievable."          *See*          *e.g.,*          https://youtu.be/h4XexOMv9ws          and https://www.forbes.com/sites/technomy/2014/06/26/got-audiobook-audible-ceo-katz-on-the-rewards-of-listening-to-literature/#7fa4f69c70c5.

144.   The asserted patents issued in October 2014.

145.   Audible's own patent prosecution cited or referenced either the Evans '009 Publication or the Evans '991 Publication in each of the years 2013, 2014, 2015, and 2016, since the publication, as opposed to the corresponding issued patent, would be the earliest dated printed-publication-type reference from Mr. Evans that Audible would need to overcome as material prior art.   That is, on information and belief, it is plausible and probable that Audible had actual knowledge of the patents-in-suit, yet continued to cite either the Evans '009 Publication or the Evans '991 Publication to comply with the duty of candor—as those publications were dated earlier than the issue date of the patents-in-suit.

146.   The risk of infringement was either known or was so obvious that it should have been known, since the issued patents stem from the Evans Provisional Patent Application and related continuations (from which the Evans publications also originated).   This application continuity data is publicly-available on Public PAIR, accessible at www.uspto.gov, and, on information and belief, was either accessed, or should have been accessed, by Defendants and/or their legal counsel.

147.   By October, 2014, a reasonable and prudent business, having cited an inventor's work to the USPTO over twenty-five times as material prior art, would have considered it unreasonably risky to continue use of an infringing Whispersync for Voice product feature, among others (such as X-Ray Lyrics), particularly when the Whispersync for Voice feature was considered by Audible to be one of its four major corporate milestones and important to its core business.

148.   On information and belief, since Audible was jointly offering a symbiotic, co-functioning e-book/audiobook product, including through Amazon.com, and since Amazon

39

exercised substantial control over Audible and the product features Audible intended to and did launch, Audible apprised, or should have apprised, Amazon of the Evans publications and patents; thus, each Defendant knew, or should have known, of the risk of patent infringement.

149.    On information and belief, Amazon and/or Audible had so completely relied upon the "Whispersync for Voice" feature as a "*key strategic differentiator*" to help create its overwhelming market share that it made the unreasonably risky business decision to keep the feature, even though they knew, or should have known, about inventor Evans's technology since at least October 2014.

150.    At Amazon, however, "Once a decision is determined, they commit wholly." *See* Amazon Leadership Principles, at https://www.amazon.jobs/principles.  According to Mr. Bezos, "At Amazon, we like things to work in five to seven years.  We're willing to plant seeds, let them grow – and we're very stubborn." *See e.g.,* https://www.wired.com/2011/11/ff_bezos/. Therefore, Amazon had no intent to discontinue at least the Whispersync for Voice feature for five to seven years after it launched the product feature in 2012, meaning it would continue selling co-functioning audiobooks and e-books long after the asserted patents issued in October 2014.

151.    On information and belief, Amazon believes it is guided by four principles: customer obsession rather than competitor focus, passion for invention, commitment to operational excellence, and long-term thinking.

152.    On information and belief, Amazon believes its customers demand new features "every day, every week, and every year."  To satiate Amazon's perceived customer demand, and to earn profit for itself with a "key strategic differentiator," Amazon has incorporated the patented features into its products and services with reckless disregard to the exclusive rights held by

Plaintiff. This tactic matches Amazon's stated core principle of obsessing on what the customer wants rather than focusing on any competitor.

153. Amazon has "Leadership Principles" it expects its executives to follow. Amazon's published "Leadership Principles" states that they expect their leaders to "*look for new ideas from everywhere, and are not limited by 'not invented here.'* As we do new things, we accept that we may be misunderstood for long periods of time." *See* Amazon Leadership Principles, at https://www.amazon.jobs/principles (emphasis added).

154. Even when those ideas are contained in patents of others, however, Defendants knowingly continue their actions unabated. This is willful, purposeful activity, enshrined in the culture of Amazon and the decision-making processes it expects from its leaders.

155. Being "not limited by 'not invented here'" ought to mean that Amazon carefully screens and employs the best ideas and, if patented by others, it takes a license or acquires the patents. Instead, on information and belief, Defendants employ no specific policy for seeking and obtaining license rights from patent holders and otherwise employ a corporate policy of ignoring the risk of patent infringement.

156. Defendants did not contact Mr. Evans in an attempt to license his technology. Rather, Defendants instead made a conscious decision, with knowledge of the patents-in-suit, to use the technology anyway, advertising that it is a "*key strategic differentiator"* exclusive to Amazon as an *Amazon* invention. This constitutes egregious conduct and willful patent infringement.

157. In sum, on information and belief, Defendants employ a corporate strategy of ignoring the risk of patent infringement and willful infringement. In the totality of circumstances, Defendants' conduct is both egregious and willful, constituting willful patent infringement.

158.    The alleged facts, in addition to those likely to be obtained through discovery, show that Defendants: (1) knew of the patents-in-suit; (2) after acquiring that knowledge, continued to infringe the patents-in-suit; and (3) in doing so, knew, or should have known, that their conduct amounted to infringement.

159.    The asserted patents do not expire until January 2031.

## THE ASSERTED CLAIMS IN THE PATENTS-IN-SUIT CLAIM PATENT ELIGIBLE SUBJECT MATTER

*Dr. Maneesh Agrawala, the Forest Baskett Professor of Computer Science and the Director of the Brown Institute for Media Innovation at Stanford University, Has Opined that the Asserted Claims are Directed to Patent Eligible Subject Matter*

160.    Dr. Agrawala has been retained on behalf of Plaintiff TrackTime, LLC to provide a declaration in connection with the instant litigation.  *See* Declaration of Dr. Maneesh Agrawala in Support of Plaintiff's First Amended Complaint for Patent Infringement, ¶ 3 (hereinafter "Agrawala Decl." attached as Exhibit 6).  Dr. Agrawala has conducted a review of the patents-in-suit (U.S. Patent No. 8,856,638 and U.S. Patent No. 8,862,978) and provided opinions on the nature of the claimed inventions, the state of the prior art as of the effective filing date of each patent, any improvements to the prior art provided by the claimed inventions of each patent and disclosed in the specification, and any benefits associated with the claimed inventions.  *Id.*

161.    In Dr. Agrawala's opinion, the inventions recited in the asserted claims of the patents-in-suit bring together numerous unconventional elements and steps previously unknown in the fields of interactive multimedia, transmission / distribution systems, and computing technology.  *Id.* at ¶ 8.  Each asserted claim recites an unconventional combination that was previously unheard of and that improves computerized interactive multimedia processes and transmission / distribution systems, for example by overcoming several problems with prior technology and allowing for advanced multimedia seek operations.  *Id.*  These advanced operations

42

may be performed even if the media resided remotely from a mobile computing device, or never resided on the mobile computing device at all. *Id*.

162.    In Dr. Agrawala's opinion, the alleged "abstract ideas" of "indexing video" and "methods of using a synchronization index for searching for multimedia based on texts associated with that multimedia, and then retrieving it or allowing for user annotation of the index just like using XML tags in searching for and retrieving data" mischaracterize the nature of the asserted claims of the patents-in-suit and ignore the essence of their primary *technical* advancement. *Id*. at ¶ 9. This is because Defendants' alleged abstract idea and the Court's characterization of the asserted claims fail to address how the claimed methods provide a user interface based on user selection / tactile input to provide enhanced media navigation in a mobile device – this technological advance is simply ignored. *Id*.

163.    In Dr. Agrawala's view, the asserted claims of the patents-in-suit bring together numerous unconventional concepts and features and set forth a solution that is necessarily rooted in computer technology. *Id*. at ¶ 10. In one aspect, the specific computer technology covered by the claims in the patents-in-suit overcomes problems specifically arising in the realm of computer networks. *Id*.

164.    In Dr. Agrawala's opinion, as one example, the use of "displaying […], at least a portion of [] text from a synchronization index on [a] viewing screen," "receiving, from [a] mobile computing device, *information indicating a user's selected mobile computing device touch-sensitive input interface gesture* performed on a portion of said viewing screen *corresponding to a displayed word, or a range of words, from said synchronization index*," "in response to the gesture performed to select a word or range of words, said timecode lookup functioning to associate a time, t1, *within multimedia to the selected word or range of words*" and/or "delivering

multimedia […] wherein said *multimedia corresponds to the word or range of words selected by the gesture*," as claimed by the '638 patent was far from conventional at the time of invention. *Id.* at ¶ 11. Indeed, in 2011, these features and components were unconventional when taken alone and were even more unconventional in combination. *Id.* Defendants and the Court omit these features and others from the supposed "abstract idea" at issue. *Id.* These interface elements are not "abstract" in any sense of the word – they are technical in nature, and in combination, cannot be characterized as being well-known, routine, and conventional in at least January of 2011; as Dr. Agrawala is unaware of any software or other service that put these elements in practice at that time. *Id.* Thus, these elements cannot be ignored in determining the nature of the claims. *Id.*

165. In another aspect, Dr. Agrawala believes that it is clear the asserted claims are directed to an improved user interface for computing devices, not to the abstract idea of "indexing video," as argued by the Defendants. *Id.* at ¶ 12. Although the generic idea of summarizing information or media (*i.e.*, "indexing") certainly existed prior to the invention, the asserted claims of the patents-in-suit are directed to a particular manner of summarizing, presenting, and navigating information in electronic devices. *Id.* For instance, claim 1 of the '638 patent requires "receiving, from [a] mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device," specifying a particular manner by which the media must be accessed. *Id.* The claim further requires the interface display a limited set of data, "displaying […], at least a portion of said text from a synchronization index on said viewing screen." *Id.* This claim limitation restrains the type of data that can be displayed on the user interface and explicitly claims *how* the limited

set of data is displayed in the graphical user interface. *Id*.; *see also* Exhibit 6, Agrawala Decl., at fn. 1. Finally, the claim recites that a window for gesture-control is "on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index," a requirement that the device applications exist in a particular state. *Id*. at ¶ 12. These limitations disclose a specific manner of displaying a limited set of information to the user and providing enhanced navigation, rather than using conventional user interface methods to "index video" on a computer. *Id*.; *see also* Exhibit 6, Agrawala Decl., at fn. 2. In Dr. Agrawala's opinion, these claims recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices. *Id*. at ¶ 12. Such improvements are patent-eligible. *Id*.

166.    As stated by Dr. Agrawala, the specifications of the patents-in-suit confirm that the asserted claims disclose an improved user interface for electronic devices, particularly those with small screens. *Id*. at ¶ 13. For instance, the specifications teach that prior art interfaces had many deficits relating to the efficient functioning of the computer in the context of manipulating transcripts, synchronizing text to video, and presenting multimedia in the courtroom, along with several other deficiencies. *Id*., citing '638 patent at 11:49-60 (summarizing the deficits of the technologies discussed at 6:9-11:24). Because small screens tend to need data and functionality divided into many layers or views, prior art interfaces required users to drill down through many layers to get to desired data or functionality. *Id*. at ¶ 13. In Dr. Agrawala's experience, that process was usually slow, complex, and difficult to learn, especially for novice users. *Id*. Using a "scrub bar" to navigate media on a mobile computing device – the only conventional method to navigate media on a mobile computing device at the time – was even more cumbersome and slow. *Id*. The inventions of the patents-in-suit improve the efficiency of the mobile computing device itself, also making the user of the device more efficient, by bringing together a limited list of desired functions

and frequently accessed stored data (*e.g.*, a synchronization index and functions such as gesture control), which can be accessed directly from the user interface (*e.g.*, via displayed text).  *Id*. Displaying the selected data or functions of interest (*e.g.*, displayed transcript text with gesture control functionality) on the user interface of a mobile device allows the user to see the most relevant data or functions and also acts to "enable a user to scroll through the text transcript with or without impacting the media displayed in the media area."  *Id*., citing '638 patent at 13:17–33. The speed of a user's navigation through various views and windows are also improved because the inventions of the patents-in-suit save the user from the cumbersome prior art techniques, such as the use of bulky transcript management utilities, which were impractical to attempt on a device with a small screen.  *Id*. at ¶ 13.  In Dr. Agrawala's opinion, the above-referenced disclosures of the patents-in-suit, in light of the knowledge of a person having ordinary skill in the art, clearly indicate that the asserted claims are directed to an improvement in the functioning of computers, particularly those with small screens.  *Id*.

167.    It is Dr. Agrawala's understanding and opinion, given his study and research relating to use of user interfaces, that the claimed user interface on a mobile computing device is a specific structure inextricably intertwined with accessing functions of the mobile computing device itself, particularly as it relates to the function of navigation of media.  *Id*. at ¶ 14.  Indeed, in January, 2011, touch-screen enabled mobile computing devices, such as the iPhone, eliminated a physical keyboard altogether, leaving only a user interface and a limited number of physical buttons to access all functions of the device.  *Id*.  The claimed user interface on a mobile computing device provided an intuitive structure to access a particular function of the device, which retrieved a particular portion of a particular media file for display.  *Id*.

168.    A user interface is the means by which a user interacts with a computing device to issue commands to it.  *Id*. at ¶ 15.  Well-designed user interfaces are especially critical for mobile devices where a lack of screen-space requires the presentation of only the most important information to users so that they can efficiently issue their next command.  *Id*.  The patents in-suit claim a specific approach for designing the user interface to control multimedia content using a synchronization index that address the issues of limited screen-space, limited computational power and gesture-based commands.  *Id*.  The Defendant's claim that there is no user interface in the patents-in-suit are false.  *Id*.

169.    Furthermore, even if it is assumed that the asserted claims of the patents-in-suit are directed to some "abstract idea," at a minimum, each of the asserted claims of the patents-in-suit include a combination of elements that were not well-known, routine, and conventional at the time of the inventions, which may preclude a finding that the claims are ineligible for patent.  *Id*. at ¶ 16.  Specifically, each of the independent claims of the '638 patent and independent claim 1 of the '978 patent recite elements that, especially in combination, were not well-known, routine, and conventional at the time of filing of the patent's parent application in January of 2011.  *Id*.

170.    As provided in ¶ 17 of Dr. Agrawala's Declaration (Exhibit 6), Claim 1 of the '638 patent recites the following elements that, in combination, were neither well-known, routine, or conventional at the time of filing of the application (January of 2011):

- providing, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein said synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia;

- displaying, after said providing step, at least a portion of said text from a synchronization index on said viewing screen, wherein said text is displayed other than as a web page;

47

- receiving, from [a] mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device;

- performing a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, said timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words; and

- delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device to play said multimedia, wherein said multimedia corresponds to the word or range of words selected by the gesture.

171.   As provided in ¶ 18 of Dr. Agrawala's Declaration (Exhibit 6), Claim 9 of the '638 patent recites the following elements that, in combination, were neither well-known, routine, or conventional at the time of filing of the application (January of 2011):

- displaying on a mobile computing device text from a synchronization index, wherein said synchronization index comprises respective times within multimedia corresponding to a word or range of words and wherein said text is displayed other than as a web page;

- receiving information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface;

- performing a data lookup using said synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words selected by the recognized gesture; and

- seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at t1.

