IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRACKTIME, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 18-1518 (MN) ) |
| AMAZON.COM, INC., AMAZON.COM LLC, AMZN MOBILE LLC, AMAZON WEB SERVICES, INC., AMAZON DIGITAL SERVICES LLC, and AUDIBLE, INC., | ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM ORDER

At Wilmington this 7th day of July 2021:

As announced at the hearing on February 12, 2021, IT IS HEREBY ORDERED that the disputed claim term of U.S. Patent Nos. 8,856,638 ("the '638 Patent") and 8,862,978 ("the '978 Patent") is construed as follows:

1. "multimedia" includes media that consists of only one type of media ('638 Patent, claims 1–7, 9–12, 14–16, 18, & 19; '978 Patent, claims 1–7).

In addition, for the reasons set forth below:

1. "executable program code configured to facilitate annotation of a portion of said synchronization index" is a means-plus-function term subject to 35 U.S.C § 112 ¶ 6 and is indefinite ('978 Patent, claim 1).

2. "executable program code configured to synchronously play said associated multimedia with said synchronization index" is a means-plus-function term subject to 35 U.S.C § 112 ¶ 6 and is indefinite ('978 Patent, claim 2).

The parties briefed the issues. (*See* D.I. 71). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 79), and applied the following legal standards in reaching its decision.

## I. LEGAL STANDARD

### A. Claim Construction

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [(Patent and Trademark Office)] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318–19. Where the intrinsic record unambiguously describes the scope

of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

B. <u>Indefiniteness</u>

Section 112 of the Patent Act requires a patent applicant to "particularly point[] out and distinctly claim[] the subject matter" regarded as the applicant's invention. 35 U.S.C. § 112 ¶ 2. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 28–29 (1997)). Put another way, "[a] patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002).

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See, e.g., Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017); *see also Teva*, 574 U.S. at 333. "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

## II. THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '638 and '978 Patents were announced from the bench at the conclusion of the hearing. The Court's rulings are as follows:

> At issue are three disputed claim terms in two patents.[1] I am prepared to rule on one of those disputes, the first of those disputes. I will not be issuing a written opinion, but I will issue an order stating my ruling. In that order or later, I will construe the remaining two terms. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patents in dispute and the evidence submitted by the parties, including portions of the prosecution history, various sources of definitions, and declarations of experts submitted for each side. There was full briefing on each of the disputed terms. There has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. As an initial matter, I am not going to read into the record my understanding of claim construction law generally. I have a legal standard section that I have included in earlier opinions, including recently in *Best Medical International v. Varian Medical Systems, Inc.*, C.A. No. 18-1599. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.
>
> Defendants offered, through their expert witness Dr. Schonfeld, that "a person of ordinary skill in the art at the time of the alleged invention would have had a bachelor's degree in Computer Science or in Electrical and Computer Engineering and at least two years of experience in media systems such as text, image, graphics, audio, and video systems."[2] Plaintiff's expert, Dr. Agrawala, had no objection to Dr. Schonfeld's proposed level of skill and the level of ordinary skill in the art does not appear to be relevant to the disputes before me today.

---

[1] The '638 Patent and the '978 Patent are continuations of the same patent application and share a specification. (D.I. 35 ¶¶ 16, 19, 25 n.1).

[2] (D.I. 71-8 ¶ 20).

Now the disputed terms:

The first term is "multimedia."[3] Plaintiff proposes the construction, "audio, video, music, songs, video books, audio books, movies, television shows, radio recordings, voicemail, podcasts, audio of an oral argument, streaming media, and other media recordings." In its briefing, Plaintiff clarifies that its proposed construction "cover[s] media that consists of only one type of media (*e.g.*, audio files)." Defendants propose the construction, "more than one type of media."[4]

I am going to adopt Plaintiff's construction, that "multimedia" includes media that consists of only one type of media. The patent specification indicates that multimedia can be audio only. For example, at column 31, lines 41–42, the specification recites "multimedia formats, including in variant playlists, including *audio*, H.264, MPEG4, M4V type media files . . . ." At column 40, lines 13–32, the specification discloses, "a hierarchical seek order may be employed by the mobile computing device to retrieve multimedia" and provides an example of retrieving a song. And at column 44, line 34, the specification states, "the multimedia may be a voicemail."[5]