172.   As provided in ¶ 19 of Dr. Agrawala's Declaration (Exhibit 6), Claim 14 of the '638 patent recites the following elements that, in combination, were neither well-known, routine, or conventional at the time of filing of the application (January of 2011):

- providing a synchronization index that comprises an electronic transcript that indicates text corresponding to audio from the multimedia and indicates respective times within

multimedia corresponding to when a word or range of words is audible in the multimedia;

- displaying on said mobile computing device text from the synchronization index, wherein said text is displayed other than as a web page;

- receiving, by the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index;

- wherein said gesture is recognized by said touch-sensitive input interface;

- performing a timecode lookup using the synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words;

- seeking on said receiving device multimedia corresponding to said synchronization index, and, if found, accessing multimedia at t1.

173.   As provided in ¶ 20 of Dr. Agrawala's Declaration (Exhibit 6), Claim 1 of the '978 patent recites the following elements that, in combination, were neither well-known, routine, or conventional at the time of filing of the application (January of 2011):

- providing for use on a mobile computing device a synchronization index, wherein said synchronization index is associated to multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia;

- providing mobile computing device software, wherein said mobile computing device software comprises executable program code configured to receive the synchronization index, and wherein said text is able to be displayed other than as a web page,

- wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface,

- wherein performing a user's selected gesture on a portion of said viewing screen corresponding to a portion of said text is recognized by said touch-sensitive input interface to facilitate annotation of a portion of said synchronization index, and

- wherein said mobile computing device software comprises executable program code configured to facilitate annotation of a portion of said synchronization index responsive to user input received by the mobile computing device; and

- communicating said annotation for subsequent retrieval on a second computing device via a network.

174.    Thus, each of the asserted claims of the patents-in-suit bring together numerous unconventional elements and steps previously unknown in the fields of interactive multimedia, transmission / distribution systems, and computing technology.  Exhibit 6, Agrawala Decl., at ¶ 21.  The inventions of the patents-in-suit improve those technologies and contain numerous technical and computerized limitations as set forth above.  *Id.*  Again, by utilizing the specific claimed techniques in the '638 patent, users may now seamlessly navigate through media utilizing gestures in connection with displayed text synchronized to a corresponding media file via a mobile device.  *Id.*  Prior to the inventions of the patent-in-suit, this was unheard of and unconventional. *Id.*  Furthermore, the additional functionality included in claim 1 of the '978 patent, allowing for annotation of a portion of a synchronization index, enables more efficient and flexible distribution and communication, because the underlying file management system is now streamlined via the shared, networked synchronization index.  *Id.*  Prior to the inventions of the patent-in-suit, this was unheard of and unconventional.  *Id.*

175.    In Dr. Agrawala's opinion, it is important to remember the shortcomings of the prior art systems discussed above.  *Id.*, at ¶ 22.  First of all, there was no service, product, or technology in existence prior to the inventions of the patents-in-suit that utilized gesture control for navigation/transcript management in devices with small screens, much less any service, product, or technology that was so long in use and so commonly used that it would have gone *beyond* prior art at the time of invention to have become "well-known, routine, and conventional." *Id.*  The patents-in-suit resolved the underlying technical issues by integrating advanced techniques

for navigating media files as described in the unconventional elements listed above. *Id*. The use of networked, shared annotations refined these techniques, as they enhance navigability of shared or networked media in a technical and novel way, resulting in enhanced feedback from the user of a mobile device, among other advantages. *Id*.

176. Dr. Agrawala has presented evidence that establishes at the time of the invention, the features and components were not well-known, routine, or conventional even when taken as a combination. *Id*., at ¶ 23. As such, they bear little resemblance to Defendant's simplistic abstract idea of "indexing video." *Id*. The asserted claims of the patents-in-suit recite inventions that constitute technical improvements of interactive multimedia, by utilizing various aspects of distribution systems, networking, and computing technology that were completely unconventional at the time of invention, and helped resolve technical problems. *Id*.

177. In Dr. Agrawala's opinion, the asserted claims of the patents-in-suit pose no risk of preempting a scientific field of endeavor, the basic tools of scientific and technical work, or any proposed abstract idea. *Id*., at ¶ 24.

178. Even if any claim was fairly characterized as "indexing video" or "using an index to synchronize text and multimedia", there would be numerous ways of "indexing video" or "using an index to synchronize text and multimedia" that would not require one to perform the ordered combination of steps claimed. *Id*., at ¶ 25. The principle underlying the "abstract idea" judicial exception to patent eligibility is one of preemption – the desire to prevent monopolization of *all* ways of practicing an abstract idea. *Id*. The claimed subject matter of the patents-in-suit comes nowhere close to preempting every way of practicing the alleged abstract idea. *Id*. No claim is directed merely to the result of accessing media at a particular time on a mobile computing device,

or using an index to do it, but rather only to a very specific way, using a specific user interface with associated gesture controls. *Id*.

179.    In Dr. Agrawala's opinion, all asserted claims are directed to patent eligible subject matter. *Id*., at ¶ 7.

180.    In addition or the alternative to the foregoing, Defendants have made factual statements that would directly contradict any assertion that the combination of claimed elements in the patents-in-suit was well-known, routine, and conventional at the time of invention. *Id*., at ¶ 26.

181.    For instance, U.S. Patent No. 9,176,658 to Amazon, entitled "NAVIGATING MEDIA PLAYBACK USING SCROLLABLE TEXT," was filed December 10, 2013 and issued November 3, 2015 (hereinafter "the Amazon '658 patent"). *Id*., at ¶ 27. The Amazon '658 patent has fifteen sheets of figures and fourteen columns of written description. *Id*. The subject matter claimed is use of an index (lines of lyrics with associated times), on a user interface of a mobile computing device, to navigate audio and text by gesturing on a line of lyrics to "jump" the song to a portion selected by a gesture made on a specific part of the user interface, for example by tapping on a line of lyrics. *Id*. This is virtually identical to the claimed subject matter of the asserted '638 patent. *Id*.

182.    Amazon, through the inventors of the Amazon '658 patent, swore, under oath, to the USPTO under a continuing duty of candor that the Amazon '658 Patent contains patentable subject matter and an inventive concept. *Id*., at ¶ 28. Dr. Agrawala is not aware that Amazon has recanted any of its sworn statements to the USPTO. *Id*.

183.    The specification of the Amazon '658 patent contains factual statements, made by Amazon to the USPTO under penalty of perjury and under a continuing duty of candor, to support

the contention that the claimed subject matter met all conditions for patentability under Sections 102, 103, and 112, and patent eligibility under Section 101. *Id.*, at ¶ 29. The Amazon '658 patent specification recites that as of the Amazon filing date of December 10, 2013:

> "**Conventional** approaches typically enable the user to scrub or navigate through the media playback by **moving a scrubbing element** (e.g., slider, button, marker, pointer). Moreover, in some cases, text associated with the media can be presented in conjunction with the media playback. In one example, text in a subtitle file can be displayed while a movie is playing. However, **conventional approaches to navigating media content and presenting text associated with the media content can be uninteresting and lacking in interactivity**. This can negatively affect the overall user experience associated with using computing devices to access media content." Col. 1:17-1:28 (emphasis added).

*Id.* Therefore, Amazon identified that a technical problem to be overcome in prior art mobile computing devices and user interfaces was that "conventional approaches to navigating media content and presenting text associated with the media content" could be characterized as "lacking in interactivity." *Id.*

184. This same problem was identified and discussed in the specification of the asserted patents. *Id.*, at ¶ 30. However, it should be noted that the asserted patents claim priority to January, 2011 – more than two years prior to the filing of the Amazon '658 patent. *Id.* Specifically, the '638 Patent, at col. 11:11-11:36 recites:

> Thirteenth, closed captioning text and subtitles are not "interactive," in that a user cannot do anything with the words other than watch them appear on screen when the video plays. The user cannot move ahead or backward in the transcription, and the user cannot read any words other than the limited number of lines than can fit on the video screen, obscuring part of the screen. Closed captioning and karaoke-type subtitles, and the information to display them in a synchronization index-type format, are characterized by passive non-interactivity, meaning there is no way for an operator to utilize the text in any way other than watching it appear and disappear, typically from the multimedia viewing area itself. The user has no opportunity to use the words in any fashion other than to read them.
>
> By contrast, the synchronization index and software suited for use on a mobile computing device of the present disclosure is characterized by interactivity, meaning that the user is able to use the synchronous text display to accomplish

> another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia. Other actions may also be provided, as discussed further below, including annotation of text and provision of advertising to a mobile computing device. In the present disclosure, an enhanced overall user experience may be provided, where the text can be used as an interactive tool to facilitate navigation within corresponding media.

*Id*.

185.    Therefore, both the '638 patent and the (later-filed) Amazon '658 patent overcame that which was "conventional" by providing specific technological solutions to the problem of lack of interactivity with text corresponding to media on a mobile computing device. *Id*., at ¶ 31.

186.    In Dr. Agrawala's opinion, this evidences that Amazon admitted in late 2013 and affirmed through its prosecution of the Amazon '658 patent (ending with its issuance in November of 2015) that the use of an interactive, synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia was, at a minimum, an inventive concept worthy of patent protection. *Id*., at ¶ 32.

187.    Additionally, in Dr. Agrawala's opinion, this evidences that Amazon admitted as fact that the use of an interactive, synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia was not (1) an "abstract idea" unworthy of patent protection, or (2) well-known, routine, or conventional. *Id*., at ¶ 33.

188.    Dr. Agrawala notes there are many additional factual statements made by Amazon in the specification of the Amazon '658 patent supporting his opinions. *Id*., at ¶ 34. For example, at col. 2, lines 6-14, Amazon states, "[s]ystems and methods in accordance with various embodiments of the present disclosure **overcome one or more of the above-referenced and other deficiencies in conventional approaches to presenting media content via a computing**

device.  **In particular, various embodiments of the present disclosure can output audio, display text that is synchronized to the audio, and navigate a playback of media content based, in part, on scrolling through and selecting the text**" (emphasis added).  *Id*.  This is a statement of fact Amazon made to the USPTO, in part to convince the USPTO that the claimed subject matter was patent eligible and contained an inventive concept.  *Id*.  This statement of fact is diametrically opposed to any factual contention that the claimed subject matter of the asserted patents was "well-known, routine, and conventional" as of January 3, 2011.  *Id*.

189.    Another example is found in the Amazon '658 patent specification at col. 7, lines 9 through 16, "[i]n some embodiments, the user can select targeted lyrics by tapping, touching, and/or otherwise interacting with the targeted lyrics.  As shown in the example of FIG. 4C, the user can tap 410 on the line 'When the blazing sun is gone,' or the word 'sun's' in order to select the respective line or word. When the line or word is selected, the device 402 can cause the song to (skip to and) play the portion that corresponds to the selected (target) line or word."  *Id*., at ¶ 35.  This is another statement of fact Amazon made to the USPTO, in part to convince the USPTO that the claimed subject matter was patent eligible and contained an inventive concept.  *Id*.  This is another statement of fact that is diametrically opposed to any factual contention that the claimed subject matter of the asserted patents was "well-known, routine, and conventional" as of January 3, 2011.  *Id*.

190.    Additional statements supporting Dr. Agrawala's opinions may be found in the Amazon '658 patent, at Figs. 2A-9 and their corresponding descriptions in the specification, showing that such user interfaces were inventive and non-conventional approaches to solving technological problems.  *Id*., at ¶ 36, citing the Amazon '658 patent, at 2:6-14; 4:41-8:46; 9:5-40; 10:9-12:53.

191.    In addition to the statements in the specification, the issued claims of the Amazon '658 patent include a similar, if not identical, inventive concept as that provided in the patents-in-suit, especially in the asserted '638 patent.  Exhibit 6, Agrawala Decl., at ¶ 37.  In Dr. Agrawala's opinion, comparing the claims of these patents to one another further evidences that, at a minimum, the claimed combination of elements found in the patents-in-suit was not well-known, routine, or conventional as of January, 2011.  *Id*.  This is true regardless of any alleged "abstract idea" set forth, because Amazon admitted, via seeking corollary claims more than two years after the priority date of the patents-in-suit, that the claimed elements were not well-known, routine, and conventional.  *Id*.

192.    When the asserted claims of the '638 patent and the Amazon '658 patent are compared, it is clear that there are corollaries for each element.  *Id*., at ¶ 38.  Dr. Agrawala created a chart that compares the elements of claim 1 of the '638 patent to claim 1 of the Amazon '658 patent.  *Id*.  Dr. Agrawala placed the corresponding elements side-by-side for comparison and added a column that provides a narrative summarizing the similarities between the claims.  *Id*. This chart is reproduced below:

| Asserted '638 Patent Claim 1 | Amazon '658 Patent Claim 1 | Comparison Notes |
|---|---|---|
| 1. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the *steps*: | 1. A computing device comprising:<br>at least one processor;<br>at least one memory device including *instructions that*, when executed by the at least one processor, *cause the computing device to*: | Preambles are not limiting. The processor, memory and instructions of the Amazon claim merely indicate components of a server/client device. |
| providing, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein said synchronization index | acquire information about a current track time associated with a song being played by the computing device; | Both claims include providing / acquiring information from a synchronization index. |

| | | |
|---|---|---|
| comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia; | | |
| wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface; | | Not required by this Amazon claim. |
| displaying, after said providing step, at least a portion of said text from a synchronization index on said viewing screen, wherein said text is displayed other than as a web page; | identify a current line of lyrics out of a plurality of lines of lyrics associated with the song, wherein the current line of lyrics has a start time at or before the current track time, and wherein the current line of lyrics has an end time at or after the current track time; display at least the current line of lyrics; | Both claims include displaying text from the synchronization index. |
| receiving, from the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device; | receive a command to scroll through at least a subset of the plurality of lines of lyrics; display at least the subset of the plurality of lines of lyrics when scrolling; display at least a target line of lyrics when a selection for the target line of lyrics is received; | Both claims include receiving information / commands for navigation in the context of the synchronization index. |
| performing a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, said | identify the start time associated with the target line of lyrics when the selection for the target line of lyrics is received; and | Both claims require the identification / lookup of times within multimedia (such as music). |

| | | |
|---|---|---|
| timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words; and | | |
| delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device to play said multimedia, wherein said multimedia corresponds to the word or range of words selected by the gesture. | play the song at a track time corresponding to the start time associated with the target line of lyrics. | Both claims require delivering / playing the media in conjunction with navigation information corresponding to the synchronization index. |

193.    By focusing on claim 1 of the '638 patent in this analysis, Dr. Agrawala and/or Plaintiff is in no way suggesting or admitting that claim 1 of the '638 patent is representative of other asserted claims for purposes of determining patent ineligibility. *See e.g.*, Exhibit 6, Agrawala Decl., at fn. 5.

194.    As observed via the analysis presented in the chart above, Dr. Agrawala has shown that there are few, if any, technical distinctions that may be drawn between the claim 1 of the '638 patent and claim 1 of the Amazon '658 patent. *Id*., at ¶ 39.  Both claims are not directed to any abstract idea, but rather to an inventive concept. *Id*.  In Dr. Agrawala's opinion, the fact that the scope and content of the claims of the Amazon '658 patent significantly overlap with the claimed subject matter of the patents-in-suit is clear and convincing evidence that, at a minimum, the combination of elements within the asserted claims was not well-known, routine, and conventional in January of 2011. *Id*.  In Dr. Agrawala's opinion, this is true regardless of the presence of any alleged or proposed "abstract idea." *Id*.