The patent specification also supports that "multimedia" includes audiovisual media, consistent with Plaintiff's construction. For example, at column 41, lines 37–40, the patent discloses that "multimedia may be a film, movie, motion picture, theatrical release, musical, music video, movie preview or trailer, or other

---

[3] This term is in claims 1–7, 9–12, 14–16, 18, and 19 of the '638 Patent and claims 1–7 of the '978 Patent.

[4] The parties do not define "media," but do not appear to dispute its meaning. I have tried to use "media" consistently with the parties' use.

[5] Plaintiff cites several other portions of the specification that ostensibly show that multimedia can be audio only. (D.I. 71 at 2–3). Some examples discuss embodiments related to multimedia, for example "*multimedia content*, such as audio and/or video clips." *See, e.g.*, '638 Patent at 9:13–15 (emphasis added). Plaintiff's other citations to the patent specification do not clarify what portion of the embodiment corresponds to "multimedia." *See, e.g.*, *id.* at 50:25–43 ("Other uses for a *synchronization index and associated multimedia* operating on a mobile computing device are legion, and may include . . ." (emphasis added)). For avoidance of doubt, in construing "multimedia," I rely on Plaintiff's citations to the intrinsic evidence that clearly refer to "multimedia."

video generally consumed for entertainment or used for documentary purposes."[6]

Defendants argue that their proposed construction is supported by the definition of "multimedia" found in multiple dictionaries specific to the fields of electronics, computers, and telecommunications.[7] The Federal Circuit has cautioned against "elevating the dictionary" and other extrinsic evidence "to such prominence [because] it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."[8] I will heed that caution and decline to adopt the dictionary definition of "multimedia."

Defendants also argue that intrinsic evidence supports their construction of "multimedia" as "more than one type of media." For example, claim 1 of the '978 Patent recites both "respective times . . . corresponding to when a word or range of words is *audible in the multimedia*" and a "viewing screen . . . able to *display multimedia*," suggesting that the claimed multimedia has both audio and visual components. Defendants also note that at column 1, lines 23–35, the specification discloses that "multimedia may comprise a combination of text, audio, images, animation, video, or interactive content." This intrinsic evidence, however, is also consistent with Plaintiff's construction, which includes media of multiple types. Defendants do not explain why the cited portions of the patent

---

[6] Plaintiff also asserts that its proposed construction of "multimedia" is consistent with its meaning in a prior art patent and one of Defendants' own patents. (D.I. 71 at 3). These other patents are extrinsic evidence and are less reliable than the patents-in-suit to clarify the meaning of "multimedia." *See Phillips*, 415 F.3d at 1318; *Tex. Dig. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) (declining to consider during claim construction a patent that had the same inventor as the patents-in-suit). I do not rely on these patents when construing "multimedia." Plaintiff also notes that the Court referenced "multimedia like audio or video" in a previous order ruling on a motion to dismiss. (D.I. 71 at 3 (citing D.I. 28 at 6)). That order did not set out to formally construe "multimedia," and I do not base my construction on that statement.

[7] *See* D.I. 71-3 at 4 ("Multimedia . . . involves two or more simultaneous media types to communicate information."); D.I. 71-4 at 4 ("Multimedia combines multiple forms of media in the communication of information between users and machines."); D.I. 71-5 at 4 (defining "multimedia" as "[a] computer-based method of presenting information by using more than one medium of communication, such as text, graphics, and sound, and emphasizing interactivity"); D.I. 71-6 at 4 ("Multimedia is the combination of multiple forms of media in the communication of information."); D.I. 71-7 at 4 (defining "multimedia" as "[t]he combination of sounds, graphics, animation, and video.").

[8] *Phillips*, 415 F.3d at 1321.