195.    Once again, it is Dr. Agrawala's understanding that Amazon, through the inventors of the Amazon '658 patent, swore, under oath, to the USPTO under a continuing duty of candor that *the claims* of the Amazon '658 patent contain patentable subject matter and an inventive concept.  *Id*., at ¶ 40.  Through the analysis above, it is factually clear that Amazon has admitted, under oath, that the subject matter of the asserted claims, as evidenced above with respect to claim 1 of the '638 patent, was not well-known, routine, or conventional in January of 2011 (the priority date of the patents-in-suit) or even December of 2013 (the filing date of the Amazon '658 patent). *Id*.

196.    Dr. Agrawala is also aware of additional statements made by Amazon and/or Audible that are in line with their statements to the USPTO, and supports his opinion that the subject matter claimed in the asserted claims was not well-understood, routine, and conventional as of January 2011.  *Id*., at ¶ 41.

197.    For example, in a slide presentation that was published on September 19, 2012, Amazon identified Whispersync for Voice as an innovative feature you will not find anywhere else.  *Id*., at ¶ 42, citing https://www.slideshare.net/jjwu6266/introducing-amazon-kindle-fire-hd-7-inch-14351150?from_action=save, slide 15.  Specifically, Amazon stated: "Now you do not have to put a good book down, even if you're cooking, running or commuting.  With Whispersync for Voice, you can seamlessly switch between listening to the Audible audiobook and reading the companion Kindle book right where you left it."  *Id*.  In other words, in 2012 Amazon was touting as innovative Whispersync for Voice's ability to navigate between text and audio content via a synchronization index.  *Id*., at ¶ 42.  This supports Dr. Agrawala's opinion that the asserted claims, which relate to navigating between text and audio content via a synchronization index, are not

directed to subject matter that was well-understood, routine, and conventional as of January 2011. *Id.*

198.    As another example, Dr. Agrawala is aware that Audible has referred to Whispersync for Voice as an "Audible innovation," stating: "Introduced in 2012, Whispersync for Voice is an audible innovation utilizing Amazon's eBook to audiobook synchronization platform, enabling readers to switch seamlessly between reading and listening without losing their place." *Id.*, at ¶ 43, citing http://stn.audible.com/ios-meetup/.  In other words, in 2012 Audible was touting as innovative Whispersync for Voice's ability to navigate between text and audio content via a synchronization index.  *Id.*  This supports Dr. Agrawala's opinion that the asserted claims, which relate to navigating between text and audio content via a synchronization index, are not directed to subject matter that was well-understood, routine, and conventional as of January 2011.  *Id.*

199.    In sum, Dr. Agrawala believes that all asserted claims of the patents-in-suit are directed to patent eligible subject matter.  *Id.*, at ¶ 44.  Factually and technically, no claim is directed to any abstract idea and all asserted claims recite an inventive concept, not merely that which was "well-known, routine, and conventional" at the time of invention.  *Id.*  Further, given the factual statements by Amazon under oath, Dr. Agrawala also believes there is no set of facts that would clearly and convincingly show that any asserted claim of the patents-in-suit is invalid. *Id.*  Each claim is presumed valid, and Dr. Agrawala is aware of no evidence, much less clear and convincing evidence, that would disturb that presumption.  *Id.*

***Additional Allegations Establishing that the Asserted Claims of the '638 Patent Claim Patent Eligible Subject Matter***

200.    All claims of the '638 patent are presumed valid.  Each claim is presumed to meet all statutory criteria for patentability and patent eligibility.

201.    The claimed subject matter of claim 1 of the '638 patent is patent eligible under the plain language of 35 U.S.C. 101, which includes the definition of the word "process" from 35 U.S.C. 100.

202.    35 U.S.C. 101 recites "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

203.    35 U.S.C. 100 defines the term "process" from Section 101 thusly: "The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."

204.    Independent claim 1 of the '638 patent is directed to a method, listing five process steps: a "providing" step, a "displaying" step, a "receiving" step, a "performing a timecode lookup" step, and a "delivering multimedia" step.  The combination of these five steps meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means process . . . ."  The combination of these five steps also meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means . . . method . . ." and the claim recites "A method for a multimedia seek sequence using a synchronization index and a mobile computing device" comprising certain steps.  Even if one of these steps was a known step, the claimed subject matter is still patent eligible under Section 101, because further still under Section 100, "The term 'process' . . . includes a new use of a known process . . ."  Because the claim recites a "process" under Section 100, the claim is directed to patent eligible subject matter under Section 101 as being directed to "a new and useful process." Even if one of these steps was a known step, the claim is directed to patent eligible subject matter under Section 101 as being directed to "an improvement" to the "process."

205.    Dependent claims 2-8 of the '638 patent are patent eligible for the same reasons as claim 1.  The dependent claims also add steps to the "process" and/or more clearly define the steps and features of claim 1.

206.    Independent Claim 9 of the '638 patent is directed to a method, listing four process steps: a "displaying" step, a "receiving" step, a "performing a data lookup" step, and a "seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at time t1" step.  The combination of these steps meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means process . . . ."  The combination of these five steps also meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means . . . method . . ." and the claim recites "A method for a multimedia seek sequence using a synchronization index and a mobile computing device" comprising certain steps.  Even if one of these steps was a known step, the claimed subject matter is still patent eligible under Section 101, because further still under Section 100, "The term 'process' . . . includes a new use of a known process . . ."  Because the claim recites a "process" under Section 100, the claim is directed to patent eligible subject matter under Section 101 as being directed to "a new and useful process."  Even if one of these steps was a known step, the claim is directed to patent eligible subject matter under Section 101 as being directed to "an improvement" to the "process."

207.    Dependent claims 10-13 of the '638 patent are patent eligible for the same reasons as claim 9.  The dependent claims also add steps to the "process" and/or more clearly define the steps and features of claim 9.

208.    Independent Claim 14 of the '638 patent is directed to a method, listing seven process steps: a "providing a mobile computing device" step, a "providing a synchronization index" step, a "displaying" step, a "receiving" step, a "performing a timecode lookup" step, and a

"seeking on said receiving device multimedia corresponding to said synchronization index, and if found, accessing multimedia at time t1" step.  The combination of these steps meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means process . . . ."  The combination of these five steps also meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means . . . method . . ." and the claim recites "A method for a multimedia seek sequence using a synchronization index and a mobile computing device" comprising certain steps.  Even if one of these steps was a known step, the claimed subject matter is still patent eligible under Section 101, because further still under Section 100, "The term 'process' . . . includes a new use of a known process . . ."  Because the claim recites a "process" under Section 100, the claim is directed to patent eligible subject matter under Section 101 as being directed to "a new and useful process."  Even if one of these steps was a known step, the claim is directed to patent eligible subject matter under Section 101 as being directed to "an improvement" to the "process."

209.    Dependent claims 15-20 of the '638 patent are patent eligible for the same reasons as claim 14.  The dependent claims also add steps to the "process" and/or more clearly define the steps and features of claim 14.

**Additional Allegations Establishing that the Asserted Claims of the '978 Patent Claim Patent Eligible Subject Matter**

210.    All claims of the '978 patent are presumed valid.  Each claim is presumed to meet all statutory criteria for patentability and patent eligibility.

211.    Independent claim 1 of the '978 patent is directed to a method, listing three process steps: a "providing for use on a mobile computing device a synchronization index" step, a "providing mobile computing device software" step (with several clarifying "wherein" clauses), and a "communicating said annotations for subsequent retrieval on a second computing device via a network" step.  The combination of these three steps and other claimed language meets the

63

definition of "process" of 35 U.S.C. 100, because "The term 'process' means process . . . ."  The combination of these five steps also meets the definition of "process" of 35 U.S.C. 100, because "The term 'process' means . . . method . . ." and the claim recites "A method for social networking with a mobile computing device" comprising certain steps.  Even if one of these steps was a known step, the claimed subject matter is still patent eligible under Section 101, because further still under Section 100, "The term 'process' . . . includes a new use of a known process . . ."  Because the claim recites a "process" under Section 100, the claim is directed to patent eligible subject matter under Section 101 as being directed to "a new and useful process."  Even if one of these steps was a known step, the claim is directed to patent eligible subject matter under Section 101 as being directed to "an improvement" to the "process."

212.    Dependent claims 2-10 of the '978 patent are patent eligible for the same reasons as claim 1 of the '978 patent.  The dependent claims more clearly define the steps and features of claim 1.

**Additional Factual Assertions That Preclude A Finding of Patent Ineligibility**

**The Amazon Patents and Amazon's Sworn Factual Statements to the USPTO Estop Any Credible Factual Contention That The Claimed Subject Matter Is Patent Ineligible**

213.    Amazon and Audible have received patents related to, or identical to, the claimed subject matter.

214.    While the issue of whether Amazon's patents and Audible's patents are directed to patent eligible subject matter is not before the court, ***sworn factual statements to the USPTO under a duty of candor*** made in those applications, in those prosecution histories, and in those issued patents are relevant to the issue of novelty, non-obviousness, inventiveness, whether elements are well-understood, routine, and conventional, and whether the subject matter claimed

in the asserted patents is patent eligible.  For example, if defendants made *sworn factual statements to the USPTO under a duty of candor* that use of a graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device was novel and non-obvious and patent eligible, then the opposite statement to this court would necessarily lack credibility and could not possibly constitute "clear and convincing evidence" to invalidate any asserted claim.  Amazon's duty of candor is ongoing, and Amazon has never informed the USPTO of any contradictory factual statement or belief.

215.    The patents Amazon has received (collectively, the "Amazon Patents") related to the claimed subject matter are, at a minimum:  U.S. Patent No. 9,176,658 ("the Amazon '658 patent"), titled "Navigating Media Playback Using Scrollable Text" (attached as Exhibit 7), and U.S. Patent No. 9,977,584 ("the Amazon '584 patent"), titled "Navigating Media Playback Using Scrollable Text" (attached as Exhibit 8).  Audible has also received over one hundred patents, many of which relate to the claimed subject matter here, most notably U.S. Patent No. 9,799,336 ("the Audible '336 patent"), titled "Identifying Regions of Corresponding Content" (attached as Exhibit 9).

**The Amazon '658 Patent Contains Factual Statements that Use of A Synchronization Index to Navigate Between Text and Audio Content is Not Well-Understood, Routine, and Conventional**

216.    The Amazon '658 Patent was filed December 10, 2013 and issued November 3, 2015.  The subject matter claimed is use of an index (lines of lyrics with associated times), on a user interface of a mobile computing device, to navigate audio and text by gesturing on a line of lyrics to "jump" the song to a portion selected by a gesture made on a specific part of the user interface, for example by tapping on a line of lyrics.  This is virtually identical to the claimed subject matter of the asserted '638 patent.

217.    Amazon swore, under oath, to the USPTO under a continuing duty of candor that the Amazon '658 Patent contains patentable subject matter and an inventive concept.

218.    The Amazon '658 Patent contains factual statements in the specification, made by Amazon to the USPTO under penalty of perjury, and under a continuing duty of candor, to support the contention that the claimed subject matter met all conditions for patentability under Sections 102, 103, and 112, and patent eligibility under Section 101.  The Amazon '658 Patent specification recites that as of the filing date of December 10, 2013,

> "**Conventional** approaches typically enable the user to scrub or navigate through the media playback by **moving a scrubbing element** (e.g., slider, button, marker, pointer). Moreover, in some cases, text associated with the media can be presented in conjunction with the media playback. In one example, text in a subtitle file can be displayed while a movie is playing. However, **conventional approaches to navigating media content and presenting text associated with the media content can be uninteresting and lacking in interactivity**. This can negatively affect the overall user experience associated with using computing devices to access media content."

Exhibit 7, 1:17-28. In other words, Amazon thought that as of December 10, 2013, a problem that existed in the art of mobile computing devices was that "conventional approaches to navigating media content and presenting text associated with the media content" could be characterized as "lacking in interactivity."

219.    The (much earlier filed) '638 Patent identified the same problem in the prior art, when reciting thirteen problems in the prior art.  Exhibit 1, '638 patent, 10:32-11:36.  Specifically, the '638 patent states,

> Thirteenth, closed captioning text and subtitles are not "interactive," in that a user cannot do anything with the words other than watch them appear on screen when the video plays. The user cannot move ahead or backward in the transcription, and the user cannot read any words other than the limited number of lines than can fit on the video screen, obscuring part of the screen. Closed captioning and karaoke-type subtitles, and the information to display them in a synchronization index-type format, are characterized by passive non-interactivity, meaning there is no way for an operator to utilize the text in any way other than watching it appear and disappear, typically from the multimedia viewing area itself. The user has no opportunity to use the words in any fashion other than to read them.

By contrast, the synchronization index and software suited for use on a mobile computing device of the present disclosure is characterized by interactivity, meaning that the user is able to use the synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia. Other actions may also be provided, as discussed further below, including annotation of text and provision of advertising to a mobile computing device. In the present disclosure, an enhanced overall user experience may be provided, where the text can be used as an interactive tool to facilitate navigation within corresponding media.

Exhibit 1, '638 patent, 11:11-11:36.

220.    Therefore, both the '638 patent and the (later filed) Amazon '658 patent overcame that which was "conventional" by providing specific structure to provide the specific functionality of interactivity with text corresponding to media on a mobile computing device.

221.    The Amazon '658 patent continues with Amazon asserting *as fact*, "Systems and methods in accordance with various embodiments of the present disclosure **overcome one or more of the above-referenced and other deficiencies in conventional approaches to presenting media content via a computing device.  In particular, various embodiments of the present disclosure can output audio, display text that is synchronized to the audio, and navigate a playback of media content based, in part, on scrolling through and selecting the text**." Exhibit 7, '658 patent. The '658 patent goes on to state: "In some embodiments, the user can select targeted lyrics by tapping, touching, and/or otherwise interacting with the targeted lyrics. As shown in the example of FIG. 4C, the user can tap 410 on the line 'When the blazing sun is gone,' or the word 'sun's' in order to select the respective line or word. When the line or word is selected, the device 402 can cause the song to (skip to and) play the portion that corresponds to the selected (target) line or word." *Id*. at 7:9-7:16.  This is a statement of fact Amazon made to the USPTO, in part to convince the USPTO that the claimed subject matter was patent eligible and contained an inventive concept.  This statement of fact is directly opposite any factual contention that the claimed subject matter of the asserted patents was "well-known, routine, and conventional" as of January 3, 2011.

222.    Amazon believes, and has sworn to the USPTO under oath, that in the Amazon '658 Patent the index depicted in Fig. 2B in conjunction with the user interface depicted in Fig. 3C (or the user interface depicted in Fig. 4C, and described at 7:9-16 where "the user can tap on the line" of lyrics to "cause the song to (skip to and) play the portion that corresponds to the selected (target) line or word") "**overcome[s] one or more of the above-referenced and other deficiencies in conventional approaches to presenting media content via a computing device.**" *See Id.* at 7:9-16, Figs. 2B, 3C, 4C.  That is, Amazon swore to the USPTO the specific structure of the user interface with gesture controls and the specific structure of the index/plurality of lines paired with the specific functionality of "caus[ing] the song to (skip to and) play the portion that corresponds to the selected (target) line or word" was **not** conventional.