7

require "multimedia" in general to be "more than one type of media," at the exclusion of other disclosed embodiments wherein multimedia is, for example, only audio.[9] Moreover, to adopt Defendants' proposed construction would contravene the "strong presumption against a claim construction that excludes a disclosed embodiment," as noted by the Federal Circuit.[10]

The second term is "executable program code configured to facilitate annotation of a portion of said synchronization index."[11]

The third term is "executable program code configured to synchronously play said associated multimedia with said synchronization index."[12] For these two terms, Plaintiff asserts that no construction is necessary and Defendants assert that the terms are governed by Section 112, paragraph 6 and that the terms are indefinite. I need time to consider further the arguments made before me today and I am not prepared to construe these terms today.

As noted, the Court did not decide at the hearing whether the disputed terms "executable program code configured to facilitate annotation of a portion of said synchronization index" in claim 1 of the '978 Patent and "executable program code configured to synchronously play said associated multimedia with said synchronization index" in claim 2 of the '978 Patent are "means plus function" terms subject to § 112 ¶ 6, and if so, whether they are indefinite.

"Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112 ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital

---

[9] To wit, Defendants argue that replacing "multimedia" with "audio" would lead to nonsensical claim language, such as "audio from the [audio]" (D.I. 71 at 4–5 (citing '638 Patent at claim 1)). Plaintiff, however, does not propose that "multimedia" mean "audio." Rather, Plaintiff argues that audio is an exemplary embodiment of multimedia consisting of a single type of media.

[10] *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020) (quoting *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018)).

[11] This term is in claim 1 of the '978 Patent.

[12] This term is in claim 2 of the '978 Patent.

of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). As *Williamson* recognized, "[i]n enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Id.* at 1347–48 (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003)).

When disputed claim terms do not use the word "means," there is a rebuttable presumption that § 112, ¶ 6 does not apply. *Id.* at 1348. To overcome that presumption, Defendants must demonstrate, by a preponderance of evidence, that the claim terms fail to "recite sufficiently definite structure or else recite[] function without reciting sufficient structure for performing that function." *Id.* at 1349 (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)) (internal quotation marks omitted); *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016).

Here, the terms at issue do not use the word means. Thus, the question is whether program code provides sufficient structure to overcome the presumption that § 112 ¶ 6 does not apply. Defendants argue that "executable program code" is a generic black box without any definite structure. Defendants assert that the claims are "silent as to *how* [the executable program code] achieve[s]" the claimed functions. They also note that the claims recite "executable program code

*configured to*" perform functions, thereby implying that the limitation is more structurally specific than "executable program code," but they do not disclose what the necessary configuration is.[13]

Plaintiff argues that "executable program code" is not a generic black-box term, but rather a specific reference to conventional code existing at the time of invention that would have been familiar to a person of ordinary skill in the art. (D.I. 71 at 24–26). Plaintiff offers definitions of "executable program" and "program" found in industry-specific dictionaries. (D.I. 71-11 ¶¶ 38–40). The existence of these definitions, however, does not show that a person of skill would understand the terms, as they are used in the claims, to have a definite structure. For example, one definition of "executable program" offered by Plaintiff is "[a] program that is ready to run on a given computer." (*Id.* ¶ 38). This generic definition gives no indication that "executable program code" is a specific code with definite structure.

Next, Plaintiff asserts that the claimed "executable program code" refers to code in certain prior art software applications, such as LiveNote, SyncPlayer, Microsoft Synchronized Accessible Media Exchange, RealLegal Binder, and Summation.[14] (D.I. 71 at 24–25). Plaintiff, however, does not show that the '978 Patent indicates to a person of skill in the art that "executable program code" refers to these software applications. Indeed, the '978 Patent refers to LiveNote, RealLegal,

---

[13] Plaintiff argues that Defendants have not met their burden to rebut the presumption that § 112 ¶ 6 does not apply. The presumption, however, is not a strong one. *Williamson*, 792 F.3d at 1349. Furthermore, to the extent Plaintiff's contention rests on the difficulty of showing the absence of disclosed structure, Defendants cannot be faulted for being unable to prove a negative.