Amazon '658, Fig. 3C

| Start Time | Lines of Text for Media Content Item ("Twinkle, Twinkle, Little Star") | End Time |
|---|---|---|
| ⋮ | ⋮ | |
| 2:38 | Till the sun is in the sky. | 2:43 |
| 2:44 | Twinkle, twinkle, little star, | 2:49 |
| 2:55 | How I wonder what you are. | 2:59 |
| 3:00 | … | 3:15 |

Amazon '658, Fig. 5B

223.    Both the Amazon '658 Patent, Fig. 5B, and the '638 patent, Fig. 17 depict a type of synchronization index.  The synchronization index is a specific structure, not an abstract idea nor a step in a method.  The synchronization index is specific structure for navigating text and

associated media, just as a "notebook tab" is specific structure for navigating a three dimensional spreadsheet on a computer.

224.    The Amazon '658 Patent, Fig. 5B depicts an index, which the Amazon '658 patent, claim 1 and specification refers to as a "plurality of lines of lyrics."  The index depicted in the Amazon '658 Patent, Fig. 5B is a specific structure used in a specific user interface with gesture controls (*e.g.* Fig. 4C), to produce a specific result, namely "caus[ing] the song to (skip to and) play the portion that corresponds to the selected (target) line or word."  Exhibit 7, 7:1-16.

225.    The Amazon '658 Patent, Fig. 5B has been excerpted and colorized below to show the index is a specific structure that contains a word or range of words (depicted in the center, yellow cell containing a line of lyrics reading "Till the sun is in the sky"), a start time for the word or range of words (depicted in the green cells, labeled "Start Time" with the timecode "2:38", adjacent to and thus corresponding to the yellow line of lyrics "Till the sun is in the sky"), and an end time for the word or range of words (depicted in the red cells, labeled "End Time" with the timecode "2:43", adjacent to and thus corresponding to the yellow line of lyrics "Till the sun is in the sky").

| Start Time | Lines of Text for Media Content Item ("Twinkle, Twinkle, Little Star") | End Time |
|---|---|---|
| | ⋮ | |
| 2:38 | Till the sun is in the sky. | 2:43 |
| 2:44 | Twinkle, twinkle, little star, | 2:49 |
| 2:55 | How I wonder what you are. | 2:59 |
| 3:00 | ... | 3:15 |

**Amazon '658 Patent, Fig. 5B (excerpted and colorized)**

Amazon describes this specific structure thusly: "FIG. 5B illustrates example data 550 that can be useful for implementing navigation of media playback using scrollable text. . . . As shown in the example of FIG. 5B, there can be a data entry 552 for a music-only portion of the song "Twinkle, Twinkle, Little Star," the music-only portion having a start end of 3:00 and an end time of 3:15. As such, the computing device can analyze the data 550 to recognize which portions are not transcribable and when to display the special element (e.g., an ellipse, "Music Only", etc.)." Exhibit 7, 7:46-57, Fig. 5B.

226.    The Amazon '658 patent specification also says, "In other words, when the user selects a target line or word, the device 402 can identify the start time of the target line or word and change the current track time of the playback to be the start time of the target line or word." *Id.* at 7:5-8.  The wording "the device 402 can identify the start time of the target line" is the equivalent to "performing a timecode lookup using the synchronization index" step in claim 1 of the asserted '638 patent.  This step is not an abstract idea, but rather a specific function tied to the specific structure of the synchronization index and the specific structure of the user interface with gesture controls.

227.    The Amazon '658 patent, Fig. 5B depicts an index, or a synchronization index.  It is further described in the specification as a "plurality of segments of text (e.g. lines of text) associated with the media content item".  Exhibit 7, 2:17-37; 2:42-57, Fig. 5B.

228.    The patents in suit depict an embodiment of the specific structure of the synchronization index similarly in **Fig. 17**, providing an embodiment even more specific than the exemplar in the Amazon '658 patent, and used for the same function of navigating the playback of media content by selecting a word or range of words.  Fig. 17 has been excerpted and colorized, below, to depict a sample portion of a synchronization index with a line of text (denoted in yellow,

beginning with "<LINE" and ending with "</LINE>", and being line number 4 denoted by "<lnum>4</lnum>"), where the line of text has a start time (depicted in green with the value "T='244661'") and an end time (depicted in red as "end_T=246826").  Moreover, each word in the line of text ("Word1" and "And" and "Word2") has its own start time and end time, for example "Word1" has a start time at "<t>244661</t>" and an end time at "<end_t>245429</end_t>", and so on.

```
COUNTY OF HENNEPIN THIRTY-EIGTH JUDICIAL DISTRICT
   </LINE>
+  <LINE pbk="F" T="0" end_T="2816" n="3" p="3" a="3">
-  <LINE pbk="F" T="244661" end_T="246826" n="15" p="15" a="190">
      <lnum>4</lnum>
   -  <W pbk="F">
         <w>Word1</w>
         <t>244661</t>
         <end_t>245429</end_t>
      </W>
   -  <W pbk="F">
         <w>And</w>
         <t>245429</t>
         <end_t>245748</end_t>
      </W>
   -  <W pbk="F">
         <w>Word2</w>
         <t>246038</t>
         <end_t>246197</end_t>
      </W>
      </LINE>
   </PAGE>
```

*See e.g.,* Exhibit 1, '638 patent, Fig. 17; Exhibit 2, '978 patent, Fig. 17.

229.   The structure of the index depicted in the Amazon '658 patent, Fig. 5B is substantially similar to the structure of the index depicted in Fig. 17 of the asserted patents, each having a line of text, a start time for the line of text, and an end time for the line of text, arranged either in a table or as computer readable code.  These indexes are not abstract ideas, but specific structures found in claim 1 of each asserted patent and in the Amazon '658 patent.

230.   The asserted patents depict that a synchronization index, such as the embodiment in Fig. 17, can be configured in an embodiment that is a table, as depicted in Fig. 39.  This is no different than the index depicted as a table in the Amazon '658 Patent, Figs. 2B and 5B.  These are specific structures.  *Compare* Exhibit 7, Figs. 2B and 5B *with* Exhibits 1 and 2, Fig. 17.

231.   As a result, the asserted patents contain an enabling description of a synchronization index.   The synchronization index is a specific structure for navigating between text and multimedia, and that specific structure is found in each asserted claim.

232.   The Amazon '658 Patent lists *eleven* inventors.  Each of these eleven inventors signed an oath or declaration that they believed the content of the specification to be true and accurate and that they believed the subject matter claimed met all statutory requirements for patentability and patent eligibility under Section 101.  These eleven inventors are: Toby Ray Latin-Stoermer, Jonathan Beech, Hari Gangadharan, Gabriela Ahern, Brandon Scott Durham, Darren Levi Malek, Ralph Cameron Harvey, Benjamin Lee Shepherd, Jason Christopher Hall, Andrew Powell McGoogan, and Robert Richard Morse.

233.   On information and belief, each of these eleven Amazon inventors has documents and things, kept, created, or generated contemporaneously within the 2011 to 2013 time period, to substantiate the assertions they made in sworn oaths and declarations to the USPTO, namely that a new and novel and non-obvious and patent eligible manner of navigating audio and text content on the small screen of a mobile device via a "plurality of segments" [as depicted in the index of Fig. 2B] and gesture controls, such as a gesture on a portion of a viewing screen [as in Fig. 4C], was not well-known, routine, and conventional at the time.  On information and belief, Amazon is in possession of these materials, which would be likely and probable to show the claimed subject

matter of the asserted patents, as a matter of fact, was not well-known, routine, and conventional on January 3, 2011, or earlier.

234.   Because Amazon told the USPTO, under oath on December 10, 2013 (a date two years *after* the January, 2011 filing date of the asserted patents), that it believes navigating media playback using scrollable text (*e.g.* a new and novel manner of navigating audio and text content on the small screen of a mobile device via a "plurality of segments" [as depicted in the index of Fig. 2B] and gesture controls, such as a gesture on a portion of a viewing screen [as in Fig. 4C]) is a technical improvement that "**overcome[s] one or more of the above-referenced and other deficiencies in conventional approaches to presenting media content via a computing device**", Amazon cannot credibly argue that the present claimed subject matter (*e.g.* a new and novel manner of navigating audio and text content on the small screen of a mobile device via a synchronization index and gesture controls), considering each claim as a whole, ordered combination, was well-known, routine, and conventional almost two years earlier in January, 2011. That is, if a new and novel manner of navigating audio and text content on the small screen of a mobile device via a "plurality of segments"/synchronization index and gesture controls was not conventional on Amazon's December 10, 2013 filing date, it was certainly not conventional earlier on January 3, 2011.

235.   Amazon believes, and has sworn to the USPTO, that each claim of the Amazon '658 Patent is patent eligible, meets the requirement of 35 U.S.C. 101, is not directed to any abstract idea, contains an inventive concept, and was not well-known, routine, and conventional as of its December 10, 2013 filing date.

236.   Because the disclosure of the Amazon '658 Patent is so closely parallel to the disclosure of the (much earlier filed) '638 Patent, Amazon cannot credibly argue that the

combination of claimed features of the '638 Patent were beyond that which was in the prior art to have become "well-known, routine, and conventional" but that the combination of claimed features in the (later filed) Amazon '658 Patent were not conventional at all but a technical solution to problems in the prior art.

237.    The Amazon Music app and/or Amazon Devices practice one or more claims of the Amazon '658 Patent.

**The Patents-in-Suit and the Amazon '658 Patent and the Amazon '584 Patent All Describe and Claim an Improved User Interface Paired with a Prescribed Functionality.**

238.    The asserted '638 patent, the asserted '978 patent, the Amazon '658 patent, and the Amazon '584 patent all describe and claim an improved user interface for using a synchronization index and a mobile computing device to navigate media with gesture controls.

239.    At least the following figures from the '638 patent, and the corresponding portion of the specification describing each figure, depict an improved user interface for a mobile computing device: Figs. 1, 2, 3, 4, 5, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 42.

240.    At least the following figures from the '978 patent, and the corresponding portion of the specification describing each figure,  depict an improved user interface for a mobile computing device: Figs. 1, 2, 3, 4, 5, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 42.

241.    At least the following figures from the Amazon '658 patent were represented by Amazon to the USPTO, under oath, and to the public (along with the corresponding portion of the specification describing each figure) to depict an improved user interface for a mobile computing device: Figs. 1, 3A, 3B, 3C, 4A, 4B, 4C, and 5A.

242.    At least the following figures from the Amazon '584 patent were represented by Amazon to the USPTO, under oath, and to the public (along with the corresponding portion of the specification describing each figure) to depict an improved user interface for a mobile computing device: Figs. 1, 3A, 3B, 3C, 4A, 4B, 4C, and 5A.

243.    Fig. 35 of the asserted '638 patent and the asserted '978 patent is substantially similar to Fig. 4C of the Amazon '658 Patent and the Amazon '584 Patent.  The only part of each user interface that was conventional was the scrub bar with slider component, depicted in both figures at the bottom of the screen, and described by Amazon at col. 1:17-20.  *See e.g.,* Exhibit 7, Amazon '658 patent, 1:17-20.  Each user interface depicts a portion of a synchronization index on the screen, not necessarily all of the text or lines of lyrics in the synchronization index.  Each user interface depicts lines of lyrics from a song.  Each user interface depicts graphically a position indicator.  For example, Fig. 35 of the asserted '638 patent shows a blue bar corresponding to the line of lyrics "Got to be a joker he just do what he please" to indicate that is the portion of the song playing; while Fig. 4C of the Amazon '658 patent shows the line of lyrics "When the blazing sun is gone" in a larger font to indicate that is the portion of the song playing.



**TrackTime '638 Patent, Fig. 35**          **Amazon '658, Fig. 4C**

*Compare* Exhibit 1, '638 patent, Fig. 35 *with* Exhibit 7, Amazon '658 patent, Fig. 4C.

244.    The '638 patent describes that a "tap" on a line of lyrics may be used to "jump" the song to the portion corresponding to the line of lyrics selected.  Exhibit 1, 33:63-34:13.  The specification describes *how* to accomplish this function with the specific structures of the synchronization index, the display of a portion of the synchronization index, and gesture controls using a mobile computing device.  *See e.g., Id.* at 32:66-34:59.  These specific structures are paired with a prescribed functionality, namely causing "performing a timecode lookup" step and a "delivering multimedia" in claim 1; causing differently in claim 2 "performing a data lookup" step and a "seeking on said mobile device" step and "accessing multimedia" step; and causing differently again in claim 14 a "performing a timecode lookup" step and a "seeking on said receiving device" step and "accessing multimedia" step. These specific structures and paired

prescribed functions for navigating text and media content are explicitly recited in the claims of each asserted patent, including claim 1 of the '638 patent and claim 1 of the '978 patent.

245.    Virtually identically, the (later filed) Amazon '658 patent (and the much later filed Amazon '584 patent) describe a "tap" on a line of lyrics may be used to "jump" the song to the portion corresponding to the line of lyrics selected.  *See e.g.,* Exhibit 7, Amazon '658 patent, 7:1-15.  The specification describes <u>*how*</u> to accomplish this function with the specific structures of the synchronization index, the display of a portion of the synchronization index, and gesture controls using a mobile computing device.  *Id.* at Fig. 4C; 7:1-15.  These specific structures and specific related functions for navigating text and media content are explicitly recited in the claims of the Amazon Patents, calling the synchronization index "a plurality of lines of lyrics."

246.    The only difference between Fig. 35 of the asserted '638 patent and Fig. 4C of the Amazon '658 patent and the Amazon '584 patent, is that Fig. 35 depicts additional, specific structure and functionality compared to the user interface of Amazon's Fig. 4C.  For example, Fig. 35 depicts album art, the name of the album, bibliographic information about the album, thumbnail image structures used to access other albums, for example by the same artists, a yellow annotation applied to two lines of lyrics, and other GUI elements in the upper right corner of the screen, for example drop-down control-type images for settings, annotations, and the like.  That is, if Amazon Fig. 4C is an improved user interface, as Amazon *swore* to the USPTO, then Fig. 35 of the asserted patents is also an improved user interface.  In each figure, there is depicted a specific, structured graphical user interface paired with a prescribed functionality directly related to the graphical user interface's structure that is addressed to and resolves a specifically identified problem in the prior state of the art.

247.    Amazon's user interface with the "X-Ray Lyrics" feature appears substantially identical to Fig. 35 of the '638 patent, as depicted below:



**U.S. Patent 8,856,638, Fig. 35**



**Amazon Kindle Fire running "X-Ray Lyrics"**

248.    Amazon's user interface with the "X-Ray Lyrics" feature practices one or more claims of the Amazon '658 patent and the Amazon '584 patent.

249.    Navigating multimedia playback using scrollable text was disclosed and claimed in the '638 patent and the '978 patent.  *See e.g.,* Exhibit 1, '638 patent, 32:66-34:59; 39:15-41:35 (music plus song lyrics), Fig. 35 (music plus song lyrics), 47:8-63, Fig. 36 (audiobook plus e-book), 50:25-43.