[14] Plaintiff contends that Defendants essentially conceded this point by including some of these prior art references in Defendants' invalidity contentions. This argument conflates the two different standards governing invalidity based on prior art and sufficient disclosure to avoid means-plus-function claiming. Defendants' contention that the "executable program code" limitation exists in the prior art does not mean that a person of skill in the art would know the claimed structure of "executable program code" simply from the claims and the written description.

and other software applications by name, but only to state that their respective file formats can be ingested by the invention's "file format and data parsing logic 6-8." ('978 Patent at 28:1–16, 43:1–12). The patent does not state that these prior art software applications contain the claimed executable program code.

Finally, Plaintiff argues that a person of skill in the art would derive sufficient structural meaning of "executable program code" from the intrinsic evidence. (D.I. 71 at 28–30). Plaintiff implies, without ever explaining, that a person of skill in the art would recognize that the disputed terms correspond to "annotation and edit logic 6-12" and "video, display, and playlist logic 6-13" in the '978 Patent specification. (*Id.* at 28–30, 41–42). Even if this were true, Plaintiff fails to show structure for the "executable program code." By itself, "logic" connotes no more definite structure than "executable program code" and thus does not remove the disputed terms from means-plus-function claiming. *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374–75 (Fed. Cir. 2020) ("As used, 'logic' is no more than a 'black box recitation of structure' that is simply a generic substitute for 'means.'" (quoting *Williamson*, 792 F.3d at 1350)).

Plaintiff's cited authority, *Zeroclick, LLC v. Apple Inc.*, does not compel a different conclusion. 891 F.3d 1003 (Fed. Cir. 2018). In *Zeroclick*, the disputed terms were, "program that can operate the movement of the pointer" and "user interface code being configured to detect . . . ." *Id.* at 1006–1007. First, the Federal Circuit found that the district court had erred in applying § 112 ¶ 6 when the challenger of the patents-in-suit had not presented any evidence to rebut the presumption that the disputed terms did not use means-plus-function claiming. *Id.* at 1007–1008. Here, Defendants have presented evidence that the disputed terms, despite omitting the word "means," are subject to § 112 ¶ 6. Second, the *Zeroclick* court found that the disputed terms did not use means-plus-function claiming because the patents-in-suit expressly disclosed that the terms

11

referred to existing programs. *Id.* at 1008–1009 (showing that the patents-in-suit recite: "the programming design for all graphical interfaces has been based with the mindset of using the movement of the mouse . . . [whereas] the invention claimed in the patent provides the design of the computer interface to the movement of the pointer" (quotation marks and emphasis omitted); "the concept of activating some element of a GUI without clicking is *known*" (emphasis added); "the *nearest prior art* described the typical embodiment of the *conventional* graphical user interface GUI and how it could be generated by a computer" (quotation marks omitted) (emphases added); "backward compatibility, enabling all *existing* GUI's [*sic*] . . . to automatically be changed to add or replace it with the Zeroclick methodology" (quotation marks omitted) (emphasis added)). By contrast, the '978 Patent does not indicate that "executable program code" refers to a specific existing code or disclose what that code is. Thus, the Court finds that the '978 Patent is silent as to the structure of "executable program code," and thus § 112 ¶ 6 applies.

Having made this determination, the Court must undertake a two-step inquiry to determine whether the terms are indefinite. *Williamson*, 792 F.3d at 1351. "The court must first identify the claimed function." *Id.* (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012)). "Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352. If the specification does not disclose adequate corresponding structure, the claim is indefinite. *Id.*