250.    Amazon cannot credibly argue that the claimed subject matter of the '638 patent is not patent eligible because it is directed to an abstract idea with no inventive concept (and similarly Amazon can provide no "clear and convincing evidence" that the combination of claimed features was "well-known, routine, and conventional"), while simultaneously telling the USPTO, under oath and under a continuing duty of candor, that the virtually identical claimed subject matter in the Amazon '658 and '584 patents *is* patent eligible (and not "well-known, routine, and conventional"), and novel, and non-obvious, and enabled.

78

251.   Amazon's sworn statements to the USPTO concerning that which it believed to be patent eligible must be taken as true and cannot be ignored.

252.   If Amazon was to assert as fact the notion that there is no inventive concept in navigating media playback using scrollable text on the user interface of a mobile computing device, using a synchronization index and a mobile computing device with a touch-sensitive input interface for gesture controls as specific structure paired with the prescribed functionality (navigating media by corresponding text for convenient, non-linear access to a desired portion of the media) directly related to the graphical user interface's structure, that would be a statement contradicting at least ***_eleven sworn oaths_*** submitted to the USPTO in the Amazon '658 patent and ***_another eleven sworn oaths_*** submitted to the USPTO in the Amazon '584 patent.

**Audible Arguments to the USPTO in Prosecuting U.S. Patent No. 9,472,113 Demonstrate that the Subject Matter of the Asserted Claims is Patent Eligible**

253.   In addition to the Amazon '658 patent and the Amazon '584 patent, Audible has applied for at least 29 patents (naming 19 individual inventors) in the same art or a related art, in each instance swearing to the USPTO that the claimed subject matter was patent eligible, that the claimed subject matter contained an inventive concept (and therefore was not directed to any abstract idea), that the claimed subject matter was not "well-known, routine, and conventional," and that the claimed subject matter met all statutory requirements for patentability, including under Sections 100, 102, 103, and 112.

254.   Audible's 9,472,113 patent ("the Audible '113 patent"), for example, involves the generation and use of a synchronization index in a "content playback synchronization system." The specification discloses, "In a specific example, content detection and/or synchronization information may include data that can be used to map a segment of text (for example, a word, line, sentence, etc.) to a timestamp of a corresponding audio recording."  Exhibit 10, Audible '113

patent,  3:30-34.  The specification continues, "for example, content synchronization information can be used to switch back and forth between presenting audio content and textual content (in embodiments where textual content is presented by the synchronization device 104). More specifically, in some embodiments, **a computing device may display the text of an electronic book and then switch to playing the audio of an audio book at a corresponding position using the content synchronization information**."  *Id.* at 15:67-16:8.

255.    The USPTO rejected the Audible '113 patent claims finding that using such a synchronization index was directed to patent ineligible subject matter.  Exhibit 11, Audible '113 patent file history excerpts, pp. 26-34.  Audible then conducted an oral interview with the patent examiner (*Id.* at pp. 23-25) and then submitted a written response to the office action (*Id.* at pp. 2-22), arguing **factually and legally** that the generation and use of a synchronization index for synchronous display of text and corresponding media was <u>NOT</u> something that would cause the claim to be patent ineligible under Section 101 and using the two-step test of *Alice.*  *Id.* at pp. 2-25.

256.    First, Audible argued to the USPTO that the Supreme Court required it to "tread carefully," arguing,

> the Office Action disregards both the Court's warning to "tread carefully in construing this exclusionary principle lest it swallow all of patent law," *Alice*, slip op. at 6, and the Court's recognition that "[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" Id. (quoting *Mayo v. Prometheus*, 566 U.S._ (2012)).

*Id.* at p. 14.

257.    Audible also argued to the USPTO that there was no preemption, because there were meaningful limitations in the claim, including that certain functions were "based at least in part on content synchronization information."  *Id.* at pp. 15-16.

258.     Audible also argued to the USPTO that no claim was directed to any abstract idea. *Id*. at pp. 16-17.

259.     Audible also argued that even if directed to an abstract idea, each claim was directed to an innovative concept, or "significantly more" than that which was well-known, routine, and conventional. *Id*. at pp. 17-19.

260.     That is, Audible made factual and legal arguments, under a duty of candor to the USPTO, that "indexing" media and use of a synchronization index in a particular way for a particular result is not an abstract idea that renders a claim patent ineligible.  Audible argued that synchronizing media content to corresponding text and playing the two together "based at least in part on content synchronization information" was "significantly more" than any abstract idea, and that there was a "non-routine" device claimed, despite the specification saying, "The computing device may include . . . a handheld device (such as a tablet computer, personal digital assistant (PDA), hybrid PDA/mobile phone, mobile phone, smartphone, electronic book reader, or digital media player) . . ." and "may be associated with a number of devices for user input, including, but not limited to . . . touch screens . . ."  Exhibit 10, Audible '113 patent, 4:1-16.  Audible argued recitation of this "synchronization information" in the claim recites "specific non-routine devices and functionality" that do not preempt every application of any abstract idea.  Audible argued that there was no preemption, that the claim using "synchronization information" was not directed to any abstract idea under *Alice*, step 1, and that there was an inventive concept, or "something more," under *Alice*, step 2.  Audible successfully persuaded the USPTO, and their patent issued as a result.

**Statements in the Audible '336 Patent Demonstrate that the Subject Matter of the Asserted Claims is Patent Eligible**

261.     In the Audible '336 patent, Audible argued to the USPTO, under oath and under penalty of perjury, that indexing, or "generating synchronization information," was patent eligible.

262.    The Audible '336 patent describes creating an index for "content synchronization information to facilitate the synchronous presentation of audio content and textual content" where "words in the textual content that correspond to words in the audio content are synchronously presented."  The result is that "an audiobook is synchronized with an electronic book, so that as the electronic book is displayed, corresponding words of the audiobook are audibly presented." *See* Exhibit 9, Audible '336 patent, Abstract.

263.    Audible represented to the USPTO **as fact** that such an index, formatted as depicted below in Audible's Fig. 8, was specific structure that could be used in an improved user interface, such as one depicted below in Audible's Fig. 9B.



Audible '336, Fig. 9B          Audible '336, Fig. 8

*See* Exhibit 9, Audible '336 patent, Figs. 8, 9B and corresponding description and text.

264.    In the background section, Audible describes, "a user may be interested in consuming multiple items of content at the same time. For example, a user may wish to read an electronic book while listening to an audiobook of the same title . . . [which may be] referred to as 'companion' items of content."  Audible continues to tell the USPTO and the public problems with the prior art and technical problems they set out to solve via indexing, namely,

"in many **current approaches**, the user must <u>manually line up</u> the two companion items of content so that the words narrated in the audiobook correspond to what the user is reading in the electronic book. For example, the <u>user may find it necessary to **pause the audiobook manually**</u> during portions of the electronic book that have no counterpart in the audiobook. Likewise, the user may find it necessary **to manually fast-forward** the audiobook during portions of the audiobook that have no counterpart in the electronic book. This scheme can prove frustrating and inconvenient for users."

*Id.* at 1:17-44.

265.    Audible described, under oath, that the "current approaches" as of its September 2015 filing date, required manually lining up companion items of content and then performing manual operations of pausing and fast-forwarding and that these prior art problems were "frustrating and inconvenient for users." *Id.*

266.    Audible then set out, as fact, what it believed to be certain technical solutions to technical problems in the prior art, in order to use a synchronization index for "facilitating the synchronous presentation of an item of content comprising audio content (such as an audiobook) with a companion item of textual content (such as an electronic book)." *Id.* at 2:13-21.

267.    Audible described the structure of the synchronization index, stating, "The transcription may include timestamps for each of the words recognized in the audio content representing a time interval during which a particular word is spoken, sung, shouted, or otherwise presented in the audio content. In addition, the textual transcription of the audio content may be divided into blocks, which may correspond to relatively large divisions of the item of content comprising audio content." *Id.* at 2:61-65.  The specification continues, "content synchronization information can include data that can be used to map a portion of textual content (e.g., a word, line, sentence, paragraph, etc.) to a timestamp of a corresponding item of audio content. . . . Accordingly, the content synchronization information can be generated in a variety of formats,

versions, etc. . . . In addition, the content synchronization information can include any combination of features or data used to synchronize content." *Id.* at 5:6-24.

268.    Audible further described the structure of the synchronization index, saying, "The timestamped transcription may include timestamps for each word of the transcript, corresponding to when each word is spoken (or otherwise presented audibly) in the audio content. For example, a word of the timestamped transcription might be assigned a timestamp of 0:01-0:02, indicating that the word was spoken during that time interval of the audio content." *Id.* at 9:50-53.  This is the same structure of the synchronization index described in the asserted patents, Fig. 17.  *See supra* ¶¶ 223-230.  Audible also describes, "timestamps may be assigned to portions of textual content comprising one or more words." Exhibit 9, 21:44-46.  Audible also describes, "timestamps may be assigned to words of textual content in any of a number of ways . . ." *Id.* at 11:45-47.

269.    The Audible '336 patent specification goes on to state,

> As discussed above, content synchronization information may be generated based on corresponding words between a transcription (or updated textual transcription) of an item of audio content and a companion item of textual content. Generally described, content synchronization information directs a computing device to present corresponding portions of the companion items of content synchronously, and to cease synchronous presentation for mismatched portions of the companion items of content. This content synchronization information may accordingly facilitate the synchronous presentation of a portion of the item of audio content and a corresponding portion of the item of textual content.
>
> In one example of how content synchronization information facilitates the synchronous presentation of companion items of audio content and textual content, the audio content may follow a user's progress in the textual content, so that the words spoken in the audio content line up with the words read by the user in the textual content. The content synchronization information may direct a user computing device 102 to synchronously present a portion of the item of audio content indicated to correspond to a portion of the item of textual content, for example.

*Id.* at 20:25-46.

270.    The Audible '336 patent further states, "the content synchronization information can include information regarding positions in the item of textual content that correspond to

positions in the item of content comprising audio content (e.g., a page and line in an electronic

book and a playback position of an audiobook), additional information related to synchronous

presentation (e.g., information for highlighting, underlining, etc. a portion of an electronic book

that corresponds to the playback of an audiobook), information identifying portions of the textual

content and audio content that correspond or fail to correspond, or any combination thereof." *Id.*

at 23:51-61.

271.    Audible continues to describe the user interface depicted in Fig. 9A, 9B, and 9C,

describing the structure of a user interface paired with the prescribed functionality of navigation:

> a user can select any word or group of words of a page of an electronic book presented
> on the display **900** and start playback at a corresponding point in the audiobook.
> Alternatively or additionally, the user can navigate to any point in time in the
> audiobook, and the corresponding page of the electronic book can be displayed by the
> user computing device **102**, and/or the user can navigate to any position in the
> electronic book and playback of the audiobook can begin at the corresponding point in
> the audiobook.    The user computing device **102** can also support search and
> bookmarking functionalities, maintaining the synchronous presentation of both the
> audiobook and the electronic book."

*Id.* at 25:30-43.

272.    Audible continues, reciting yet **another fact** that caused their disclosure to solve

problems in the prior art, "For example, content synchronization information can be used to switch

back and forth between presenting audio content and textual content. More specifically, in some

embodiments, a computing device can display the text of an electronic book and then switch to

playing the audio of an audiobook at a corresponding position using the content synchronization

information." *Id.* at 26:57-60.

273.    Audible described that the user computing device "may be any computing device",

such as a "tablet computer, . . . personal digital assistant (PDA), hybrid PDA/mobile phone, mobile

phone, electronic book reader, . . . audiobook player" and the like.  *Id.* at 6:24-33.

274.    Audible also described, and depicted in figures (including Figs. 9A, 9B, and 9C),
what it believed to be an improved user interface that overcame problems in the prior art as of their
filing date in 2015.  *See e.g., Id.* at Figs. 9A, 9B, and 9C.  For example, Audible described existence
of a "user interface module **212** that facilitates generation of user interfaces (such as by providing
instructions therefor) for display upon a computing device such as user computing device **102**.
The user interface may be displayed via a navigation interface such as a web browser installed on
the user computing device **102**."  *Id*. at 9:5-11.

275.    Because the duty of candor to the USPTO is a continuing duty, and because Audible
has never informed the USPTO that it believes any claim of its own patents would be patent
ineligible as directed to an abstract idea, with no inventive concept as a matter of fact, it is true
that Audible still to this day believes, as a matter of fact, that use of a graphical user interface for
navigating text and corresponding audio by use of a synchronization index and gesture controls on
a mobile computing device **_overcomes_** that which was "well-known, routine, and conventional"
as of the 2012 priority date of  the Audible '336 patent.

276.    The Audible '336 patent lists *two* inventors, Guy A. Story and Steven C. Dzik.
Each alleged inventor signed an oath or declaration that he believed the content of the specification
to be true and accurate and that he believed the subject matter claimed met all statutory
requirements for patentability and patent eligibility under Section 101.

277.    On information and belief, each of these two alleged Audible inventors and/or
Audible  has documents and things, kept, created, or generated contemporaneously within the 2011
to 2013 time period, to substantiate the assertions they made in sworn oaths and declarations to
the USPTO, namely that a new and novel and non-obvious and patent eligible manner of
navigating audio and text content on the small screen of a mobile device via a synchronization

index or "content synchronization information" [as depicted in the index of Fig. 8] using an improved graphical user interface on a mobile computing device [as in Figs. 9A, 9B, and 9C], was NOT well-known, routine, and conventional at the time.  On information and belief, Audible is in possession of these materials, which would be likely and probable to show the claimed subject matter of the asserted patents, as a matter of fact, was not well-known, routine, and conventional on January 3, 2011, or earlier.

278.    Because Audible told the USPTO, under oath on August 3, 2015 (a date more than 4 years *after* the January, 2011 filing date of the asserted patents), that it believes generating an index and "use of content synchronization information to facilitate the synchronous presentation of audio content and textual content" is a technical improvement that is patently distinct from the "many current approaches" that require manually pausing and fast-forwarding, Audible cannot credibly argue that the subject matter claimed in the asserted claims (*e.g.* a new and novel manner of navigating audio and text content on the small screen of a mobile device via a synchronization index and gesture controls), considering each claim as a whole, ordered combination, was well-known, routine, and conventional almost two years earlier in January, 2011.  That is, if a new and novel manner of navigating audio and text content on the small screen of a mobile device via a "content synchronization information"/synchronization index and gesture controls was not conventional on Audible's filing date, it was certainly not conventional earlier on January 3, 2011.

279.    Audible declared **factually** under oath, and under a continuing duty of candor to the USPTO, that generating an index for companion content and then using that index to perform a prescribed function related to the structure of the index and the user interface of the mobile computing device was 1) novel, 2) non-obvious, 3) enabled, and 4) directed to patent eligible subject matter.

280.    Audible believes, and has sworn to the USPTO, that each claim of the Audible '336 patent is patent eligible, meets the requirement of 35 U.S.C. 101, is not directed to any abstract idea, contains an inventive concept, and was not well-known, routine, and conventional as of its priority date.