Here, the function of "executable program code configured to facilitate annotation of a portion of said synchronization index" is "facilitat[ing] annotation of a portion of said synchronization index." For computer-implemented means-plus-function claims, courts search

for an algorithm or procedure to provide adequate structure to overcome an indefiniteness challenge. *See Personal Audio LLC v. Google, Inc.*, Civil Action No. 17-1751-CFC-CJB, 2020 WL 58631, at *8 (D. Del. Jan. 6, 2020) (citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008)). The required structure can be disclosed, for example, "as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (citation omitted). In the parties' joint claim construction chart, Plaintiff cites numerous and voluminous portions of the '978 Patent that it argues provide structure for the claimed function. (D.I. 62 at 3). Some portions simply repeat the function without providing corresponding structure.[15] Some portions describe applications and embodiments of the claimed annotation function.[16] For example, the written description discloses, "[T]he annotation and edit logic 6-12 may enable a user to add notes to a text transcript, lock editing of a text transcript, link a counter designation to a direct designation, merge designations, bulk import designations, maintain confidentiality for edits to a text transcript, flatten designations, and add/edit evidentiary ruling designations."[17] Some portions

---

[15]     *See, e.g.*, '978 Patent at Abstract, 3:54–4:5, 4:55–60, 13:6–22.

[16]     *See, e.g., id.* at 11:15–26 ("Other actions may also be provided . . . including annotation of text"), 13:6–22 (describing annotation on tablet computer), 13:37–52 (describing a viewing screen with an annotation icon), 21:45–22:9 (describing annotation using colors), 22:64–23:17 (describing annotation for case management), 24:8–15 (describing annotation using colors and graphics), 29:39–47 (describing "annotation and edit logic" as applied to case management), 30:43–60 (disclosing "function controllers" for "annotating and editing capability"), 31:51–32:3 (describing annotation for case management on iPad), 34:66–35:23 (describing annotation as designating deposition transcript), 38:13–52 (describing real-time implementation), 47:39–51 ("functional, inter-related, interactive product with annotation capacity"), 49:6–51 (describing annotating parts of a song and sharing annotations).

[17]     *Id.* at 16:8–15.

describe the annotation function in terms of other black-box words that lack structure.[18] None of the cited sections, however, discloses an algorithm or procedure that explains how the "executable program code" accomplishes the annotation function. Thus, the term "executable program code configured to facilitate annotation of a portion of said synchronization index" is an indefinite means-plus-function claim term. *See Arendi S.A.R.L. v. LG Elecs., Inc.*, No. 12-1595-LPS, 2019 WL 3891150, at *12 (D. Del. Aug. 19, 2019) (finding that "program instructions for performing" certain steps was indefinite means-plus-function term because the only corresponding structure, "computer readable medium program including instructions," was itself a generic black box).

Turning to "executable program code configured to synchronously play said associated multimedia with said synchronization index," the Court also finds that the '978 Patent does not disclose sufficient corresponding structure for the function, "synchronously play[ing] said associated multimedia with said synchronization index." In the joint claim construction chart, Plaintiff cites several portions of the written description that it claims provide definite structure for this limitation. (D.I. 62 at 4). These sections, again, only describe applications and implementations of the "synchronous play" function.[19] For example, the written description states that "[t]he video, display, and playlist logic 6-13 may control synchronous text/video using a

---

[18] *See, e.g., id.* at 12:3–15 (describing a viewing screen layout with "computer source code"), 15:17–38 (describing exemplary system including software with various types of "logic"), 25:60–26:5 ("the software examines the synchronization index to compute the time difference"), 27:18–43 (describing web application coded with Ruby on Rails and comprising various types of "logic").

[19] *See, e.g., id.* at 11:39–50 ("a mobile computing device . . . may be employed to . . . synchronously display text and multimedia"), 12:3–15 (describing viewing screen layout including "computer source code (*e.g.*, code written in Xcode or other suitable programming language) . . . compiled for mobile computing devices"), 32:38–34:43 (describing implementation on mobile computing device software for transcript management), 39:3–41:21 (describing application to music), 41:23–43:51 (describing application to movies and motion pictures).

synchronization index. The video, display, and playlist logic 6-13 may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control."[20] Plaintiff does not cite, and the Court cannot find, any portion of the specification that discloses an algorithm or procedure by which multimedia and a synchronization index are synchronously played. Thus, the term "executable program code configured to synchronously play said associated multimedia with said synchronization index" is indefinite.

*Maryellen Noreika*
The Honorable Maryellen Noreika
United States District Judge

---

[20] *Id.* at 16:16–22.