**Statements in U.S. Patent No. 9,141,257 to Audible Demonstrates that the Subject Matter of the Asserted Claims is Patent Eligible**

281.    In U.S. Patent 9,141,257 ("the Audible '257 patent"), Audible describes as patent eligible using the user interface of a mobile computing device to play a "base content item" (such as an audiobook or an e-book), in conjunction with displaying "supplemental content," sometimes referred to as "enhancement content" that is synchronized to the "base content item."   The specification recites "for a base item content that includes an electronic book of a particular title, related items of content in other media may include an audiobook in the same tittle . . ." *See* Exhibit 12, Audible '257 patent, 9:32-34.   These items are mapped to one another in a synchronization index.   The specification recites,

> In block 312, the content enhancement service may **align the selected items of enhancement content with the portions of the base item** of content to be enhanced. For example, the content enhancement service may map each item of enhancement content accessed (or designated to be accessed by streaming) by the user computing device 102 or the content enhancement server 110 to one or more portions of a base item of content. **These mappings may be collected into an enhancement settings content file**, which may be shared over the network 106 with other user computing devices 102 or with the content enhancement server 110. . . . For base items of content that are conveyed continuously (e.g., audiobooks, videos, television programs, etc.), **items of enhancement content may be mapped to timestamps of the base item of content and conveyed when the conveying computing device (such as the user computing device 102) reaches that timestamp in the base item of content**. . . ."

*Id.* at 11:56-12:9.

282.    The Audible specification continues, "For example, a user interface may display a portion of a base item of content, such as text, images, or the like. When the user interacts with the

user interface (e.g., by tapping a word or image that is an enhancement object in a portion of an electronic book displayed by the user interface), the enhancement content may be conveyed." *Id.* at 13:36-41.  Audible further describes,

> "For example, by interacting through a user interface with his or her user computing device 102, a user may indicate that he or she wishes to obtain enhancement content for use with a base item of content. For example, in embodiments in which the content enhancement service is partially or wholly embodied on user computing device 102, the content enhancement service may generate one or more user interfaces through which the user indicates that he or she wishes to obtain one or more items of enhancement content. In other embodiments, the content enhancement service presents one or more user interfaces for requesting enhancement content as part of a content page accessed through a network browser run by the user computing device 102."

*Id.* at 13:61-14:7.

283.    That is, Audible discloses an electronic book synchronized and mapped to the corresponding audiobook in a synchronization index, and then using the user interface of a mobile computing device to play back these items that have been "mapped" by referring back to the synchronization index.

284.    In prosecuting the Audible '257 patent, Audible told the USPTO, via oaths sworn under penalty of perjury and under a continuing duty of candor, that generation and use of this type of synchronization index was patent eligible – a use of a specific structure paired with a prescribed functionality directly related to the structure – and that there existed an inventive concept over and above any abstract idea.  Audible's factual statements made to the USPTO cannot be ignored, and any new factual statements to the contrary would necessarily lack weight and credibility.

**Apple's  Statements Concerning the Subject Matter of the Patents-in-Suit Demonstrate that the Claimed Subject Matter was Not "Well-Known, Routine, and Conventional" as of January 3, 2011**

285.   Apple confirmed to Mr. Evans, the named inventor, that the claimed subject matter was not well-known, routine, and conventional as of January 3, 2011, but rather that the methods of the claimed subject matter, embodied in executable program code, would be a new and exciting product for Apple and its mobile computing device users.

286.   In the 2010-2011 timeframe, Apple employed personnel tasked with assisting third-parties in developing applications, or "apps," suitable for release in the Apple App Store.

287.   One such Apple employee was Mr. Tyler Stone.  Mr. Stone served as Apple's "Segment Manager – Worldwide Developer Relations."  He was hired to that position in January, 2000.  His job description was, and is, the following: "Primary liaison between Apple and key third-party developers in the productivity and utility segments, and the legal, real estate, home improvement, and museum vertical markets. Responsible for developer technical needs, business development, and co-marketing with Apple.  Have guided hundreds of iOS, macOS, watchOS, and tvOS developers, assisting with the full range of their business needs including product development, technology selection, and marketing plans."   *See* https://www.linkedin.com/in/tystone/.

288.   Mr. Stone corresponded, and conducted an in-person meeting, with Mr. Evans, the named inventor of the asserted patents, when Evans was engaged in a confidential software development undertaking in 2010 that he intended would result in commercially-available applications that would practice the claimed subject matter.

289.   Mr. Evans and Mr. Stone discussed the claimed subject matter at length.  This included demonstration of an ad hoc build of software loaded onto Mr. Evans' mobile computing device, provisioned to function on only that mobile computing device.  This ad hoc build showed how software practicing the claimed subject matter would function; particularly how a specific

structure of a user interface displaying text from a synchronization index could be used to navigate corresponding media with gesture controls. For example, by gesturing on a portion of the viewing screen corresponding to a word or range of words, the media would "jump" to the desired location, providing a new way to achieve quick, convenient, non-linear access to media based on selection of corresponding text.

290.     During, or shortly after, their in-person meeting, Mr. Stone confirmed to Mr. Evans that Mr. Evans' concepts were not well-known, routine, and conventional in the industry, or at Apple. Indeed, Mr. Stone remarked that there was no app in the Apple App Store at the time that enabled use of a graphical user interface for navigating text and corresponding audio by implementation of a synchronization index and gesture controls on a mobile computing device.

291.     As the "Primary liaison between Apple and key third-party developers responsible for developer technical needs, business development, and co-marketing with Apple," Mr. Stone was in a position to know whether an app was available in the Apple App Store that practiced (or was even analogous to) the claimed subject matter. Mr. Stone confirmed that there was no such app.

292.     Mr. Stone was distinctly impressed with the software build that Mr. Evans showed him and elucidated in detail. He remarked, "Pretty darn cool. . . I'm more than happy to convey to [potential partners] the idea that this would be of interest to Apple. . . . This way to deliver text and media is very interesting. This is very compelling. . . . There is definite interest on our end to focus on this market. It should be very powerful, frankly. It sounds like you've got a hit on your hands."

293.     At no time did Mr. Stone, or anyone else from Apple, indicate that the technical solutions to technical problems demonstrated by Mr. Evans were within the prior art; nor did

anyone from Apple at any time indicate that such technical solutions had so long existed and were in such common use that they would have gone beyond prior art to have become well-known, routine, and conventional.

294.    After the in-person meeting between Mr. Evans and Mr. Stone, Mr. Stone was excited about the technology Evans explained to him, and he wanted to share it with others to show them what could be done via the Apple ecosystem.  Mr. Stone expressed that Apple was eager to introduce new products to the legal market, in particular, since most lawyers had been PC users and many were reluctant to switch to the "Apple ecosystem" of devices and software.  Mr. Evans also told Mr. Stone that he had been a litigation consultant for Apple in a patent infringement case in the Eastern District of Texas and that he had worked with Apple's in-house attorneys as well as their outside counsel.  Evans told Stone that Apple's own attorneys were using Apple laptops and iPhones for their day-to-day legal work, but that he observed their workflow could be vastly improved if they were to implement and use his ideas for use of a graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device.  Mr. Stone was excited about the prospect of bringing a new productivity app to the Apple App Store and to Apple's own legal teams.

295.    Mr. Stone explained that certain executives from the American Bar Association were going to be visiting Apple's campus, and Apple wanted to demonstrate new technologies coming to the Apple App Store that would be of interest to the ABA and its membership.  Mr. Stone asked for and received a beta application build from Mr. Evans, provisioned only for Stone's mobile computing device, to demonstrate during an Apple meeting with leaders from the American Bar Association.  Had the software provided by Mr. Evans been well-known, routine, and conventional, Apple would have had no need or desire to show them to the ABA.  On information

and belief, Apple did, in fact, demonstrate this software at a meeting with the ABA as a new and exciting product for use by lawyers.

296.   On information and belief, Apple and Mr. Stone are or would be in possession of documents and things, kept, generated, and/or maintained in the timeframe contemporaneous with the years 2010-2012, which would show the claimed subject matter was not in the prior art, and that if a portion of it was within the prior art, the combination of claimed features as a whole had not so long existed and were not in such common use that they would have gone beyond prior art to have become well-known, routine, and conventional.

297.   Also in the 2010-2011 timeframe, it was not unusual for Apple to offer technical assistance to third-party developers creating new and exciting applications that could be launched in the Apple App Store.  Apple's internal staff had additional technical resources and could help shepherd third-parties through their development process, resulting in quicker commercial release of applications for mobile computing devices using Apple's operating systems.

298.   Mr. Evans worked with at least one of these Apple coding engineers, beginning in in 2010, to receive technical assistance to bring a product to market.  Mr. Larry Coopet, a Senior Engineer at Apple, Inc. since 2001 and a proficient software coding engineer, worked with Mr. Evans and told him, in substance, that the claimed subject matter as a whole was not in the prior art, and that if a portion of it was within the prior art, the combination of claimed features as a whole had not so long existed and were not in such common use that they would have gone beyond prior art to have become well-known, routine, and conventional.  Mr. Coopet confirmed that there was no app in the Apple App Store that performed the combination of steps of Mr. Evans' inventions, nor was he aware of any such app existing anywhere regardless of mobile computing device operating system, and that he would provide assistance in bringing a product to market, just

as Apple tasked some employees with doing.  Mr. Coopet also confirmed that, with the enabling disclosure provided to him by Mr. Evans, a person of ordinary skill in the art at the time could author software to perform the claimed subject matter using iOS as an operating system.  That is, the functioning of mobile computing devices using the iOS operating system would be technically improved, because all of the claimed features had not previously existed on iOS devices.

299.    Mr. Evans relied on these statements by Apple employees that the software features he described to them, the same features present in the claims of the asserted patents, were not well-known, routine, and conventional, but that they would be new and exciting for Apple's customers.

300.    Informed by these Apple employees, funds were expended by Mr. Evans for continued software development and for patent prosecution activities in light of his understanding at the time that the technology was not well-known, routine, and conventional to a person of ordinary skill in the art.

301.    Because Mr. Evans was also a patent attorney (and remains so qualified), he conducted a survey of the prior art himself to determine what may have been in the prior art and what may have gone beyond the prior art to have become so commonplace that it would be considered well-known, routine, and conventional.  Mr. Evans' own study of the prior art caused him to conclude that use of a graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device was novel, non-obvious, and patent eligible.  As a result, Mr. Evans drafted the provisional patent application himself and with the scope of the prior art in mind, having been informed and assured by Apple's own employees that the claimed subject matter was not that which could be considered well-known, routine, and conventional, but rather that it would constitute an improvement to the functioning of mobile computing devices themselves.

**The Improved User Interface Described and Claimed in the Asserted Claims, and Implemented in Whispersync for Voice, Has Been Lauded in the Industry, Was Newsworthy in 2012 as an "innovation," and Was Not Regarded by the Industry at the Time of Invention as "Well-Known, Routine, and Conventional"**

302.     In addition to Amazon and Audible *themselves* lauding Whispersync for Voice and Immersion Reading (*i.e.,* the subject matter of the asserted claims) as being "innovative" and a "key strategic differentiator" over prior art in 2012, among many other similar superlatives tending to show the "fused together" user interface was not "well-known, routine, and conventional," others also contemporaneously lauded the innovative graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device.

303.     At the time of Amazon's launch of Whispersync for Voice in 2012, the press generally reported that Whispersync for Voice and Immersion Reading were technical advancements over prior art user interfaces for mobile computing devices that improved the function of the mobile computing devices themselves.  For example, it was reported that "Amazon is enabling a new feature" as "a fusion of Kindle and audio versions of the same book." https://www.theverge.com/2012/9/6/3298182/amazon-whispersync-voice-kindle-fire-audiobooks.  These technical advancements were represented by an innovative graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device, and they would not have been newsworthy in 2012 if they had become "well-known, routine, and conventional" by that time.  As but one representative customer comment in 2012, one customer said, "I absolutely love the idea of being able to listen to an audiobook in my car and then seamlessly pick up where I left off reading the book version when I get home. Actually feeling a bit of jealousy right now as an iOS user – Apple get cracking!" Of course, these ideas were first recited in the asserted patents, for example reciting,

"Because the text of that book also functions as a synchronization index to the audio book, the reader may insert a bookmark, discontinue reading, move to a different location where reading is impracticable (such as in a car), access the bookmark as part of the synchronization index, and begin the playback of the audio book at the precise location where the reader had stopped reading. . . Once the user has finished listening to the audio, the receiving device can communicate back to the mobile communicating device the point at which listening ceased. A bookmark is inserted into the synchronization index at that point, and the next time the user accesses the synchronization index, he can return to the correct point within the synchronization index to either begin reading or to begin a new listening session. In practice, the user utilizes the synchronization index on the mobile computing device to establish non-linear access to corresponding multimedia content in a new, novel way.

With this and other uses, new commercial opportunities are provided for those who control distribution of text-based authored works and for multimedia owners. As an example, consumers have typically purchased either an electronic book for reading on a mobile computing device, or, in the alternative, they have purchased an audiobook. Very few, if any, users have purchased both products, particularly with the full feature set of the described system for use on a mobile computing device. With the described techniques and systems, synchronization indexes and corresponding multimedia can be offered for sale as a functional, inter-related, interactive product with annotation capacity, rather than just text alone or just multimedia alone."

*See e.g.,* Exhibit 1, '638 patent, 47:8-63.

304.    The publication "Emerging Technologies: A Primer for Librarians" (Rowman and Littlefield, 2015) listed Whispersync for Voice as an "emerging technology," not "well-known, routine, and conventional" as of the publication date of 2015.  This publication states, "What do we mean by *emerging*?  The technologies we cover in this book are just hitting the middle of the acceptance bell curve.  Nothing so cutting edge that only a few people even understand them and nothing so mainstream that everyone is using it.  We also look at older technology being used in new ways, using very recent advances to change what's possible using that tool."  "Emerging Technologies: A Primer for Librarians" was published in 2015, and has a 2015 copyright notice to authors Jennifer Koerber and Michael P. Sauers.  *See* https://tinyurl.com/yy4e94ho.  According to this publication, use of a graphical user interface for navigating text and corresponding audio by

use of a synchronization index and gesture controls on a mobile computing device was "emerging" and was not "well-known, routine, and conventional" even by 2015. *Id.*

305.    "Kindle's Whispersync for Voice technology" is routinely listed as one of the "technological advancements [that] can help advance in your English learning." In November, 2015, this "technological advancement" was touted as one of the technologies likely to impact the estimated 22 million online students, in an online distance learning market that was estimated to be worth $70 billion. *See* https://www.english.com/blog/students-can-use-technology-improve-english/.

306.    The website "Kindle Nation Daily" said on September 19, 2012, that the graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device was a "new feature." *See* https://kindlenationdaily.com/2012/09/video-post-whispersync-for-voice-immersive-reading-and-text-to-speech-on-the-kindle-fire-hd/.

307.    On information and belief, there exist numerous other publications and articles that contemporaneously lauded as "innovative" the disclosed and claimed graphical user interface for navigating text and corresponding audio by use of a synchronization index and gesture controls on a mobile computing device.

## COUNT I
### (DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,856,638)
**Amazon**

308.    Plaintiff incorporates paragraphs 1 through 307 herein by reference.

309.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

310.    Plaintiff is the owner of the '638 patent with all substantial rights to the '638 patent including the exclusive right to enforce, sue, and recover damages for past and future infringement.

311.    The '638 patent is valid, enforceable and was duly issued in fully compliance with Title 35 of the United States Code.

312.    Amazon has, and continues to, directly infringe one or more claims of the '638 patent in this judicial district and elsewhere in Delaware and the United States.

313.    In particular, Amazon has, and continues to, infringe at least claims 1 through 20 of the '638 patent ("the '638 Asserted Claims") by practicing the claimed methods via its actions in conjunction with its software and applications supporting X-Ray Lyrics and/or X-Ray Music functionality, including but not limited to its "Amazon Music" software application ("the Amazon Music Accused Practices") and its Amazon Kindle software and applications supporting features referred to by Amazon as "Whispersync for Voice," "Kindle Books with Audible Narration," and/or "Immersion Reading" ("the Amazon Kindle Accused Practices").

314.    Amazon is liable for these infringements of the '638 patent pursuant to 35 U.S.C. § 271.

**'638 Patent, Claim 1**

315.    Claim 1 of the '638 patent claims:

1. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the steps: providing, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein said synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia; wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface; displaying, after said providing step, at least a portion of said text from a synchronization index on said viewing screen, wherein said text is displayed other than as a web page; receiving, from the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said

synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device; performing a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, said timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words; and delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device to play said multimedia, wherein said multimedia corresponds to the word or range of words selected by the gesture.

316.     The preamble of claim 1 is not limiting.  However, to the extent the preamble of claim 1 is found to be limiting, as described below, Amazon has, and continues to, practice a method for a multimedia seek sequence using a synchronization index and a mobile computing device.

317.     Amazon provides, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia.

318.     The mobile computing device includes a viewing screen and touch sensitive input interface.

319.     Amazon displays, after the providing step, at least a portion of the text from a synchronization index on the viewing screen, wherein the text is displayed other than as a web page.

320.     Amazon receives, from the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from the synchronization index, wherein the gesture is recognized by the touch-sensitive input interface on the mobile computing device.

321.    Amazon delivers multimedia beginning at time t1, or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device to play the multimedia, wherein the multimedia corresponds to the word or range of words selected by the gesture.

322.    Amazon performs a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, the timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words.

### '638 Patent, Claim 2

323.    Claim 2 of the '638 patent claims:

2. The method of claim 1, further comprising seeking on said mobile computing device a multimedia file corresponding to said synchronization index, and if found, accessing multimedia at time t1.

324.    Amazon seeks, on the mobile computing device, a multimedia file corresponding to the synchronization index, and if found, accesses the multimedia at time t1.

### '638 Patent, Claim 3

325.    Claim 3 of the '638 patent claims:

3. The method of claim 1, wherein the receiving device is said mobile computing device, wherein delivered multimedia is able to be played with at least a portion of said text from a synchronization index on said viewing screen.

326.    In Amazon's practicing of the method of claim 1, the receiving device is the mobile computing device and delivered multimedia is able to be played with at least a portion of the text from a synchronization index on the viewing screen.

### '638 Patent, Claim 4

327.    Claim 4 of the '638 patent claims:

4. The method of claim 1, wherein the receiving device is other than said mobile computing device and configured to receive multimedia input from a source selected from the group comprising satellite receiver, internet connection, WiFi, computer network, cable

television system, fiber optic cable delivery network for data, cellular communication channel, bluetooth, UPnP, and local wireless connection.

328.    In Amazon's practicing of the method of claim 1, the receiving device is other than the mobile computing device and configured to receive multimedia input from a source selected from the group including satellite receiver, internet connection, WiFi, computer network, cable television system, fiber optic cable delivery network for data, cellular communication channel, Bluetooth, UPnP, and local wireless connection.

### '638 Patent, Claim 5

329.    Claim 5 of the '638 patent claims:

5. The method of claim 1, wherein the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, a plasma display, an LED display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

330.    In Amazon's practicing of the method of claim 1, the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, a plasma display, an LED display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

### '638 Patent, Claim 6

331.    Claim 6 of the '638 patent claims:

6. The method of claim 3, further comprising caching within said mobile computing device at least a portion of the audio from said multimedia.

332.   On information and belief, Amazon caches within the mobile computing device at least a portion of the audio from the multimedia.

**'638 Patent, Claim 7**

333.   Claim 7 of the '638 patent claims:

7. The method of claim 1, wherein multimedia is delivered at t1 and cached thereafter to memory accessible to said receiving device to facilitate subsequent seek operations.

334.   On information and belief, in Amazon's practicing of the method of claim 1, multimedia is delivered at t1 and cached thereafter to memory accessible to the receiving device to facilitate subsequent seek operations.

**'638 Patent, Claim 8**

335.   Claim 8 of the '638 patent claims:

8. The method of claim 1, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

336.   In Amazon's practicing of the method of claim 1, the mobile computing device includes an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

**'638 Patent, Claim 9**

337.   Claim 9 of the '638 patent claims:

9. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the steps: displaying on a mobile computing device text from a synchronization index, wherein said synchronization index comprises respective times within multimedia corresponding to a word or range of words and wherein said text is displayed other than as a web page; wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface; receiving information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface; performing a data lookup using said synchronization index, wherein said

synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words selected by the recognized gesture; and seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at t1.

338.     The preamble of claim 9 is not limiting.  However, to the extent the preamble of claim 9 is found to be limiting, as described *infra*, Amazon has, and continues to, practice a method for a multimedia seek sequence using a synchronization index and a mobile computing device.

339.     Amazon displays on a mobile computing device text from a synchronization index, wherein the synchronization index includes respective times within multimedia corresponding to a word or range of words and wherein the text is displayed other than as a web page.

340.     The mobile computing device includes a viewing screen and touch-sensitive input interface.

341.     Amazon receives information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of the viewing screen corresponding to a word, or range of words, from the synchronization index, wherein the gesture is recognized by the touch-sensitive input interface.

342.     Amazon performs a data lookup using the synchronization index, wherein the synchronization index is referenced to provide data for a time location t1 that corresponds to the word or range of words selected by the recognized gesture.

343.     Amazon seeks on the mobile computing device multimedia corresponding to the synchronization index, and if found, accesses the multimedia at t1.

**'638 Patent, Claim 10**

344.     Claim 10 of the '638 patent claims:

10. The method of claim 9, further comprising: requesting from a second computing device delivery of multimedia beginning at time t1; delivering multimedia beginning at

time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said multimedia comprises at least an audio element; and caching within said mobile computing device at least a portion of said audio element.

345.    Amazon requests from a second computing device delivery of multimedia beginning at time t1.

346.    Amazon delivers multimedia beginning at time t1,or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein the multimedia includes at least an audio element.

347.    On information and belief, Amazon caches within the mobile computing device at least a portion of the audio element.

### '638 Patent, Claim 11

348.    Claim 11 of the '638 patent claims:

11. The method of claim 9, further comprising: requesting from a second computing device delivery of multimedia beginning at time t1; delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device; and caching within said mobile computing device said multimedia or a portion thereof.

349.    Amazon requests from a second computing device delivery of multimedia beginning at time t1.

350.    Amazon delivers multimedia beginning at time t1, or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device.

351.    On information and belief, Amazon caches within the mobile computing device the multimedia or a portion thereof.

### '638 Patent, Claim 12

352.    Claim 12 of the '638 patent claims:

12. The method of claim 9, further comprising: requesting from a second computing device delivery of multimedia beginning at time t1; delivering multimedia beginning at

time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said receiving device is other than said mobile computing device; and caching, within said receiving device, or memory accessible thereto, said multimedia or a portion thereof.

353.   Amazon requests from a second computing device delivery of multimedia beginning at time t1.

354.   Amazon delivers multimedia beginning at time t1, or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein the receiving device is other than the mobile computing device.

355.   On information and belief, Amazon caches within the receiving device, or memory accessible thereto, the multimedia or a portion thereof.

### '638 Patent, Claim 13

356.   Claim 13 of the '638 patent claims:

13. The method of claim 9, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

357.   In Amazon's practicing of the method of claim 14, the mobile computing device includes an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

### '638 Patent, Claim 14

358.   Claim 14 of the '638 patent claims:

14. A method for a multimedia seek sequence using a synchronization index and a mobile computing device, said method comprising the steps: providing a mobile computing device comprising a viewing screen and a touch-sensitive input interface; providing a synchronization index that comprises an electronic transcript that indicates text corresponding to audio from the multimedia and indicates respective times within multimedia corresponding to when a word or range of words is audible in the multimedia; providing a receiving device; displaying on said mobile computing device text from the synchronization index, wherein said text is displayed other than as a web page; receiving, by the mobile computing device, information indicating a user's selected mobile computing

105

device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index; wherein said gesture is recognized by said touch-sensitive input interface; performing a timecode lookup using the synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words; seeking on said receiving device multimedia corresponding to said synchronization index, and, if found, accessing multimedia at t1.

359.    The preamble of claim 14 is not limiting.  However, to the extent the preamble of claim 14 is found to be limiting, as described *infra*, Amazon has, and continues to, practice a method for a multimedia seek sequence using a synchronization index and a mobile computing device.

360.    Amazon provides a mobile computing device that includes a viewing screen and a touch-sensitive input interface.

361.    Amazon provides a synchronization index that includes an electronic transcript that indicates text corresponding to audio from the multimedia and indicates respective times within multimedia corresponding to when a word or range of words is audible in the multimedia.

362.    Amazon provides a receiving device.

363.    Amazon displays on the mobile computing device text from the synchronization index, wherein the text is displayed other than as a web page.

364.    Amazon receives by the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of the viewing screen corresponding to a word, or range of words, from the synchronization index.

365.    In Amazon's practicing of the method of claim 14, the gesture is recognized by the touch-sensitive input interface.

366.    Amazon performs a timecode lookup using the synchronization index, wherein the synchronization index is referenced to provide data for a time location t1 that corresponds to the word or range of words.

367.    Amazon seeks on the receiving device multimedia corresponding to the synchronization index and, if found, accesses the multimedia at t1.

### '638 Patent, Claim 15

368.    Claim 15 of the '638 patent claims:

15. The method of claim 14, further comprising: providing a second computing device; requesting from a second computing device delivery of multimedia beginning at time t1; delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said multimedia comprises at least an audio element; and caching within said receiving device, or memory accessible thereto, at least a portion of said audio element.

369.    Amazon provides a second computing device.

370.    Amazon requests from a second computing device delivery of multimedia beginning at time t1.

371.    Amazon delivers multimedia beginning at time t1, or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein the multimedia includes at least an audio element.

372.    On information and belief, Amazon caches within the receiving device, or memory accessible thereto, at least a portion of the audio element.

### '638 Patent, Claim 16

373.    Claim 16 of the '638 patent claims:

16. The method of claim 14, further comprising:providing a second computing device; requesting from a second computing device delivery of multimedia beginning at time t1; delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device; and caching, within said receiving device, or memory accessible thereto, said multimedia or a portion thereof.

374.    Amazon provides a second computing device.

375.    Amazon requests from a second computing device delivery of multimedia beginning at time t1.

376.    Amazon delivers multimedia beginning at time t1, or provides instructions for the delivery of multimedia beginning at time t1, to a receiving device.

377.    On information and belief, Amazon caches within the receiving device, or memory accessible thereto, the multimedia or a portion thereof.

### '638 Patent, Claim 17

378.    Claim 17 of the '638 patent claims:

17. The method of claim 14, wherein the receiving device is said mobile computing device.

379.    In Amazon's practicing of the method of claim 14, the receiving device is the mobile computing device.

### '638 Patent, Claim 18

380.    Claim 18 of the '638 patent claims:

18. The method of claim 14, wherein the receiving device is other than said mobile computing device and is configured to receive multimedia input from a source selected from the group comprising satellite receiver, internet connection, WiFi, computer network, cable television system, fiber optic cable delivery network for data, cellular communication channel, bluetooth, UPnP, and local wireless connection.

381.    In Amazon's practicing of the method of claim 14, the receiving device is other than said mobile computing device and is configured to receive multimedia input from a source selected from the group comprising satellite receiver, internet connection, WiFi, computer network, cable television system, fiber optic cable delivery network for data, cellular communication channel, bluetooth, UPnP, and local wireless connection.

**'638 Patent, Claim 19**

382.    Claim 19 of the '638 patent claims:

19. The method of claim 14, wherein the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, an LED display, a plasma display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

383.    In Amazon's practicing of the method of claim 14, the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, an LED display, a plasma display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

**'638 Patent, Claim 20**

384.    Claim 20 of the '638 patent claims:

20. The method of claim 14, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

385.    In Amazon's practicing of the method of claim 14, the mobile computing device includes an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

386.    In addition to the specific factual allegations set forth above, attached hereto as Exhibits 4 and 5 is additional evidence pertaining to Defendants' infringements of the '638 patent, which supports the factual allegations set forth above and is incorporated herein by reference.

These Exhibits comprise, generally, sample screenshots of the Amazon and Audible app interfaces, Amazon and Audible websites and marketing, and user instructions.

387.    Plaintiff has been damaged as a result of Amazon's infringing conduct described in this Count.  Amazon is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Amazon's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**
**(DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,856,638)**
**Joint Infringement – Amazon and Audible**

388.    Plaintiff incorporates paragraphs 1 to 387 herein by reference.

389.    As detailed in Count I, Amazon has, and continues to, engage in the Amazon Kindle Accused Practices, thereby infringing the '638 Asserted Claims.  However, to the extent Amazon does not practice one or more steps in the '638 Asserted Claims, such steps are practiced by Audible under the direction and/or control of Amazon.  In the alternative, Amazon and Audible are engaged in a joint enterprise with respect to the Amazon Kindle Accused Practices.

390.    Audible is a wholly owned subsidiary of Amazon.

391.    Audile identifies itself as "an Amazon company."

392.    Amazon Prime members have access to Audible content by virtue of the membership.

393.    Amazon offers, via its website www.amazon.com, an entire Audible store that includes content, the ability to sign up for Audible, information about Audible, help directories and tutorials regarding the Audible applications, the ability to adjust a user's Audible settings, as well as additional information, content, and functionality regarding Audible.

394.    Amazon offers, via its website www.amazon.com, detailed information, help, library management, account management, and other features and tools for Audible Audiobooks.

395.    Amazon offers, via its website www.amazon.com, the ability to add Audible Narration to books a person owns.

396.    On information and belief, to the extent Audible provides content to Amazon and/or Amazon users, it does so under Amazon's direction and/or control.

397.    On information and belief, to the extent Audible provides content to Amazon and/or Amazon users, it is contractually obligated to Amazon to provide such content.

398.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, it does so under the direction and/or control of Amazon.

399.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, it is contractually obligated to do so.

400.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, Amazon conditions Audible's role as an Amazon company or receipt of some other benefit on Audible's performance of such step(s) and Amazon establishes the manner or timing of that performance.

401.    On information and belief, Amazon and Audible are engaged in joint enterprise.

402.    On information and belief, there is an express or implied agreement between Amazon and Audible, at least in relation to the Amazon Kindle Accused Practices.

403.    On information and belief, Amazon and Audible share a common purpose at least with respect to the Amazon Kindle Accused Practices.  For example, Amazon and Audible share a common purpose of making the features, applications, and functionality related to the Amazon

111

Kindle Accused Practices available, as well as ensuring that end users of such features, applications, and functionality know how to use them, enjoy using them, and continue using them.

404.   On information and belief, Amazon and Audible have a shared pecuniary interest in their common purpose.

405.   For example, on information and belief, Amazon and Audible both receive money and derive revenue from the Amazon Kindle Accused Practices.

406.   On information and belief, and in the alternative to Plaintiff's allegations of direction and/or control, Amazon and Audible have an equal right to a voice in the direction of their joint enterprise related to the Amazon Kindle Accused Practices, which gives each an equal right of control.

407.   Plaintiff has been damaged as a result of Defendants' infringing conduct described in this Count.  Defendants are, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
### (INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,856,638)
#### Audible

408.   Plaintiff incorporates paragraphs 1 to 407 herein by reference.

409.   Based on the information presently available to Plaintiff, absent discovery, and in the alternative to direct infringement, Plaintiff contends that Audible has, and continues to, indirectly infringe one or more claims of the '638 patent by inducing direct infringement by Amazon.

410.   Audible has had knowledge of the '638 patent since at least early 2013.  In the alternative, Audible has had knowledge of the '638 patent since at least as early as service of the

original complaint in this matter.  On information and belief, despite having knowledge of the '638 patent, Audible has specifically intended for Amazon to continue to engage in the Amazon Kindle Accused Practices, thereby infringing the '638 Asserted Claims, and Audible knew or should have known that its actions were inducing infringement.

411.    Audible encourages Amazon to engage in the Amazon Kindle Accused Practices. For example, Audible promotes use of Whispersync for Voice, Audible Narration, and Immersion Reading (*i.e.,* the features underlying the Amazon Kindle Accused Practices).  *See* Exhibit 5; *see also* www.audible.com.

412.    Audible also offers help and customer service / support for Whispersync for Voice, Audible Narration, and Immersion Reading (*i.e.,* the features underlying the Amazon Kindle Accused Practices).

413.    In accordance with Fed. R. Civ. P. 11(b)(3), Plaintiff will likely have additional evidentiary support after a reasonable opportunity for discovery on this issue.

414.    Plaintiff has been damaged as a result of Audible's infringing conduct described in this Count.  Audible is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Audible's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV
## (DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,862,978)
### Amazon

415.    Plaintiff incorporates paragraphs 1 through 414 herein by reference.

416.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

417.    Plaintiff is the owner of the '978 patent, entitled "Methods and Systems for Facilitating an Online Social Network," with all substantial rights to the '978 patent including the exclusive right to enforce, sue, and recover damages for past and future infringement.

418.    The '978 patent is valid, enforceable and was duly issued in fully compliance with Title 35 of the United States Code.

419.    Amazon has, and continues to, directly infringe one or more claims of the '978 patent in this judicial district and elsewhere in Delaware and the United States.

420.    In particular, Amazon has, and continues to, infringe at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of the '978 patent ("the '978 Asserted Claims") by practicing the claimed methods via the Amazon Kindle Accused Practices.

421.    Defendant is liable for these infringements of the '978 patent pursuant to 35 U.S.C. § 271.

### **'978 Patent, Claim 1**

422.    Claim 1 of the '978 patent claims:

1. A method for social networking with a mobile computing device comprising: providing for use on a mobile computing device a synchronization index, wherein said synchronization index is associated to multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia; providing mobile computing device software, wherein said mobile computing device software comprises executable program code configured to receive the synchronization index, and wherein said text is able to be displayed other than as a web page, wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface, wherein said viewing screen is able to display multimedia and text from said synchronization index, wherein performing a user's selected gesture on a portion of said viewing screen corresponding to a portion of said text is recognized by said touch-sensitive input interface to facilitate annotation of a portion of said synchronization index, and wherein said mobile computing device software comprises executable program code configured to facilitate annotation of a portion of said synchronization index responsive to user input received by the mobile computing device; and communicating said annotation for subsequent retrieval on a second computing device via a network.

423.    Amazon provides for use on a mobile computing device a synchronization index, wherein the synchronization index is associated to multimedia, wherein the synchronization index includes an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia.

424.    Amazon provides mobile computing device software, wherein the mobile computing device software includes executable program code configured to receive the synchronization index, and wherein the text is able to be displayed other than as a web page.

425.    In Amazon's practicing of the method of claim 1, the mobile computing device includes a viewing screen and a touch-sensitive input interface.

426.    In Amazon's practicing of the method of claim 1, the viewing screen is able to display multimedia and text from the synchronization index.

427.    In Amazon's practicing of the method of claim 1, performing a user's selected gesture on a portion of the viewing screen corresponding to a portion of the text is recognized by the touch-sensitive input interface to facilitate annotation of a portion of the synchronization index.

428.    In Amazon's practicing of the method of claim 1, the mobile computing device software includes executable program code configured to facilitate annotation of a portion of the synchronization index responsive to user input received by the mobile computing device.

429.    Amazon communicates the annotation for subsequent retrieval on a second computing device via a network.

**'978 Patent, Claim 2**

430.    Claim 2 of the '978 patent claims:

115

2. The method of claim 1, wherein said mobile computing device software comprises executable program code configured to synchronously play said associated multimedia with said synchronization index other than as part of a web page.

431.    In Amazon's practicing of the method of claim 1, the mobile computing device software comprises executable program code configured to synchronously play said associated multimedia with said synchronization index other than as part of a web page.

**'978 Patent, Claim 3**

432.    Claim 3 of the '978 patent claims:

3. The method of claim 1, wherein said annotation is a link to a portion of said multimedia.

433.    In Amazon's practicing of the method of claim 1, the annotation is a link to a portion of the multimedia.

**'978 Patent, Claim 4**

434.    Claim 4 of the '978 patent claims:

4. The method of claim 1, wherein said annotation is text, said text being associated to a portion of said multimedia.

435.    In Amazon's practicing of the method of claim 1, the annotation is text, the text being associated to a portion of the multimedia.

**'978 Patent, Claim 5**

436.    Claim 5 of the '978 patent claims:

5. The method of claim 1, wherein said annotation is text, said text being associated to a portion of said multimedia, and wherein said text is able to be displayed when playback of said portion of said multimedia occurs.

437.    In Amazon's practicing of the method of claim 1, the annotation is text that is associated to a portion of the multimedia and the text is able to be displayed when playback of the portion of the multimedia occurs.

**'978 Patent, Claim 6**

438.    Claim 6 of the '978 patent claims:

6. The method of claim 1, wherein said annotation is associated to a portion of said multimedia, andwherein said annotation is selected from the group comprising a threaded text discussion, a selected range of text from said synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of said synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia.

439.    In Amazon's practicing of the method of claim 1, the annotation is associated to a portion of the multimedia.

440.    In Amazon's practicing of the method of claim 1, the annotation is selected from the group including a threaded text discussion, a selected range of text from the synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of the synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia.

**'978 Patent, Claim 7**

441.    Claim 7 of the '978 patent claims:

7. The method of claim 1, wherein said annotation is associated to a portion of said multimedia; wherein said annotation is selected from the group comprising a threaded text discussion, a selected range of text from said synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of said synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia; andwherein said second computing device selectively receives annotations as part of a social network.

442.    In Amazon's practicing of the method of claim 1, the annotation is associated to a portion of the multimedia.

117

443.    In Amazon's practicing of the method of claim 1, the annotation is selected from the group including a threaded text discussion, a selected range of text from the synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of the synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia.

444.    In Amazon's practicing of the method of claim 1, the second computing device selectively receives annotations as part of a social network.

### '978 Patent, Claim 8

445.    Claim 8 of the '978 patent claims:

8. The method of claim 1, wherein said second computing device comprises computer hardware and software to operate a social networking service, wherein a user of said service is provided facility to share annotations.

446.    In Amazon's practicing of the method of claim 1, the second computing device includes computer hardware and software to operate a social networking service, wherein a user of the service is provided facility to share annotations.

### '978 Patent, Claim 9

447.    Claim 9 of the '978 patent claims:

9. The method of claim 1, wherein said second computing device comprises a second mobile computing device.

448.    In Amazon's practicing of the method of claim 1, the second computing device includes a second mobile computing device.

### '978 Patent, Claim 10

449.    Claim 10 of the '978 patent claims:

10. The method of claim 1, wherein said mobile computing device runs an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

450.    In Amazon's practicing of the method of claim 1, the mobile computing device runs an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

451.    In addition to the specific factual allegations set forth above, attached hereto as Exhibit 5 is additional evidence pertaining to Defendants' infringements of the '978 patent, which supports the factual allegations set forth above and is incorporated herein by reference.

452.    Plaintiff has been damaged as a result of Amazon's infringing conduct described in this Count.  Amazon is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Amazon's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT V**
**(DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,862,978)**
**Joint Infringement – Amazon and Audible**

453.    Plaintiff incorporates paragraphs 1 to 452 herein by reference.

454.    As detailed in Count IV, Amazon has, and continues to, engage in the Amazon Kindle Accused Practices, thereby infringing the '978 Asserted Claims.  However, to the extent Amazon does not practice one or more steps in the '978 Asserted Claims, such steps are practiced by Audible under the direction and/or control of Amazon.  In the alternative, Amazon and Audible are engaged in a joint enterprise with respect to the Amazon Kindle Accused Practices.

455.    Audible is a wholly owned subsidiary of Amazon.

456.    Audile identifies itself as "an Amazon company."

119

457.    Amazon Prime members have access to Audible content by virtue of the membership.

458.    Amazon offers, via its website www.amazon.com, an entire Audible store that includes content, the ability to sign up for Audible, information about Audible, help directories and tutorials regarding the Audible applications, the ability to adjust a user's Audible settings,  as well as additional information, content, and functionality regarding Audible.

459.    Amazon offers, via its website www.amazon.com, detailed information, help, library management, account management, and other features and tools for Audible Audiobooks.

460.    Amazon offers, via its website www.amazon.com, the ability to add Audible Narration to books a person owns.

461.    On information and belief, to the extent Audible provides content to Amazon and/or Amazon users, it does so under Amazon's direction and/or control.

462.    On information and belief, to the extent Audible provides content to Amazon and/or Amazon users, it is contractually obligated to Amazon to provide such content.

463.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, it does so under the direction and/or control of Amazon.

464.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, it is contractually obligated to do so.

465.    On information and belief, to the extent Audible performs any of the steps in the '638 Asserted Claims, Amazon conditions Audible's role as an Amazon company or receipt of some other benefit on Audible's performance of such step(s) and Amazon establishes the manner or timing of that performance.

466.    On information and belief, Amazon and Audile are engaged in joint enterprise.

120

467.    On information and belief, there is an express or implied agreement between Amazon and Audible, at least in relation to the Amazon Kindle Accused Practices.

468.    On information and belief, Amazon and Audible share a common purpose at least with respect to the Amazon Kindle Accused Practices.  For example, Amazon and Audible share a common purpose of making the features, applications, and functionality related to the Amazon Kindle Accused Practices available, as well as ensuring that end users of such features, applications, and functionality know how to use them, enjoy using them, and continue using them.

469.    On information and belief, Amazon and Audible have a shared pecuniary interest in their common purpose.

470.    For example, on information and belief, Amazon and Audible both receive money and derive revenue from the Amazon Kindle Accused Practices.

471.    On information and belief, and in the alternative to Plaintiff's allegations of direction and/or control, Amazon and Audible have an equal right to a voice in the direction of their joint enterprise related to the Amazon Kindle Accused Practices, which gives each an equal right of control.

472.    Plaintiff has been damaged as a result of Defendants' infringing conduct described in this Count.  Defendants are, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Defendants' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI
## (INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,862,978)
### Audible

473.    Plaintiff incorporates paragraphs 1 to 472 herein by reference.

474.    Based on the information presently available to Plaintiff, absent discovery, and in the alternative to direct infringement, Plaintiff contends that Audible has, and continues to, indirectly infringe one or more claims of the '978 patent by inducing direct infringement by Amazon.

475.    Audible has had knowledge of the '978 patent since at least early 2013.  In the alternative, Audible has had knowledge of the '978 patent since at least as early as service of the original complaint in this matter.  On information and belief, despite having knowledge of the '978 patent, Audible has specifically intended for Amazon to continue engaging in the Amazon Kindle Accused Practices, thereby infringing the '978 Asserted Claims, and Audible knew or should have known that its actions were inducing infringement.

476.    Audible encourages Amazon to engage in the Amazon Kindle Accused Practices. For example, Audible promotes use of Whispersync for Voice, Audible Narration, and Immersion Reading (*i.e.,* the features underlying the Amazon Kindle Accused Practices).  *See* Exhibit 5; *see also* www.audible.com.

477.    Audible also offers help and customer service / support for Whispersync for Voice, Audible Narration, and Immersion Reading (*i.e.,* the features underlying the Amazon Kindle Accused Practices).

478.    In accordance with Fed. R. Civ. P. 11(b)(3), Plaintiff will likely have additional evidentiary support after a reasonable opportunity for discovery on this issue.

479.    Plaintiff has been damaged as a result of Audible's infringing conduct described in this Count.  Audible is, thus, liable to Plaintiff in an amount that adequately compensates Plaintiff for Audible's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Plaintiff hereby requests a trial by jury for all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendants and that the Court grant Plaintiff the following relief:

a.  Judgment that one or more claims of the '638 and '978 patents have been infringed, either literally and/or under the doctrine of equivalents, by Defendants and/or by others whose infringements have been induced by Defendants and/or by others to whose infringements Defendants have contributed;

b.  Judgment that Defendants account for and pay to Plaintiff all damages to, and costs incurred by, Plaintiff because of Defendants' infringing activities and other conduct complained of herein;

c.  Judgment that Defendants be enjoined from further infringement and/or account for and pay to Plaintiff a reasonable, ongoing, post-judgment royalty because of Defendants' infringing activities, including continuing infringing activities, and other conduct complained of herein;

d.  Judgment that Defendants' infringements relative to the '638 patent and/or the '978 patents be found willful and that the Court award treble damages pursuant to 35 U.S.C. § 284;

e.  Judgment that the case be found exceptional under 35 U.S.C. § 285, and an award to Plaintiff its attorneys' fees and costs incurred in prosecuting this action;

e.   That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendants' infringing activities and other conduct complained of herein; and

i.   That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: January 8, 2020

*/s/ Timothy Devlin*
Timothy Devlin (# 4241)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, Delaware 19801
302-449-9010
tdevlin@devlinlawfirm.com

*COUNSEL FOR PLAINTIFF*
*TRACKTIME, LLC*

OF COUNSEL:

Edward R. Nelson III
Texas Bar No. 00797142
ed@nbafirm.com
NELSON BUMGARDNER ALBRITTON PC
3131 West Seventh Street, Suite 300
Fort Worth, Texas 76107
P. 817-377-9111

Timothy E. Grochocinski
Illinois Bar No. 6295055
tim@nbafirm.com
Joseph P. Oldaker
Illinois Bar No. 6295319
joseph@nbafirm.com
NELSON BUMGARDNER ALBRITTON PC
15020 S. Ravinia Ave., Suite 29
Orland Park, Illinois 60462
P. 708-675-1975