IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRACKTIME, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 18-1518(MN) |
| v. | ) |
| | ) |
| AMAZON.COM, INC., | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

Friday, June 30, 2023
10:00 a.m.
Motion Hearing

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

         DUNLAP BENNETT & LUDWIG PLLC
         BY:  TRACY L. PEARSON, ESQ.
         BY:  ROBERT P. GREENSPOON, ESQ.
         BY:  MARK A. MAGAS, ESQ.
         BY:  WILLIAM W. FLACHSBART, ESQ.

                    Counsel for the Plaintiff

```
 1   APPEARANCES CONTINUED:

 2
             ASHBY & GEDDES
 3           BY:  STEVEN J. BALICK, ESQ.

 4           -and-

 5           FENWICK & WEST LLP
             BY:  J. DAVID HADDEN, ESQ.
 6           BY:  MIN WU, ESQ.

 7                    Counsel for the Defendants

 8

 9

10                    _ _ _ _ _ _ _ _ _ _

11

12

13           THE COURT:  All right.  Good morning, everyone.

14   Please be seated.

15           MS. PEARSON:  Good morning, Your Honor.  Tracy

16   Pearson, Delaware counsel on behalf of plaintiff, TrackTime,

17   LLC.  And presenting today at the hearing will be my

18   colleagues, William Flachsbart and Robert Greenspoon.  And

19   Your Honor, sitting behind me I have our client, Mr. Curt

20   Evans on behalf of TrackTime.

21           THE COURT:  Good morning.

22           MS. PEARSON:  And our trial team member, Mark

23   Margas.

24           THE COURT:  Good morning to all of you.

25           Mr. Balick.
```

10:06:09 1          MR. BALICK:  Good morning, Your Honor.  Steven

10:06:11 2   Balick from Ashby & Geddes here on behalf of the defendants,

10:06:14 3   along with co-counsel from Fenwick & West on Your Honor's

10:06:17 4   left, David Hadden.

10:06:19 5          MR. HADDEN:  Good morning, Your Honor.  And Men

10:06:22 6   Wu.

10:06:23 7          THE COURT:  Thank you.  So we have the many,

10:06:26 8   many, many pages that were submitted to us in terms of

10:06:30 9   briefing and motions.  And we've reviewed those, but I

10:06:38 10  wanted to give an opportunity to let me know anything else

10:06:44 11  you want to say.  We'll start with the summary judgment

10:06:47 12  motion which I think both of you listed as your first one,

10:06:50 13  the one about eligibility.  So I will let the plaintiff -- I

10:07:01 14  will let the plaintiff go first on that.  And with respect

10:07:06 15  to your presentations, I am not going to rethink the

10:07:11 16  abstract idea aspects, so don't spend time on that.  If you

10:07:16 17  want, you can go to the Federal Circuit on that one.  But

10:07:20 18  that's where we're going to be.

10:07:22 19          And then for the defendants, to the extent that

10:07:27 20  I have comments that I made before, don't focus on what I

10:07:30 21  said before, focus on your arguments here.  Okay?

10:07:35 22          MR. GREENSPOON:  Thank you, Your Honor.  Again,

10:07:37 23  I'm Rob Greenspoon, Robert Greenspoon for TrackTime.  And I

10:07:42 24  got to confess, a part of me is glad you said don't focus on

10:07:45 25  the Step 1 issue because I think our case is so strong on

10:07:49 1    Step 2 when we take that as a starting point, Your Honor's

10:07:53 2    prior comments on Step 1.  If I may, I would like to frame

10:07:57 3    the case in a couple of ways.  One is how unprecedented,

10:08:02 4    unprecedented in the history of patent law this case is

10:08:06 5    where a defendant actually later patented the same thing but

10:08:11 6    still alleges ineligibility.

10:08:14 7         And Your Honor, if I may tender to the Court

10:08:19 8    something that is not in the briefing, we just found it this

10:08:22 9    morning, it's very new evidence.

10:08:25 10        THE COURT:  And have you given it to the

10:08:27 11   defendants?

10:08:28 12        MR. GREENSPOON:  It has been given to the

10:08:29 13   defendants.  It's simply the maintenance fee receipt from

10:08:34 14   May 3rd, 2023.  May I approach?

10:08:46 15        And I won't linger on this too long, this is

10:08:50 16   amplifying something we already said in the briefing about a

10:08:54 17   2019 payment of a maintenance fee for Amazon's own '658

10:08:58 18   patent.  This shows that even in the heat and spotlight of

10:09:01 19   this litigation, they went ahead and paid the

10:09:04 20   seven-and-a-half year maintenance fee.

10:09:06 21        So I'll get to the substance of why that's

10:09:09 22   important later, but I wanted to immediately get that out as

10:09:12 23   part of the framing of why this case is so unprecedented in

10:09:15 24   favor of TrackTime.

10:09:16 25        The second way I would like to frame this case

10:09:19 1    is shown on the slide, frankly, it's the front door, because

10:09:24 2    we are argue this, this is part of, you know, I'll call it

10:09:28 3    rhetoric, this is part of our rhetoric in our briefing, and

10:09:31 4    I think it still holds true, that the eligibility question

10:09:34 5    is not a question of whether the conditions for

10:09:36 6    patentability have been met.  That's Section 102, 103 and

10:09:42 7    112.  It's whether the kind, type, or category of patent

10:09:51 8    claim that got inserted at the end of the patent is the

10:09:55 9    type, kind, or category that the patent laws have

10:09:58 10   historically protected.

10:09:59 11            I think that's what the *Alice* decision was going

10:10:03 12   after and all the cases that the Supreme Court cited from

10:10:06 13   before, I think that is what the Federal Circuit is really

10:10:10 14   trying to capture with its juris prudence on patent matter

10:10:14 15   eligibility.  Did this patent owner, this inventor pay the

10:10:19 16   price of admission to get full consideration of the other

10:10:22 17   parts of the patent law.

10:10:23 18            So a decision in favor of TrackTime today, Your

10:10:26 19   Honor, is not going to be a decision that, you know,

10:10:29 20   forecloses the litigation of validity, we would still have a

10:10:33 21   validity trial obviously because there are affirmative

10:10:35 22   defenses of anticipation and what have you.  So today's

10:10:40 23   decision if it goes in favor of TrackTime simply is a

10:10:44 24   recognition that we paid the price of admission to get into

10:10:47 25   the front door.

10:10:48 1              THE COURT:  Why don't you get to the substance,

10:10:49 2  show me the claim and show me why you think it's so clear at

10:10:54 3  Step 2.

10:10:56 4              MR. GREENSPOON:  Let's start with what the claim

10:11:00 5  looks like.  It's grayed out.  I'm not going to read the

10:11:04 6  claim obviously.

10:11:05 7              THE COURT:  Go to the next page because that is

10:11:07 8  all -- there you go.

10:11:09 9              MR. GREENSPOON:  What we've done here is we've

10:11:11 10  really faded into the background Your Honor's expression of

10:11:15 11  the abstract idea which is using an index to synchronize

10:11:19 12  text and multimedia.

10:11:21 13              So this really is the baseline starting point

10:11:24 14  for Your Honor's Step 2 analysis.  You look at everything

10:11:27 15  else.  You don't consider the abstract idea, but you see

10:11:31 16  what's left in the claim and let's take a microscope to it.

10:11:34 17  And what's left in the claim is -- I'll do it this way, what

10:11:39 18  we've called the five parts or the five pieces of the

10:11:44 19  ordered combination.  We could have expressed it

10:11:47 20  differently, there is some debate there may be a sixth in

10:11:50 21  there, but we didn't even have to go there.

10:11:52 22              So we look at the five pieces in the ordered

10:11:55 23  combination and they are a mobile computing device, the

10:12:00 24  gesture on a touch screen or receiving information about the

10:12:02 25  gesture, that gesture has to be on a word or range of words,

10:12:09 1    this is vital and crucial.  That gesture on that word or

10:12:13 2    range of words causes the data or the time code lookup, and

10:12:17 3    what's returned back is a T1, that's the time location

10:12:21 4    corresponding to that word, and you change the playback

10:12:25 5    position.  The language in the claims is seek, access or

10:12:29 6    deliver the multimedia.

10:12:31 7             So the task before Amazon because Amazon has the

10:12:34 8    clear and convincing burden on this based on *Berkheimer*, the

10:12:38 9    task before Amazon is gosh, okay, so this is the full glory

10:12:44 10   of the claim outside of the abstract idea.  We now have to

10:12:48 11   go under Judge Noreika's directive, we have to go and find

10:12:52 12   that ordered combination and make our showing that it was

10:12:55 13   conventional, well understood and routine.

10:13:01 14            So this is how Amazon's expert, Dr. Dan

10:13:06 15   Schonfeld, addressed it.  I didn't view it as my -- that the

10:13:11 16   analysis required finding a prior art system that practices

10:13:14 17   each and every step in an ordered combination in order to

10:13:17 18   determine that the Step 2 of *Alice* fails and it's directed

10:13:21 19   to "well understood, routine and conventional activities."

10:13:25 20            THE COURT:  Well, that sounds true to me.

10:13:27 21            MR. GREENSPOON:  I understand.  In one sense I

10:13:30 22   would agree with you, Your Honor.

10:13:31 23            THE COURT:  Just because something is in the

10:13:32 24   prior art doesn't mean that it's well-known, routine,

10:13:36 25   conventional ^  so he didn't have to do that.

10:13:40 1               MR. GREENSPOON:  Precisely my point, but that's

10:13:42 2 a conclusion in TrackTime's favor, just even if he had done

10:13:46 3 this --

10:13:46 4               THE COURT:  Yes, but you're saying that somehow

10:13:49 5 because he said he didn't do this, that undermines his

10:13:53 6 opinion.  I'm not getting that.  Why does this undermine his

10:13:57 7 opinion?

10:13:58 8               MR. GREENSPOON:  Because the proofs would be an

10:14:00 9 issue of fact.  The proof of well understood, routine or

10:14:04 10 conventional, that's a question of fact.  Amazon's expert

10:14:07 11 was the place where the vehicle through which Amazon would

10:14:11 12 make their case.  So his job --

10:14:14 13               THE COURT:  He doesn't have to find it in the

10:14:16 14 prior art in order to do that.

10:14:18 15               MR. GREENSPOON:  Only because he has to find a

10:14:20 16 lot of it in the prior art, he has to find it's pervasive in

10:14:24 17 the prior art in order to meet this standard.

10:14:26 18               And so let me go back one slide, Your Honor --

10:14:30 19               THE COURT:  Why is this all marked confidential,

10:14:32 20 attorney's eyes only?

10:14:34 21               MR. GREENSPOON:  We're --

10:14:35 22               THE COURT:  Just so we're all clear, this is an

10:14:37 23 open court proceeding.  All of this is public.

10:14:40 24               MR. GREENSPOON:  Agreed, Your Honor.  We were

10:14:42 25 respecting the Amazon designations on this slide.  We're

10:14:45 1    happy with it being open.

10:14:47 2             So this shows that the exact thing described,

10:14:51 3    even in the detailed description of the patent on the left

10:14:55 4    which talks about at the very bottom jumping the song to

10:14:58 5    that time of elapsed duration.  You see a picture of it on

10:15:01 6    the side, Figure 35.  That exact thing that's happening in

10:15:05 7    the patent is a thing that Amazon's product is doing.  So

10:15:08 8    what we would have expected from Dr. Schonfeld is if he was

10:15:12 9    going to pursue this defense and Amazon, I mean, let's

10:15:16 10   assume for a second they could do it without an expert, even

10:15:20 11   Amazon has to provide some pervasive library of prior art,

10:15:24 12   proof of conventionality.

10:15:26 13            There is one alternative pathway to do that that

10:15:30 14   they could have used but they can't which is if the patent

10:15:33 15   specification for some reason kind of admitted that the

10:15:36 16   ordered combination was conventional, but that just isn't

10:15:39 17   the case.

10:15:40 18            In fact, let me go backwards in my slides, too,

10:15:46 19   and quote from column 11.  Maybe it's forward.  There it is.

10:16:01 20   Apologies again.

10:16:02 21            Column 11, again the baseline of what Mr. Evans

10:16:06 22   was doing, he saw the noninteractive, these are the only

10:16:10 23   words exactly from the patent, he saw the non-interactivity

10:16:14 24   of closed captioned.  I saw the non-interactivity of

10:16:21 25   karaoke, where he said there is no way for an operating to

10:16:24 1    utilize the text in any way other than watching it appear

10:16:27 2    and disappear.  Then what he said is he said I'm going to

10:16:31 3    add interactivity, I'm going to create convenient navigation

10:16:37 4    within the multimedia by using the text, or convenient

10:16:41 5    navigation of the text by using multimedia ^  the way that

10:16:45 6    we can expressed it in the briefing is sort of shorthand,

10:16:48 7    not our full argument, but just a shorthand when we refer to

10:16:52 8    the issue, is using the words as an actuator, as a kind of

10:16:56 9    button, to change the playback position.

10:17:00 10           Now, going back to Dr. Schonfeld and what he

10:17:03 11   would have had to demonstrate in order to get on the first

10:17:07 12   base for his Step 2 analysis, he would have had to

10:17:11 13   demonstrate using the words on a screen as an actuator based

10:17:16 14   on human touch to change the playback position of

10:17:22 15   multimedia, as something pervasively in the prior art, not

10:17:26 16   just one piece of prior art, pervasively.

10:17:29 17           And what I just explained or expressed from the

10:17:32 18   words I just spoke, Your Honor, is not your abstract idea.

10:17:35 19   It's not the expression of the abstract idea, it's something

10:17:40 20   above and beyond it.

10:17:42 21           So when the abstract idea is merely using an

10:17:50 22   index to I know /KHROPB /TPHAOEUZ text multimedia everything

10:17:55 23   else in the claim /KOUPBLD as the ordered combination to

10:17:58 24   start the analysis of Step 2.

10:18:02 25           THE COURT:  What is it about the ordered

10:18:04 1    combination here that's inventive?  As opposed to well you

10:18:08 2    can't do a gesture until you have received the information.

10:18:12 3    You can't perform a data or time look up because until --

10:18:18 4    that correspond to a gesture until you have the gesture.

10:18:22 5    And then you can't seek access or deliver the multimedia

10:18:27 6    corresponding to the gesture selected words until you've

10:18:30 7    made it corresponding.  So why is this -- what's so --

10:18:34 8    what's so inventive about this ordered combination?

10:18:40 9             MR. GREENSPOON:  To be precise, it's not a

10:18:42 10   question of what's inventive, that's 103, it's question of

10:18:47 11   what is an inventive concept.

10:18:49 12            THE COURT:  You said the ordered combination is

10:18:50 13   inventive, I'm just reading your slide and saying tell me on

10:18:54 14   this slide what's so inventive about the ordered

10:18:56 15   combination.  What is it about that ordered combination that

10:18:59 16   adds some inventive concept to this?

10:19:03 17            MR. GREENSPOON:  I understand, we were as loose

10:19:04 18   as --

10:19:05 19            THE COURT:  Don't criticize my looseness when

10:19:08 20   I'm using your slide, just tell me, I don't understand what

10:19:10 21   about the particular combination that you have on this slide

10:19:13 22   leads me to believe that there is anything inventive, any

10:19:17 23   inventive concept added here.

10:19:20 24            MR. GREENSPOON:  Using words or a range of words

10:19:23 25   --

10:19:23 1              THE COURT:  But that's not the combination.  Why

10:19:26 2      is that the combination?

10:19:31 3              MR. GREENSPOON:  It's part --

10:19:32 4              THE COURT:  The combination seems to me like

10:19:35 5      you're saying the ordered combination.  Are you saying it's

10:19:38 6      because you do these things in this order or that no one has

10:19:41 7      ever taken words and corresponded them with something and

10:19:45 8      then used it?

10:19:47 9              MR. GREENSPOON:  No one has ever taken a human

10:19:52 10     touch onto words on the screen as the actuator to move the

10:19:56 11     playback position to a different position, that's the

10:19:58 12     answer, Your Honor.  Using human touch onto words on a

10:20:03 13     screen to change the playback position to that exact place

10:20:07 14     where the words correspond to move the playback position.

10:20:17 15              And, Your Honor, if what we're focusing on or

10:20:21 16     we're thinking about is that okay, a mobile computing

10:20:25 17     device, that was old, touchscreens, that's in the prior art.

10:20:29 18     If we're looking at individual claim elements and we're

10:20:32 19     concluding, okay, the individual claim elements may have

10:20:35 20     been old, I would concede that, but that's irrelevant to the

10:20:40 21     question of whether the ordered combination was routine,

10:20:43 22     conventional, and well understood prior to the invention by

10:20:46 23     Mr. Evans.

10:20:47 24              In fact, Your Honor probably knows this by

10:20:51 25     heart, but in the *Intel v. IBC* Federal Circuit decision from

10:20:56 1    1991, there is this famous legal principle that all

10:21:01 2    inventions are combinations of full elements.

10:21:05 3              So, Your Honor, we don't appear here with a

10:21:10 4    blank slate as Your Honor prefaced --

10:21:13 5              THE COURT:  I'm not really so concerned about

10:21:16 6    the allegations in the complaint where we are here for

10:21:20 7    summary judgment, okay, talk is cheap.

10:21:24 8              MR. GREENSPOON:  Understood.

10:21:25 9              THE COURT:  I don't want allegations.

10:21:27 10             MR. GREENSPOON:  Let's go now to where I framed

10:21:29 11   the issue at the very beginning, which is how unprecedented

10:21:34 12   this is that we have a defendant who actually tried to

10:21:38 13   patent the very same thing and now comes in to Court to

10:21:43 14   claim that the invention was not eligible for patenting.

10:21:46 15   And that's why I handed up to Your Honor the

10:21:50 16   seven-and-a-half year maintenance fee receipt from Amazon.

10:21:53 17   We're not going to allege that that by itself is some kind

10:21:57 18   of judicial estoppel, but we're going to say that that means

10:22:01 19   that they still believe in the patent eligibility as a

10:22:05 20   party, they still believe in the patent eligibility of this

10:22:08 21   overall inventive concept which is using words on the screen

10:22:12 22   as an actuator to move the playback position.

10:22:15 23             So Dr. Schonfeld was instructed not to look at

10:22:19 24   the Amazon patenting activity, that's fine, that's his

10:22:22 25   prerogative not to look at it.  But that means that we have

10:22:25 1   a complete clear error in front of us in terms of the facts

10:22:32 2   and the evidence in this case that the '658 Amazon patent

10:22:37 3   claims ^  are for substantially the identical inventive

10:22:41 4   concept of the '638 patent claims.  So Amazon and TrackTime

10:22:46 5   are patenting the same thing, the only difference being Curt

10:22:51 6   Evans was years earlier, years before Amazon.

10:22:54 7         Let me start to wrap all this up to show what

10:22:58 8   we're talking about.  Here are just simply some callout

10:23:02 9   images from the respective patent.  On the left we have

10:23:05 10  TrackTime's patent, and I already put on the screen earlier

10:23:08 11  the same figure, Figure 35 was associated with some

10:23:11 12  discussion about jumping in the multimedia, so you sort of,

10:23:15 13  in your mind's eye you sort of imagine the Teleprompter

10:23:19 14  scrolling the text --

10:23:21 15        THE COURT:  Why don't you give me the claims so

10:23:23 16  I can see what you're talking about.  Is there a way I can

10:23:26 17  see both claims together rather than just your summary

10:23:29 18  telling me they patented the same thing we did.

10:23:32 19        MR. GREENSPOON:  It turns out on this slide it's

10:23:34 20  faded way into the background, the Hernandez expert report,

10:23:40 21  that's -- that's pages 138 to 141.  I think that would be

10:23:48 22  Exhibit C to our opening motion, if I'm not mistaken.

10:23:51 23  Should I wait for a moment, Your Honor?

10:23:56 24        THE COURT:  Yes.  All right.  What DI number is

10:24:14 25  this?

10:24:15 1        MR. GREENSPOON:  193 would have been our opening

10:24:18 2   motion.

10:24:18 3        THE COURT:  That doesn't help me.  You have a

10:24:20 4   whole bunch of declarations.  I don't know what declaration

10:24:23 5   this exhibit is.

10:24:25 6        MR. GREENSPOON:  If it's Exhibit C, it would be

10:24:29 7   dash four.  It's Hernandez before it, the cover sheet would

10:24:52 8   be a declaration.

10:24:57 9        THE COURT:  You got to tell me the DI number,

10:25:00 10  because I don't know what I'm looking for.  I have a million

10:25:03 11  documents.

10:25:04 12       MR. GREENSPOON:  Understood, Your Honor.  We'll

10:25:06 13  certainly have that for you in just a moment, I'm incapable

10:25:10 14  of doing it, but my assistants will assist.

10:25:14 15       But what Your Honor will see when we're able to

10:25:17 16  get to that DI number is the background on this slide.

10:25:20 17       THE COURT:  All right.  I have it.  What am I

10:25:22 18  looking at, what paragraph?

10:25:24 19       MR. GREENSPOON:  Pages 138 to 141.

10:25:42 20       THE COURT:  Okay.

10:25:42 21       MR. GREENSPOON:  So as Your Honor looks at that,

10:25:42 22  please, Your Honor, keep in mind there is no position from

10:25:52 23  Amazon on this whatsoever.  There is no rebuttal to our

10:25:55 24  presentation that these claims are seeking protection,

10:25:55 25  seeking patent protection over substantially the same

10:26:02 1    inventive concept.  Certainly they're going to be worded

10:26:06 2    differently --

10:26:07 3              THE COURT:  Well, theirs is a device and yours

10:26:09 4    is a method.

10:26:10 5              MR. GREENSPOON:  Right.  And, of course, the

10:26:11 6    Federal Circuit doesn't really see distinctions between

10:26:15 7    devices and methods when analyzing Section 101.  We're not

10:26:18 8    talking about what the exact contours of an infringement

10:26:21 9    checklist would be, we're talking about what is the overall

10:26:24 10   inventive concept here.  And what they were certainly going

10:26:28 11   after in these claims that they were pursuing was what's

10:26:32 12   shown in the Amazon '658 patent, Figure 4C, it's the same

10:26:37 13   kind of scrolling and human touch actuation of words or

10:26:43 14   range of words that we see in the TrackTime patent, exactly

10:26:46 15   the same.

10:26:54 16             And to close, Your Honor, here I would like to

10:26:56 17   show you an excerpt from column 1 of the '658 patent which

10:27:01 18   is Amazon's patent, this is where Amazon was stating what

10:27:06 19   was the problem we were trying to solve when we got our '658

10:27:11 20   patent, and the problem we were trying to solve was, looks

10:27:16 21   remarkably similar to the problem in column 8 of Curt Evans'

10:27:21 22   patent, it was conventional approaches, they're not so

10:27:24 23   great.  Conventional approaches are like slider buttons,

10:27:29 24   slider bars.  It's kind of onerous to move through the

10:27:35 25   playback to get to the right position.  It's uninteresting,

10:27:38 1    lacking in interactivity that can negatively affect the

10:27:42 2    overall user experience associated with using computing

10:27:45 3    devices to access media content.  So when Amazon said that,

10:27:49 4    they were correct, that's exactly an advantage of the '638

10:27:54 5    TrackTime patent that we provide this exact kind of

10:27:57 6    interactivity by using the word or range of words as

10:28:01 7    something like a button with human touch in order to change

10:28:05 8    the playback position, that's an improvement of a computer

10:28:10 9    function.

10:28:12 10            So the conclusion here is that Amazon was trying

10:28:15 11   to patent the same thing, but as I framed at the very

10:28:19 12   beginning, Amazon is seeking to prevent another party from

10:28:22 13   having patent protection, and Amazon's recent maintenance

10:28:26 14   fee payment it simply locks that in, that what we're dealing

10:28:30 15   with here is a party who is seeking to have it both ways,

10:28:33 16   and I think the Court will be able to see through that.

10:28:36 17            Finally, the final point I would like to leave

10:28:40 18   with Your Honor on this, and then of course address any

10:28:42 19   questions, is this quotation from *Dayco Products v. Total*

10:28:47 20   *Containment*, the Federal Circuit case, when prosecuting

10:28:49 21   claims before the Patent Office, a patent applicant is at

10:28:52 22   least implicitly asserting that those claims are patentable.

10:28:52 23   That is certainly the case here where Amazon is trying to

10:28:59 24   patent the same thing as TrackTime but yet pursue its

10:29:02 25   defenses in this litigation.

10:29:06 1                    THE COURT:  Well, do you have any evidence --

10:29:11 2    and I take it that it's their burden and I should have made

10:29:14 3    them go first, but do you have any evidence, like are you

10:29:20 4    going to go put on evidence other than their patent, are you

10:29:23 5    going to put on evidence that these things were not

10:29:26 6    well-known, routine and conventional?

10:29:28 7                    MR. GREENSPOON:  Yes, Your Honor.

10:29:30 8                    THE COURT:  What is the form of that evidence?

10:29:31 9                    MR. GREENSPOON:  That's Dr. Hernandez's

10:29:33 10   testimony.

10:29:34 11                   THE COURT:  What is he going to say?

10:29:35 12                   MR. GREENSPOON:  He's going to say I'm an expert

10:29:37 13   in graphical user interfaces.  I have been working in the

10:29:41 14   field since before the time of the TrackTime patent.  This

10:29:44 15   is completely new.  This is innovative.

10:29:47 16                   THE COURT:  New and innovative.  Again, you're

10:29:50 17   the one who keeps using that, but that sounds like 102, 103

10:29:54 18   to me rather than 101.  What is he going to say as to

10:29:58 19   Step 2?

10:29:59 20                   MR. GREENSPOON:  His presentation is precise

10:30:02 21   just like I was showing Your Honor where he sets aside the

10:30:06 22   abstract idea, looks at the rest of the ordered combination

10:30:08 23   and says there is nothing like this.  The second piece of

10:30:12 24   evidence which is very, very important is that Amazon in

10:30:15 25   their internal documents when they're developing and

10:30:18 1    releasing their tap-to-jump which has the same inventive

10:30:22 2    concept, they call it surprisingly addictive.  They were

10:30:26 3    congratulating each other for coming up with this music

10:30:30 4    interface for the playback operation which in their words

10:30:34 5    they said was surprisingly addictive.

10:30:36 6              That is a key issue that I think really carries

10:30:39 7    a lot of weight with the jury because what it means is

10:30:42 8    subjectively speaking they thought in their internal

10:30:45 9    development they're on to something that's never before seen

10:30:47 10   on this plant, it's going to make people very excited and

10:30:51 11   very happy.  It turns out they were right, but that's part

10:30:54 12   of our damages case.

10:30:57 13             THE COURT:  All right.  Let me hear from the

10:30:59 14   defendant.

10:31:00 15             MR. GREENSPOON:  Thank you, Your Honor.

10:31:10 16             MR. HADDEN:  Good morning, Your Honor.  Dave

10:31:17 17   Hadden for Amazon.

10:31:19 18             THE COURT:  Did you have two slides, two slide

10:31:24 19   decks or one?

10:31:25 20             MR. HADDEN:  Two, Your Honor.

10:31:26 21             THE COURT:  I think I'm missing one.  Mark, can

10:31:28 22   you find me the other one.  I have the one on the non-prior

10:31:32 23   art status, I need the eligibility one.

10:31:41 24             Thank you.  Go ahead.

10:31:41 25             MR. HADDEN:  Thank you, Your Honor.  I will skip

10:31:47 1    ahead in here, Your Honor.  You indicated that you're not

10:31:52 2    going to change your Step 1 decision (you)  so I'll skip

10:31:55 3    forward to slide 14, if I can, Your Honor.

10:32:05 4         Again, I'm not going to dwell on this because of

10:32:10 5    your prior comment, but the Court did analyze Step 2 in the

10:32:14 6    previous order and found that there was nothing there.  And

10:32:17 7    the evidence that has come out through discovery has proved

10:32:20 8    that.  Starting with the mobile computing device, the patent

10:32:24 9    itself acknowledges that these are generic and well-known

10:32:29 10   including Apple iPhones and iPads.

10:32:32 11        The inventor, Mr. Evans, confirmed at his

10:32:35 12   deposition that he did not invent any new mobile computing

10:32:38 13   devices.  Dr. Hernandez, TrackTime's expert, confirmed that

10:32:44 14   Mr. Evans did not invent any new mobile computing devices or

10:32:49 15   any new operating systems for mobile computing devices.

10:32:53 16        There is a slide that I skipped in the beginning

10:32:56 17   that explains that the screen shots in the patent were

10:33:01 18   produced by Mr. Evans by cutting and pasting from screen

10:33:06 19   shoots from existing trial transcript software and just

10:33:10 20   pasting them on to an image of an iPad.

10:33:13 21        So there is no new inventive mobile device,

10:33:17 22   nothing that will make this work on a mobile device.  The

10:33:21 23   touch interface was, of course, well-known, the patent

10:33:24 24   explains --

10:33:26 25             THE COURT:  But you're not getting at the

10:33:28 1   point -- I mean, his whole presentation was nobody had done

10:33:32 2   his words, touching the words and jumping to a place in --

10:33:37 3   jumping to those words in a song or whatever.  So why don't

10:33:42 4   you focus on that.  I know that iPhones aren't new.  I know

10:33:46 5   that he didn't invent an iPhone and I know he didn't invent

10:33:50 6   touching things, but let's focus on their argument.

10:33:53 7          MR. HADDEN:  Just one point on the touch

10:33:55 8   interface, Mr. Evans acknowledged that with an iPhone you

10:33:59 9   could touch on a word and get to that point in the text.

10:34:01 10  The idea that touching on a word and navigating there was

10:34:04 11  something new was not correct.  And touch gestures were all

10:34:08 12  well and established, this is a document that Dr. Hernandez

10:34:12 13  attached to his own report.

10:34:14 14          Then we get to the synchronization index which

10:34:20 15  the Court is missing what he used to jump to a position in

10:34:23 16  the multimedia, and it was all well-known and conventional,

10:34:26 17  multiple ways of doing it including the patent and including

10:34:30 18  this access.

10:34:31 19          Just to remind Your Honor, the issue was, the

10:34:34 20  patent acknowledges that you could click on text in a

10:34:37 21  transcript and jump to the corresponding part in the video.

10:34:42 22  Right?  What the patent said was that had to be run on a

10:34:47 23  Windows computer, so you couldn't do it on a mobile device.

10:34:50 24  All right?  So all the patent is talking about doing is

10:34:55 25  replacing a mouse click on a word to navigate and jump to

10:34:59 1    the corresponding part of the video to touching a word on a

10:35:04 2    touchscreen.  Right?  But touching a word is just like

10:35:09 3    clicking on a word was well-known at the time.

10:35:11 4            And again, as Mr. Evans acknowledged that he did

10:35:15 5    not invent this synchronization index, there were lots of

10:35:19 6    ways to do it already, the Sanctions software is one of the

10:35:23 7    examples discussed in the patent itself said you can already

10:35:26 8    do this, you just needed to have a desktop computer or a

10:35:29 9    laptop computer and not a mobile device.

10:35:32 10            So then if we get to the ordered combination,

10:35:36 11    because Your Honor already indicated, these are just a

10:35:40 12    series of functional steps, this is slide 24, that are

10:35:43 13    performed in the logical way to do it.  You have to provide

10:35:47 14    information to fully display it, you have to receive a

10:35:51 15    collection before you can jump to the right part.  All of

10:35:54 16    these steps were performed as the patent acknowledges using

10:35:58 17    existing trial management software and all the patent is

10:36:01 18    doing is saying it would be better if we could do this on a

10:36:04 19    mobile device, but it doesn't provide a solution for doing

10:36:07 20    it on a mobile device.

10:36:09 21            And again, the one case, or a case that has come

10:36:11 22    out since Your Honor's prior decision, I think is super on

10:36:17 23    point is this *IBM v. Zillow* case which has almost the same

10:36:21 24    functional steps in the claims, presenting, receiving,

10:36:25 25    selecting and synchronizing.  In that case the user would

10:36:30 1    select a portion of a map and the software would sync the

10:36:37 2    corresponding list of entities within that region and show

10:36:40 3    them.  The Federal Circuit said that's not inventive.

10:36:45 4           And again, the Court in the prior hearing,

10:36:49 5    TrackTime's counsel agreed that this ordering of these

10:36:52 6    functional steps was the logical way to do it.

10:36:55 7           Let me skip now to what they're really arguing

10:37:01 8    today.  This is slide 30.  This is from Dr. Edwin --

10:37:05 9    Dr. Hernandez's expert report.  And here he said this is the

10:37:10 10   ordered combination.  And all he does is list each claim

10:37:15 11   element with a bullet point next to it.  He's saying this

10:37:19 12   claim as a whole is the inventive ordered combination.

10:37:25 13          But as Your Honor noted last time, that's not

10:37:28 14   the law.  The law is whether the claim as a whole is novel

10:37:32 15   or not is not the test --

10:37:34 16          THE COURT:  Go back to the other slide, please.

10:37:37 17          MR. HADDEN:  Excuse me?

10:37:38 18          THE COURT:  Go back to the other slide.

10:37:40 19          MR. HADDEN:  This one?

10:37:51 20          THE COURT:  Okay.

10:37:52 21          MR. HADDEN:  So we know the Federal Circuit has

10:37:55 22   told us over and over again whether or not the claim is

10:37:59 23   novel is not the test.  And in -- funny, in *IV v. Symantech*,

10:38:08 24   the jury had already found the claims not valid, the Federal

10:38:12 25   Circuit nonetheless said they were dead under 101 and that

10:38:15  1    invalidity didn't matter.

10:38:18  2            In BSG, again, the Federal Circuit told us the

10:38:21  3    relevant inquiry is not whether the claimed invention as a

10:38:24  4    whole is unconventional or nonroutine, but that is exactly

10:38:28  5    the argument they're making, they're putting up the claim

10:38:32  6    and saying as a whole this was not in the prior art, and

10:38:35  7    that's not the test.

10:38:36  8            So a case that came out in 2019, this

10:38:40  9    *Chamberlain* case, Your Honor, I think is directly on point.

10:38:44 10    There is a lot of text on this slide.  This is slide 36.

10:38:48 11    But the patent in *Chamberlain* was to an automatic garage

10:38:55 12    door opening, and like --

10:38:56 13            THE COURT:  What's ordered combination mean?

10:38:58 14    You keep saying they're saying it as a whole, they're saying

10:39:01 15    well, it's the -- it's either putting these elements

10:39:05 16    together in a unique way or putting them together at all

10:39:08 17    because nobody else had done it.  So what is the difference

10:39:15 18    between saying well, nobody put all this together versus

10:39:18 19    saying and we did so, what's the difference between that and

10:39:24 20    looking at the claim as a whole?

10:39:27 21            MR. HADDEN:  Sure.  So I think this case

10:39:30 22    directly answers that.  So in this case, you have this

10:39:34 23    garage door opener, it was otherwise conventional, but if

10:39:39 24    the connection between the sensors at the bottom of the

10:39:41 25    garage door would detect whether something was in the way,

10:39:45 1  they would communicate with the controller in this patent

10:39:48 2  over a wireless connection, this wireless transmitter,

10:39:53 3  instead of a wire.  And the plaintiff argued the

10:39:57 4  conventional parts of a garage door opener, now we're doing

10:40:01 5  it with this wireless transmitter, that's an inventive

10:40:05 6  ordered combination.  And the Federal Circuit said no, that

10:40:09 7  misunderstands our law.  And they go on and explain the

10:40:13 8  appropriate question is not whether the entire claim as a

10:40:15 9  whole was well understood, routine or conventional, but

10:40:20 10  whether it was two questions, the two questions are one,

10:40:22 11  whether each of the elements involves well understood,

10:40:26 12  routine and conventional activity, and we've answered that

10:40:30 13  in this case, they do.

10:40:35 14          THE COURT:  Okay.  You've answered that through

10:40:37 15  your expert?

10:40:38 16          MR. HADDEN:  No, all through admissions from

10:40:41 17  their expert and their inventor and the specification.  They

10:40:44 18  don't dispute --

10:40:45 19          THE COURT:  Hold on.  You don't dispute number

10:40:47 20  one up there?

10:40:48 21          MR. GREENSPOON:  This is about the *Chamberlain*

10:40:52 22  case.

10:40:55 23          THE COURT:  I want to know, are you disputing

10:40:57 24  that each of the elements in the claimed method involves

10:41:00 25  well-known, understood and conventional activity.

10:41:05  1              MR. GREENSPOON:  Taken alone each individually,

10:41:07  2      that's correct, Your Honor.

10:41:08  3              THE COURT:  Okay.

10:41:08  4              MR. HADDEN:  So then the question is whether all

10:41:11  5      the steps when you put them together is there now something

10:41:14  6      inventive here, and this is exactly the question Your Honor

10:41:18  7      was asking.  And I think this is key, right, the notion is

10:41:22  8      not whether all these things were done in this exact way,

10:41:26  9      the question is is there something in the combination of

10:41:28 10      these conventional components that is something new, that is

10:41:32 11      something that is actually an improvement too computers --

10:41:35 12              THE COURT:  What I want to know is why is there

10:41:38 13      not a fact issue on that?

10:41:41 14              MR. HADDEN:  I'll --

10:41:41 15              THE COURT:  Give me what your evidence is that

10:41:43 16      tells me there is no fact issue on that.

10:41:46 17              MR. HADDEN:  Sure.  There is no fact issue on

10:41:48 18      that because they have not identified anything that is

10:41:52 19      somehow new and inventive that comes out --

10:41:56 20              THE COURT:  You have the burden, so why don't we

10:41:58 21      stick with what you're going to be showing.

10:42:01 22              MR. HADDEN:  Sure.  If I could just finish --

10:42:03 23              THE COURT:  No, come on, just answer my

10:42:05 24      question.  You can read all the law you want some other

10:42:05 25      time, let's get to what I need before you run out of time.

10:42:13 1     MR. HADDEN:  This is the answer, Your Honor.

10:42:16 2 You cannot just claim that performing the abstract idea on a

10:42:23 3 generic device --

10:42:24 4     THE COURT:  This is argument, what's the

10:42:26 5 evidence?  I asked him for evidence.  This is argument,

10:42:29 6 you're just saying -- you're just -- you're like excerpting

10:42:35 7 the claims, this is from a brief, it's summary judgment,

10:42:43 8 neither of you is focusing on evidence.  I don't know what

10:42:46 9 he remembered, is that what you're going to talk to to the

10:42:49 10 jury based on your argument.  I did get a punch of boxes of

10:42:53 11 stuff and we did look through the expert reports, but that's

10:42:57 12 okay, you're citing me their report.  Okay.  I mean, you're

10:43:01 13 citing a brief.  Thanks.

10:43:08 14     MR. HADDEN:  The issue, Your Honor, is --

10:43:10 15     THE COURT:  I'm trying to tell you if you want

10:43:12 16 to within this, this is not going to help you, so why don't

10:43:15 17 you focus on some kind of evidence for me.

10:43:18 18     MR. HADDEN:  The evidence is that mobile devices

10:43:20 19 were known, touchscreens were known, and the point is that

10:43:24 20 substituting clicking on a mouse to touching a screen is not

10:43:29 21 an inventive contribution, and that's exactly what

10:43:33 22 *Chamberlain* said.  *Chamberlain* said you can sub out a wire

10:43:37 23 for wireless transmitter, but that did not create an

10:43:41 24 inventive contribution.  And the reason is that *Affinity*

10:43:45 25 *Labs*, applying the abstract idea saying do it on a mobile

10:43:52 1   device cannot as a matter of law be an inventive concept,

10:43:56 2   that's what the Federal Circuit said in *Affinity Labs*,

10:44:00 3   that's what they said in *Chamberlain*, and that's all that's

10:44:04 4   happening here.

10:44:05 5         The same in *Berkheimer*, performing the abstract

10:44:08 6   idea with conventional computer components cannot be an

10:44:12 7   inventive concept at Step 2.  To contrast this with *BASCOM*,

10:44:19 8   this is slide 43, *BASCOM* there was inventive contribution

10:44:23 9   because the combination improved the computer itself.

10:44:26 10   Right?  The idea was once you do that content filtering at a

10:44:32 11   central ISP server using customized profiles that you can

10:44:36 12   associate with the customer's IP address, that is not just

10:44:40 13   saying do it on a computer or do it on a central computer,

10:44:45 14   that -- because of that combination, you now have an

10:44:49 15   improvement to computer technology.  That's how you survive

10:44:54 16   at Step 2.  You can't just say none of these -- this claim

10:44:59 17   hasn't been done before, that's can't be the argument.  The

10:45:02 18   argument has to be there is something in these components

10:45:06 19   that is an improvement to computer technology.  There is

10:45:09 20   nothing in these claims.  Dr. Schonfeld explained that,

10:45:12 21   Dr. Hernandez doesn't dispute it, all he says is the claim

10:45:16 22   as a whole wasn't done before, and that doesn't fly.

10:45:20 23         THE COURT:  What about the Amazon patent?

10:45:22 24         MR. HADDEN:  Your Honor, the Amazon patent is

10:45:25 25   irrelevant to this case.  As Your Honor held before, and

10:45:29  1    every court that has addressed this argument, *Bridge & Post*

10:45:34  2    --

10:45:34  3            THE COURT:  I get it, I get it, it's not

10:45:36  4    relevant, but answer it, let's assume it is relevant.

10:45:40  5            MR. HADDEN:  Sure.  There is two responses, Your

10:45:42  6    Honor.  One as the courts have held in Federal Circuit and

10:45:45  7    confirmed --

10:45:47  8            THE COURT:  I know it's irrelevant.  But let's

10:45:49  9    assume I don't find it's irrelevant, why isn't it wrong if

10:45:53 10    it's true what they're saying that you guys are like,

10:45:57 11    anybody knows that you can't just, you know, substitute a

10:46:00 12    mouse for a touch and move these words, but yeah, we're

10:46:04 13    going to do it.

10:46:05 14            MR. HADDEN:  Your Honor, the patent was -- the

10:46:07 15    Amazon patent was filed in 2013, before the *Alice* decision.

10:46:11 16    There was no office action --

10:46:13 17            THE COURT:  Do you agree that those claims are

10:46:16 18    ineligible?

10:46:17 19            MR. HADDEN:  They may well be ineligible.  I

10:46:21 20    haven't analyzed them because they're irrelevant, but they

10:46:24 21    may well be ineligible.  But the patent was granted with no

10:46:27 22    rejections, there are no statements by Amazon about patent

10:46:31 23    eligibility, there is no statements from the examiner about

10:46:35 24    patent eligibility, they may well be ineligible.  That

10:46:35 25    patent is not an issue, it's never been asserted, it's only

10:46:43 1    being discussed in this case because TrackTime is trying to

10:46:46 2    make this argument.  But the argument doesn't fly.  You

10:46:49 3    can't resurrect one dead patent based on some statements

10:46:53 4    about another patent that's not even in the case.

10:46:55 5            THE COURT:  No, I take your point on that, but

10:46:59 6    it does seem a little bit odd to say when it's in Amazon's

10:47:03 7    interest, Amazon is like sure, Patent Office give us this,

10:47:08 8    and we're going to continue to support that payment, we're

10:47:11 9    going to keep paying for that patent because we -- we got

10:47:14 10   it, maybe some day we'll want to use it, and now you're

10:47:18 11   coming in and saying this is so clear, Your Honor, it needs

10:47:22 12   to go on summary judgment.

10:47:24 13           MR. HADDEN:  I can't vouch for the Amazon

10:47:26 14   patent.  As I say, it was filed before *Alice.*  It's never

10:47:29 15   been asserted.  It's never been litigated.  It's one of tens

10:47:34 16   of thousands of patents Amazon has.  Whether they pay

10:47:37 17   maintenance fees on it or not, I don't see how that matters.

10:47:42 18           THE COURT:  Maybe it's just a credibility issue.

10:47:44 19           MR. HADDEN:  And again, the *Morsa v. Facebook*

10:47:48 20   case, same way, the Court did not confer patent eligibility,

10:47:52 21   you can check this patent.  I think the key point, Your

10:47:55 22   Honor, is that you can't just say the claim as a whole was

10:48:02 23   not done in the prior art.  The Federal Circuit has rejected

10:48:06 24   that a zillion times.  When we get back to -- I mean, this

10:48:11 25   is really I think the key point, this is just like *Affinity*

10:48:18  1    *Labs.   Affinity Labs* the claim was to implementing out of

10:48:24  2    region broadcasting on a cellular phone.  Here we're saying

10:48:30  3    signifying video and transcript on a mobile device.  But

10:48:33  4    because neither the claim nor the specification describes

10:48:36  5    how to do that, it can't be an eligible patent.  And that's

10:48:42  6    all they're doing here, they're applying the abstract idea

10:48:45  7    on a mobile device with no improvement to the mobile device

10:48:49  8    and no description how to make that work.  And they've

10:48:53  9    acknowledged that.  And that's the evidence that will --

10:48:58 10    that kills this patent in Step 2.

10:49:05 11              THE COURT:  Okay.

10:49:06 12              MR. HADDEN:  I'll sit down if you have no more

10:49:08 13    questions.

10:49:09 14              THE COURT:  All right.  So are you arguing the

10:49:10 15    claim as a whole?  And if not, tell me why not.

10:49:15 16              MR. GREENSPOON:  It's not the claim as a whole,

10:49:16 17    it's the part of the claim abstracted out -- I shouldn't say

10:49:20 18    that word, it's the word part of the claim that remains

10:49:23 19    after the abstract idea is removed.  It's the fading back of

10:49:26 20    the color that we showed on the slide.  In fact, I'm very

10:49:30 21    surprised to hear this position.

10:49:31 22              Let me read from the case and I'll give the case

10:49:34 23    cite after it.  Someone made the same argument, the Court

10:49:38 24    says, "In doing so, however, CSG cherrypicks a quote from

10:49:42 25    *TwoWay*, the Federal Circuit case, in order to suggest that

10:49:45 1   the novelty of the claimed feature is irrelevant to the

10:49:48 2   eligibility analysis.  This is manifestly not the case."

10:49:52 3            And then it goes on to cite the Mayo Supreme

10:49:57 4   Court decision which in the words of Mayo, this is the

10:49:59 5   Supreme Court said the 102 novelty inquiry might sometimes

10:50:03 6   overlap.  So I think counsel simply misunderstand the five

10:50:07 7   or so Federal Circuit decisions.  I could sit here and

10:50:12 8   harmonize them for Your Honor.  They are confusing, I

10:50:16 9   concede, but the basics are this is manifestly not the case

10:50:19 10  about Mr. Hadden's argument.  That case citation is Ubiquiti

10:50:25 11  2021 US Dist Lexus 92864.

10:50:32 12           The only other point I would like to make, Your

10:50:34 13  Honor, and then be available for questions, the mouse click

10:50:37 14  to jump that Mr. Hadden said is described in the patent is

10:50:40 15  preexisting in the prior art.  Not so.  You'll notice

10:50:44 16  Mr. Hadden didn't show any part of the patent when he made

10:50:47 17  that representation to the Court.  There is no place in Curt

10:50:51 18  Evans' '638 patent that said that mouse clicks to jump to

10:50:56 19  the new media by themselves are going to be an actuator to

10:51:01 20  move playback position.

10:51:02 21           Your Honor, Mr. Flachsbart will handle the other

10:51:02 22  motions.

10:51:02 23           THE COURT:  All right.  With respect to the

10:51:08 24  summary judgment motion, there has been a lot of argument

10:51:10 25  here today, but not a lot of evidence shown on either side,

10:51:13  1   but we did review the materials that were presented to us in

10:51:16  2   the briefing.  And it appears to us that there are experts

10:51:19  3   on each side who have offered opinions relevant to whether

10:51:22  4   the claimed steps or their ordered combination were well

10:51:26  5   understood, routine, and conventional.  So it seems to me

10:51:30  6   that there is a genuine issue of material fact as to whether

10:51:33  7   the asserted claims of the '638 patent are patent eligible

10:51:36  8   and I'm going to deny both sides' motions.

10:51:40  9           So that should, I believe, be the end of the

10:51:43 10   summary judgment motions given our ranking issue.  So

10:51:50 11   plaintiff's second summary judgment motion had something to

10:51:53 12   do with prior art status and I think that one is going to

10:51:56 13   raise its head in the Daubert motions to some extent.  I

10:52:01 14   guess we'll deal with it to the extent it comes up.

10:52:05 15           All right.  *Daubert* motions.  Dr. Schonfeld's

10:52:11 16   testimony on the prior art status, speaking of which, of the

10:52:16 17   Master '431 patent, arguing it should be excluded because he

10:52:20 18   admitted at his deposition that it performed no analysis on

10:52:24 19   deception by a Master, despite a report suggesting that he

10:52:30 20   did.  So, for this one, let me just get some facts before I

10:52:34 21   hear the argument.  What exactly are the defendants, not

10:52:39 22   you, for the defendants, what exactly is Dr. Schonfeld going

10:52:42 23   to say regarding the '431 patent.

10:52:52 24           MR. WU:  Your Honor, this is Min Wu for Amazon.

10:52:55 25   So Dr. Schonfeld will say, and he said the same in his

10:53:07  1    deposition --

10:53:18  2              THE COURT:  Why don't you take that one down.

10:53:20  3    Not you, take that down while he is talking.

10:53:29  4              MR. WU:  Dr. Schonfeld said in his deposition

10:53:32  5    that these documents and corresponding testimony from

10:53:36  6    Mr. Master show that he and his colleagues invented the idea

10:53:39  7    described in the Master patent by September --

10:53:42  8              THE COURT:  So what documents are you talking

10:53:44  9    about?

10:53:45 10              MR. WU:  So there are a number of documents

10:53:47 11    here.  One is a Mr. Master's evaluation showing that when

10:53:58 12    SoundHound launched a product in 2011, the product

10:54:02 13    development started two years ago which was in 2009.  And

10:54:07 14    the other document is an e-mail chain in 2009 showing that

10:54:13 15    Mr. Master and his colleagues were discussing technical

10:54:18 16    issues and how to solve this alignment issue.  So --

10:54:24 17              THE COURT:  All right.  I just want to know

10:54:26 18    those documents, what those were in my head so when you read

10:54:29 19    that to me it has more context.  Read it again what he said.

10:54:34 20              MR. WU:  Sure.  So Dr. Schonfeld said this in

10:54:38 21    his deposition, "These documents and corresponding testimony

10:54:42 22    from Mr. Master show that he and his colleagues invented the

10:54:46 23    idea described in Master patent by September of 2009.  And

10:54:50 24    here I am relying on the e-mail chain and the rest of my

10:54:55 25    opening report and also emphasizing the fact that ultimately

10:55:00 1    there was a video that showed how the system worked by

10:55:04 2    2011."

10:55:04 3              So Dr. Schonfeld will cite to those documents

10:55:09 4    that I just referred to and cite to his report -- not citing

10:55:15 5    to a report, but opine on his conclusion that all those

10:55:23 6    documents show to him that Mr. Master conceived of the idea

10:55:30 7    by 2009.

10:55:31 8              THE COURT:  And did he say that in his report?

10:55:34 9              MR. WU:  Yes, he did.

10:55:36 10             THE COURT:  All right.  So now that I understand

10:55:38 11   what he's going to say, now you can get up and make your

10:55:42 12   motion.

10:55:48 13             MR. FLACHSBART:  With respect to Dr. Schonfeld,

10:56:02 14   I think it's critical that what we're going to be looking at

10:56:05 15   is obviously we're having a priority battle and that was the

10:56:09 16   subject of this other motion.  I'm not going to raise it,

10:56:12 17   but I am going to use one slide from it to show what we're

10:56:16 18   talking about, what we're talking about this time frame,

10:56:19 19   Master filed a provisional application in 2010 that resulted

10:56:22 20   in a patent that issued, the '431.  And then there is this

10:56:27 21   SoundHound e-mail chain that they are relying on, Amazon is

10:56:30 22   relying on.  And then obviously we have a diligence period

10:56:34 23   that we argue for Mr. Evans.

10:56:36 24             Dr. Schonfeld specifically said, and so

10:56:39 25   obviously what we're looking at is a critical date in

10:56:42  1   September of 2009 is what they are saying, but he's going to

10:56:46  2   tell you that Dr. Schonfeld is going to come in here and

10:56:49  3   tell the jury that in 2009, SoundHound had conceived of the

10:56:54  4   invention.  I won't get into how, a three-page e-mail is

10:57:00  5   considered good enough for Dr. Schonfeld, but a disclosure

10:57:08  6   that is this thick isn't good enough for Mr. Evans --

10:57:12  7            THE COURT:  Well, at least you're not going to

10:57:14  8   get into it, but you just spent ten seconds finding it, but

10:57:18  9   go ahead.

10:57:19 10            MR. FLACHSBART:  So unfortunately, Dr. Schonfeld

10:57:23 11   didn't actually do this analysis.  And he admitted as much.

10:57:28 12   He said that did not make an affirmative opinion that the

10:57:31 13   earliest priority date of the '431 is September 2009.

10:57:35 14            THE COURT:  Well, what about the testimony that

10:57:37 15   I just heard?

10:57:38 16            MR. FLACHSBART:  Which testimony?

10:57:39 17            THE COURT:  The testimony that was just read to

10:57:42 18   us, that was testimony from Dr. Schonfeld's deposition, was

10:57:47 19   it not, Mr. Wu?

10:57:42 20            MR. FLACHSBART:  I didn't hear any testimony

10:57:51 21   from Dr. Schonfeld's deposition.  I heard him say what he

10:57:52 22   said he was going to say, but this is what he said at his

10:57:52 23   deposition.

10:57:52 24            THE COURT:  Hold on.  I asked a question.  What

10:58:01 25   did you read me, something about these documents show?

10:58:04 1          MR. FLACHSBART:  That's out of his report, Your

10:58:07 2  Honor.

10:58:07 3          MR. WU:  This is Dr. Schonfeld's deposition at

10:58:13 4  page 236, lines 14 to 22.

10:58:17 5          THE COURT:  Okay.

10:58:18 6          MR. FLACHSBART:  And that's these documents

10:58:20 7  show.  What are these documents?  These documents --

10:58:22 8          THE COURT:  Now you're arguing the facts of what

10:58:25 9  those documents show.  You're saying he said I have no

10:58:28 10  opinion, and at his deposition he said that, and what I just

10:58:33 11  heard was him saying look, I have an opinion that when I

10:58:36 12  read this stuff, even though it's like a three-page e-mail

10:58:40 13  and that's enough with the other thing wasn't enough, I have

10:58:44 14  concluded that he had the invention that he later patented

10:58:50 15  by 2009.

10:58:51 16          MR. FLACHSBART:  The problem is he didn't do

10:58:53 17  that analysis, Your Honor.  I mean, he says that, I don't

10:58:56 18  contend that he didn't say that, but he also said this, and

10:58:59 19  he also said this.  I did not do an analysis of conception.

10:59:02 20  So how is he going to come before the jury and testify as to

10:59:07 21  what Mr. Wu just said he's going to testify when he also

10:59:11 22  said he didn't do the analysis?  How is he going to come in

10:59:14 23  front of the jury and testify that way when he didn't do the

10:59:18 24  requisite analysis in order to determine whether or not you

10:59:22 25  had a definite and permanent idea of a complete and

10:59:25 1    operative invention by September of 2009?

10:59:27 2            And with respect to those documents, I can tell

10:59:29 3    you we included that e-mail, that September 2009 e-mail in

10:59:33 4    its entirety in an attachment to the motion because it's

10:59:37 5    three pages and doesn't mention anything about tap-to-jump,

10:59:40 6    it doesn't mention anything about anything having anything

10:59:43 7    to do with the invention.  How Dr. Schonfeld is going to

10:59:47 8    come in and it's completely ridiculous that he would come in

10:59:49 9    and say oh, yeah, this document that doesn't talk about the

10:59:53 10   invention at all, I'm going to rely on it, 2011 document to

10:59:57 11   get back to 2009.  He shouldn't be permitted to testify to

11:00:00 12   that, as to that.

11:00:02 13           Now, over obviously, look, we have no problem

11:00:04 14   with other portions of Dr. Schonfeld's opinions.  We're not

11:00:10 15   trying to exclude him in his entirety.  The only thing we

11:00:13 16   don't think he should be allowed to do is to tie Master back

11:00:16 17   to a date of 2009 which is unsupported by the evidence and

11:00:19 18   which he specifically said he didn't do the analysis and he

11:00:22 19   has no opinion.

11:00:23 20           THE COURT:  All right.  So I'm not so worried

11:00:25 21   about your assertions that it doesn't actually say what they

11:00:30 22   think it says, but let me hear, Mr. Wu, what do I do with

11:00:36 23   this?  He says I didn't make an opinion on the earliest

11:00:41 24   priority date, and I didn't look -- go to the next slide.

11:00:46 25           MR. FLACHSBART:  I didn't do the analysis.

| | |
|---|---|
| 11:00:47 | 1 |

THE COURT:  And I didn't do an analysis of
conception to address whether he had a definite and
permanent idea.  So what do I do with that?

MR. WU:  Your Honor, let me maybe present a
slide from our presentation.  Your Honor, the key here is
Dr. Schonfeld did not need to show Mr. Master conceived the
invention by 2009.  I mean, I think TrackTime also did not
show that Mr. Evans conceived the invention by 2008 because
--

THE COURT:  I don't care about that.  I'm
concerned about what your expert said.  Why does it not
matter what he said?  So you're not going to put him on to
say he did an analysis and Mr. Master had the definite and
permanent idea in 2009, you're not going to put him on to
say that?

MR. WU:  We agree, we're not going to say that.

THE COURT:  So you're not going to put him on to
say that, correct?

MR. WU:  That's correct.

THE COURT:  But you are going to put him on to
say that he reviewed that e-mail and that that shows that he
had the inventions in his head by when?

MR. WU:  2009.

THE COURT:  Okay.  So what's the relevance of
that if it's not for showing a conception?

            MR. WU:  Right.  Because TrackTime is arguing

that Mr. Evans had the invention by 2008, but also did not

do a complete conception analysis for that 2008 date.  So to

the extent TrackTime raises the sketch, the idea files with

those early days I think Dr. Schonfeld is entitled to also

raise --

            THE COURT:  But do you have their expert saying

yeah, I didn't do the analysis?

            MR. WU:  I believe we do.  I believe -- I don't

have a quote right now, but I believe Dr. Hernandez admitted

that he did not do a complete conception analysis for the

2008 sketch by Mr. Evans.

            THE COURT:  Do we have expert analysis for that,

or is that something that Mr. Evans could say or Mr. Masters

could come in and testify about, and then the jury can

decide if they had the definite and permanent idea?

            MR. WU:  Right, that's exactly the point,

Mr. Evans can come in and talk about his 2008 sketch and

Mr. Master can come in and talk about his 2009 development

and let the jury decide.  That's our point here.

            THE COURT:  Is conception an issue of law or

fact?

            MR. WU:  I believe that's an issue of law.  I

believe that's an issue of fact.

            MR. FLACHSBART:  We agree, Your Honor,

11:04:11 1    conception is an issue of fact.

11:04:13 2                THE COURT:  All right.  So you don't care if

11:04:17 3    Mr. Master comes in and testifies about what he knew when,

11:04:20 4    you just don't want their expert to come in and opine that

11:04:23 5    that's conception?

11:04:24 6                MR. FLACHSBART:  Correct.  Mr. Masters doesn't

11:04:28 7    remember, for what it's worth.

11:04:31 8                THE COURT:  So what I'm confused about from

11:04:34 9    Amazon's standpoint is -- sit down -- what I'm confused from

11:04:40 10   Amazon's standpoint is he said I didn't do an analysis of

11:04:48 11   conception, but I am going to opine for the jury that he

11:04:55 12   conceived of it, or he's not going to say I opine that they

11:05:01 13   conceived of it, he's going to say something else, that's

11:05:04 14   what I'm not understanding.  He said I didn't do the

11:05:07 15   analysis.  What I'm trying to figure out is are you trying

11:05:10 16   to backdoor in him giving the ultimate conclusion when he

11:05:13 17   didn't do the analysis or is he testifying about something

11:05:17 18   else?

11:05:19 19               MR. WU:  Right.  To make it simple, if the

11:05:21 20   Court's conclusion today is that Dr. Schonfeld should not be

11:05:25 21   talking about it, but instead Mr. Master should be talking

11:05:29 22   about, we're fine with that.

11:05:31 23               THE COURT:  Okay.  Well, fine, then if you agree

11:05:35 24   to that, then -- and it sounds like the plaintiff doesn't

11:05:39 25   disagree that Mr. Master can testify whatever he knows or

11:05:44 1    subject to what he's already told you he knows, right?

11:05:47 2              MR. FLACHSBART:  Mr. Master is a fact witness.

11:05:50 3    Obviously we don't have a *Daubert* challenge for him.

11:05:54 4              THE COURT:  Okay.  I agree.  The motion is

11:05:56 5    granted on that limited basis that Dr. Schonfeld can't come

11:05:59 6    in and say what the conception date is for Master because he

11:06:03 7    didn't -- he said he didn't do the analysis.

11:06:06 8              Okay.  Next, Dr. Macartney's affirmative

11:06:12 9    testimony on a reasonable royalty rate for Amazon Music

11:06:16 10   should be excluded because he failed to conduct the

11:06:18 11   regression, account for data sensitivity or address how a

11:06:23 12   prospective methodology could soundly result in a negative

11:06:28 13   royalty.  Okay.  I need some help on this one.

11:06:33 14             MR. FLACHSBART:  No problem, Your Honor.

11:06:34 15             THE COURT:  Do you want to exclude the testimony

11:06:37 16   because it relies on arguably insensitivity analysis, do you

11:06:41 17   want to exclude the sensitivity analysis, I didn't quite

11:06:44 18   understand what you wanted.

11:06:46 19             MR. FLACHSBART:  We want to exclude

11:06:50 20   Dr. Macartney's testimony to the extent that it relies on --

11:06:52 21   to the extent it relies on a study that he did not do.  So

11:07:01 22   Dr. Macartney, very similar, so the damages models in this

11:07:04 23   case that our expert prepared, Mr. Peterson and

11:07:08 24   Dr. Macartney prepared are very similar.  They start with a

11:07:12 25   royalty base and in the end I think they used the same

11:07:15 1   royalty base and then they applied a number of factors to

11:07:19 2   arrive at the bottom, sort of a waterfall, arrive at the

11:07:22 3   bottom with a royalty that they applied.

11:07:25 4        Both cases, both experts used this model in a

11:07:28 5   very similar fashion.  Obviously I want to be very clear, we

11:07:31 6   are not trying to exclude Dr. Macartney's criticisms of our

11:07:35 7   expert's model, he's welcomed to testify on that.  What we

11:07:39 8   are trying to exclude is his affirmative opinions on

11:07:42 9   damages.  He offers his own opinion as to what the

11:07:45 10  appropriate number of damages would be, but in order to do

11:07:49 11  that, he makes a mistake in each model.  And they're

11:07:52 12  critical mistakes.

11:07:55 13       In the model that relates to x-ray lyrics, he

11:07:58 14  relies on a study, a multivariant regression analysis that

11:08:02 15  was done by Amazon.  Amazon got a function called disco that

11:08:08 16  does mathematical analyses of their various products.  They

11:08:13 17  take a bunch of different features and in this case they

11:08:16 18  analyze their worth, their feature weight and they analyze

11:08:19 19  that with respect to the Amazon user products.  And he uses

11:08:24 20  one of those features in order to apply a value in the

11:08:28 21  context of coming up with his waterfall.

11:08:31 22       Now, he did not do that study.  He did not have

11:08:34 23  access to that study.  He did not testify whether or not the

11:08:38 24  feature interactions of that study were sensitive to

11:08:42 25  correlation or not correlation.  In other words, he

11:08:44 1    basically took what Amazon had done and stuck it in his own

11:08:48 2    report without doing any analysis.  He didn't do it himself.

11:08:53 3    And that is not permitted.  He's an expert.  He's got to do

11:08:57 4    the work.  He can't just take numbers from a company and say

11:09:01 5    these numbers are fine.  He didn't see what happens if you

11:09:04 6    change the features.

11:09:04 7              We asked him questions about that, and one of

11:09:07 8    the questions here, did you examine the correlation effect

11:09:10 9    between the MHV, these MHV, these are exactly what we talk

11:09:15 10   about, these are the features that they use to generate this

11:09:19 11   model.  He said I have not.  I relied on it because it's

11:09:22 12   something that Amazon does, which might work for a normal

11:09:26 13   situation, but he's not in a normal situation, he's an

11:09:29 14   expert.  He's suppose to do the work himself.  It's not

11:09:33 15   necessary for me to go in and start second guessing Amazon,

11:09:36 16   and yet that is exactly what is required.  He needs to look

11:09:38 17   at the study and say how do these features interact.  He

11:09:42 18   never even looked at the study.  Did you test the design of

11:09:45 19   causal model framework?  That's the name of the study, a

11:09:48 20   type of study.  I didn't test it.  It's something they did.

11:09:51 21   Then I asked him about what if we change the variables, we

11:09:55 22   take the study and change the variable, can it change the

11:09:58 23   coefficients, he said of course it can.  I said, this is my

11:10:01 24   questioning, can it the flip the sign of the coefficient, he

11:10:05 25   said it can change them, so it can change the sign.  So in

11:10:09 1   other words, if he got a negative value, he could come up

11:10:11 2   with the result that the royalty due was negative, that for

11:10:16 3   infringing, Amazon is owed money.  Well, it didn't turn out

11:10:20 4   that way in the actual study, but he didn't test anything --

11:10:24 5            THE COURT:  He's not relying on a hypothetical

11:10:26 6   study, he's relying on the study that Amazon did in the

11:10:30 7   ordinary course of its business.  That doesn't seem -- that

11:10:34 8   doesn't seem odd to me that he relies on work that Amazon

11:10:39 9   did when it's looking at and evaluating its products and

11:10:42 10  it's evaluating features of its products, it did a study,

11:10:46 11  and he relies on it.  That doesn't seem odd to me, why is

11:10:50 12  it.

11:10:50 13           MR. FLACHSBART:  I don't think it would have

11:10:51 14  been odd at all had he dug into the underlying -- either of

11:10:55 15  the studies and been able to answer these questions for me,

11:10:58 16  which of the features are correlated.

11:11:00 17           THE COURT:  He did answer the questions.  He

11:11:02 18  said yeah, if they change the input, the output would be

11:11:07 19  different.  But these are -- this is what Amazon looks to

11:11:12 20  when it's doing its business as to what it thinks is

11:11:16 21  correct.  I mean, I'm going to deny this motion.  I think

11:11:21 22  you can cross him on this and say look, it could have -- you

11:11:25 23  know, it could have weird results, you could wind up where

11:11:29 24  the plaintiff owes Amazon money.  You can ask all those

11:11:32 25  questions, but I don't think the fact that he relied on a

11:11:36 1    study that Amazon did in the ordinary course of its business

11:11:41 2    is sufficient to preclude his testimony.

11:11:43 3             MR. FLACHSBART:  Okay.  I understand, Your

11:11:46 4    Honor.  Can I talk briefly about the other side of his

11:11:49 5    analysis?

11:11:51 6             THE COURT:  Okay.

11:11:51 7             MR. FLACHSBART:  I'll just refer you to the

11:11:54 8    brief on that one, Your Honor.  He literally just made up a

11:11:58 9    number with the portion of his waterfall that relates to the

11:12:04 10   Kindle product.  There is no basis for it at all.  He just

11:12:07 11   says I came up with it, 20 percent, and there is no real --

11:12:10 12   there is no basis for that at all.

11:12:12 13            THE COURT:  All right.  Mr. Wu, does he just

11:12:14 14   make up the number?  Where does he come up with the

11:12:18 15   20 percent?

11:12:22 16            MR. WU:  Yes.  So the 20 percent number, I

11:12:28 17   believe this is Dr. Macartney had a discussion with Amazon's

11:12:33 18   technical expert, Dr. Schonfeld, and understood from

11:12:38 19   Dr. Schonfeld's perspective that the intellectual values of

11:12:42 20   books and music are much higher than the value of this

11:12:52 21   feature.  And I believe Dr. Macartney said in his report

11:12:57 22   that he is giving TrackTime the benefit of doubt and use a

11:13:02 23   20 percent number which is way higher than it actually is.

11:13:09 24   It's a rough estimate, we admit that, but by any means the

11:13:14 25   20 percent is more than the actual value.

THE COURT:  All right.  I'm going to deny that
part of the motion as well.

Okay.  Next *Daubert* motion, Dr. Schonfeld's
testimony, preclude Dr. Schonfeld from testifying on a lack
of inventive concept under *Alice* Step 2 because he never
considered the ordered combination of the claimed invention.
I'm going to deny that.  I denied the summary judgment
motions because there was expert testimony on that that
created a genuine issue of fact.  I think his testimony is
fair.

The fourth *Daubert* motion of five, because
apparently Amazon couldn't get any expert to say anything
that was admissible, Dr. Macartney's affirmative testimony
on a reasonable royalty rate for Amazon user should be
excluded because he improperly relied on post negotiation
data for parameters that would have had known values during
the 2014 negotiation.  All right.  So there are times when
you can look at things that are post the negotiation, and I
suppose times when you can't.  So I want to hear first from
the defendant, why is it appropriate here?  Tell me what he
relied on it and why it's appropriate that he relied on it?

MR. WU:  Yes.  So I believe TrackTime's only
argument is that post -- discussion of post negotiation data
is improper if it contradicts with prenegotiation data.  And
that is not the case here.  In fact, TrackTime's own expert,

11:15:09 1    Mr. Peterson, also cites extensively to post negotiation

11:15:15 2    data and apparently TrackTime didn't find any problem there.

11:15:22 3           And the issue here is not really post

11:15:25 4    negotiation data disagree with prenegotiation data, it's

11:15:30 5    just disagree among the experts.  I mean, they both cite to

11:15:37 6    -- because there are -- I mean, both experts --

11:15:40 7           THE COURT:  What is the post-negotiation data

11:15:44 8    that is sought to be excluded?

11:15:54 9           MR. WU:  Yes.  I believe the first one is a -- I

11:15:59 10   believe that's data that we just talked about which is the

11:16:02 11   retention of 0.4 percent, and that's coming from a 2021

11:16:11 12   study ^ .  And I believe the next one is a mobile usage

11:16:27 13   ratio of about 40 percent, and that's from a 2017 survey.

11:16:33 14          And none of these data contradicts any

11:16:38 15   prenegotiation data.  And the only thing that TrackTime

11:16:45 16   points to is prenegotiation, the mobile usage rate had a

11:16:52 17   different number.  But that different number was counted in

11:16:56 18   a different manner.  That included the Amazon TV boxes which

11:17:04 19   are -- I mean, I think we all agree that the asserted

11:17:02 20   invention cannot be practiced on those TV boxes.  So these

11:17:15 21   are just two complete separate sets of data, they're not in

11:17:20 22   disagreement with each other.

11:17:23 23          THE COURT:  Okay.  Thank you.  Let me hear from

11:17:26 24   the plaintiff.  Did your expert rely on post-negotiation

11:17:30 25   information?

11:17:31  1          MR. FLACHSBART:  For anything?  Yes.

11:17:33  2          THE COURT:  For what?

11:17:36  3          MR. FLACHSBART:  Used it to verify his

11:17:39  4   assumptions, I believe, about the contemporaneous with

11:17:43  5   negotiation data and he used it to bolster missing data from

11:17:48  6   the time of the negotiation.

11:17:50  7          THE COURT:  All right.  Tell me why that's okay

11:17:52  8   but what the defendant's proposal of doing isn't?

11:17:59  9          MR. FLACHSBART:  Because what he didn't do is

11:18:01 10   take post-negotiation data and use it to contradict during

11:18:05 11   negotiation data.  Mr. Wu's pointed to precisely the number

11:18:10 12   that we had a particular issue with, mobile usage at the

11:18:15 13   time of the negotiation was 80 percent.  It fell thereafter

11:18:20 14   and became closer to 40 percent.  And so Dr. Macartney uses

11:18:25 15   the 40 percent number from several years later and uses that

11:18:29 16   instead of the 80 percent which wore for the contemporaneous

11:18:35 17   data, that's an improper use of the book of wisdom.

11:18:38 18          THE COURT:  Was that the one that he said was

11:18:40 19   calculated the same way?

11:18:41 20          MR. FLACHSBART:  We don't agree with his

11:18:42 21   statement.

11:18:44 22          THE COURT:  You said it, you don't agree, but

11:18:46 23   what am I supposed to do.  You don't agree, he said it was

11:18:50 24   calculated from a different thing, it included the TV boxes,

11:18:55 25   that nobody says -- you don't say TV boxes are included,

11:18:57 1   right, people aren't touching their TV and going to

11:19:00 2   different lyrics, different places.

11:19:02 3               MR. FLACHSBART:  We do not.

11:19:03 4               THE COURT:  Does it include the TV boxes?

11:19:06 5               MR. FLACHSBART:  Which one?

11:19:07 6               THE COURT:  The 80 percent.

11:19:08 7               MR. FLACHSBART:  As I stand here today, Your

11:19:10 8   Honor, I confess I'm not certain.

11:19:12 9               THE COURT:  So you can't tell me it's not

11:19:14 10  exactly the same, I don't know what the basis for your

11:19:18 11  disagreement is, but he says it's apples and oranges so it's

11:19:22 12  not inconsistent.  And you're saying, I don't know, because

11:19:25 13  I don't know if what he says was taken out is included, so

11:19:28 14  I'm going to deny that motion.  You guys can continue to

11:19:32 15  talk about it.  If it turns out that we are talking apples

11:19:35 16  to apples, you can raise it again, use your trial time to

11:19:39 17  deal with it before he testifies.

11:19:41 18              MR. FLACHSBART:  Okay.

11:19:41 19              THE COURT:  Number five, Dr. Macartney's

11:19:42 20  affirmative testimony on a reasonable royalty rate for

11:19:48 21  emersion reading should be excluded.

11:19:50 22              MR. FLACHSBART:  We already dealt with that,

11:19:52 23  Your Honor, and you denied it.  That was my earlier one I

11:19:55 24  talked about, the emersion reading.

11:19:57 25              THE COURT:  So I denied that.

11:19:59  1                    MR. FLACHSBART:  You did.

11:19:59  2                    THE COURT:  Okay.

11:20:02  3                    Defendant's *Daubert* motions, only four.

11:20:09  4       Dr. Hernandez's testimony regarding the credibility of

11:20:13  5       Mr. Chamberlain should be excluded.  Well, that seems right.

11:20:17  6       So tell me what he's going to testify to so we can get out

11:20:22  7       of here.  It doesn't seem like anybody should be able to

11:20:27  8       testify whether someone is credible.  Why don't you point

11:20:29  9       out to me what you're complaining about, because it was like

11:20:34 10       eleven paragraphs here, so I need to understand

11:20:36 11       specifically.

11:20:37 12                    MR. WU:  Right.  The gist of that opinion is

11:20:40 13       simply because Mr. Chamberlain had a security clearance, his

11:20:44 14       credibility is somehow bolstered.  And I mean, first of all,

11:20:51 15       credibility is an issue for the jury to decide.  Second,

11:20:55 16       Dr. Hernandez does not purport to even have the expertise to

11:21:00 17       evaluate credibility or security clearances.

11:21:04 18                    THE COURT:  Okay.  That sounds right.  Why

11:21:07 19       should Dr. Hernandez be able to say he seems like a credible

11:21:12 20       guy to me?

11:21:12 21                    MR. FLACHSBART:  Dr. Hernandez wasn't really

11:21:16 22       opining as to Mr. Chamberlain's credibility, he was

11:21:19 23       discussing why he found his declaration -- Mr. Chamberlain

11:21:24 24       is unfortunately no longer with us.  He passed away.  So

11:21:28 25       Dr. Hernandez was merely opining as to why he was relying on

11:21:32 1    the declarations in his analysis of the -- basically the

11:21:37 2    possession of the invention at the earliest date.  I mean,

11:21:42 3    we're not going to have Dr. Schonfeld come in here and tell

11:21:46 4    the jury that, you know, Mr. Chamberlain is credible, but he

11:21:50 5    may very well say I relied on this, and this is why.

11:21:57 6            THE COURT:  This is 286 which is one of the two

11:22:01 7    paragraphs that's been requested.  In my opinion, the fact

11:22:04 8    that Mr. Chamberlain had a high security TS/SCI clearance

11:22:12 9    that matches his credibility and trustworthiness.  For this

11:22:14 10   type of security clearance, Mr. Chamberlain was subject to

11:22:18 11   life-style and polygraph clearances.  This type of security

11:22:21 12   clearances evidences the trustworthiness of Mr. Chamberlain

11:22:25 13   since he was routinely entrusted with even the most

11:22:25 14   sensitive national security information and was able to

11:22:31 15   maintain those secrets in confidence.  He also necessarily

11:22:33 16   possessed the technical proficiency to be employed and to

11:22:36 17   work on those classified programs.  That seems to me like

11:22:39 18   he's vouching for credibility, so I will grant the motion as

11:22:43 19   to paragraph 286 because he's basically telling the jury

11:22:47 20   he's credible rather than letting the jury determine it.

11:22:55 21          So let's look at paragraph 288.  Dr. Schonfeld

11:23:01 22   does not offer any opinion about Mr. Chamberlain's

11:23:04 23   trustworthiness.  My opinion is that Mr. Chamberlain had a

11:23:08 24   high level of trustworthiness given his line of work and his

11:23:12 25   security clearances.  For the same reason I exclude 286, I'm

11:23:16  1    going to exclude 288.  You know, if he wants to say

11:23:20  2    Mr. Chamberlain knew, he was in a position to know what was

11:23:24  3    relevant or what was going on or what wasn't going on,

11:23:28  4    that's fine, but to say oh, he was given security

11:23:32  5    clearances, therefore, he gets some added benefit of the

11:23:34  6    doubt, that seems like it is improper, so that one is

11:23:38  7    granted.

11:23:39  8            All right.  Next, Dr. Hernandez's testimony

11:23:44  9    regarding judicial estoppel should be excluded.  Are you

11:23:49 10    really going to have him testify about judicial estoppel?

11:23:55 11    That seems like a legal issue that shouldn't go to the jury.

11:23:57 12            MR. FLACHSBART:  No, Your Honor, we're going to

11:23:59 13    have him testify as to comparison of the complaint -- excuse

11:24:02 14    me, the claims of the Amazon patent with our patent, just

11:24:11 15    like the chart that you looked at earlier, Your Honor.

11:24:13 16            THE COURT:  All right.  Well, I am going to

11:24:16 17    reserve on this one because I assume there is a motion in

11:24:19 18    limine coming on that.

11:24:22 19            MR. WU:  Yes, Your Honor.

11:24:22 20            THE COURT:  So we're not going to rule on that.

11:24:25 21    But he certainly -- let me just make clear, he is not going

11:24:30 22    to tell the jury about judicial estoppel.

11:24:33 23            MR. FLACHSBART:  Absolutely not, Your Honor.

11:24:35 24            THE COURT:  Number three.  Dr. Hernandez's

11:24:37 25    testimony that adopts Dr. Agrawala's opinions and TrackTime

11:24:43 1   claim charts and infringement contentions should be

11:24:47 2   excluded.  All right.  So this one -- hold on, Mr. Wu.  Let

11:24:53 3   me ask.  So what is TrackTime planning to do, we're not

11:24:59 4   having multiple experts testify on the same thing, right?

11:25:01 5              MR. FLACHSBART:  No, Your Honor, he reviewed and

11:25:05 6   agreed with the claim charts.  He provides a detailed

11:25:08 7   paragraph-by-paragraph analysis.  It's going to come right

11:25:11 8   out of his report, his testimony.  There is not going to be

11:25:14 9   anything that wasn't included in his report with respect to

11:25:19 10  Dr. Agrawala.  We had Dr. Agrawala do a declaration quite a

11:25:24 11  while ago.  Obviously Dr. Agrawala is not available for us

11:25:28 12  for trial.  We don't want to have multiple witnesses, so

11:25:32 13  Dr. Hernandez reviewed that, he then wrote whole paragraphs

11:25:37 14  about it, they are not identical to the paragraphs in

11:25:39 15  Dr. Agrawala's declaration.  At the end of those paragraphs

11:25:43 16  where he does the exact same analysis, he says I agree with

11:25:46 17  Dr. Agrawala's declaration, but he has the analysis himself

11:25:50 18  in his report, that's what we're going to testify to.  We're

11:25:54 19  not going to have him show an Agrawala declaration.  All of

11:25:59 20  these are included in his report, they are textual

11:26:02 21  paragraphs, there is no adoption by reference as in the main

11:26:07 22  cases that they cite, there is actual opinion endorsed and

11:26:10 23  analyzed by Dr. Hernandez.  Everything he is going to

11:26:14 24  testify to is in his report.

11:26:15 25             THE COURT:  All right.  Now you can go, Mr. Wu.

11:26:24 1        MR. WU:  So there are three items which we

11:26:29 2   believe are improper incorporation, and I believe we just

11:26:34 3   talked about the first one which is Dr. Agrawala --

11:26:39 4        THE COURT:  Can you point me to the paragraphs

11:26:40 5   because it's helpful if you read exactly what you want.  I

11:26:44 6   was just looking at the numbers that I had written down here

11:26:46 7   and I can't quite figure out where we are.

11:26:51 8        MR. WU:  So for incorporation of Dr. Agrawala's

11:26:55 9   opinion, one example is paragraph 310 of Dr. Hernandez's

11:27:02 10  report.

11:27:06 11       THE COURT:  Just give me a second.

11:27:16 12       Okay.

11:27:18 13       MR. WU:  So our issue is that the case law is

11:27:21 14  clear, Dr. Hernandez cannot just copy from Dr. Agrawala's

11:27:27 15  opinion and say it's his own.

11:27:30 16       THE COURT:  So let me ask you this, let's say I

11:27:32 17  say look, you can't do that, if he wants to testify it has

11:27:37 18  to be something that affirmatively is in his report.  And so

11:27:41 19  if we get to trial and you say, Your Honor, that wasn't

11:27:42 20  disclosed and I say show Mr. Wu where it was disclosed and

11:27:51 21  they say it was in Dr. Agrawala's report, that's not enough,

11:27:58 22  but if they say it's here, it's in paragraph 317, then it's

11:28:02 23  okay.  Do we agree, is that what you're arguing?

11:28:07 24       MR. WU:  I believe that's not okay because the

11:28:08 25  case law is clear, he must -- Dr. Hernandez must do his own

11:28:17  1    independent analysis --

11:28:17  2              THE COURT:  How do I know, he says in

11:28:20  3    paragraph 310, I adopt that as my opinion here.  Okay?  And

11:28:24  4    he attaches it, Exhibit 6, I say okay, that's not enough,

11:28:28  5    you can't just say I adopt what that expert says.  But he

11:28:32  6    doesn't just do that, he goes on in paragraph after

11:28:36  7    paragraph, and he says -- I mean, he's not just talking

11:29:09  8    about Dr. Agrawala, he goes on in all these paragraphs, in

11:29:14  9    the 320s, 331, I don't understand why what I said isn't

11:29:19 10    okay, which is he can't say my opinion is based, look at

11:29:24 11    Exhibit 6 which is someone else's opinion, but if he says

11:29:27 12    the opinion I want to tell the jury is in paragraph 337 of

11:29:31 13    my report, why isn't that okay?

11:29:34 14              MR. WU:  That is okay because he just copied the

11:29:37 15    same language from Dr. Agrawala's declaration, and the case

11:29:42 16    law is clear that is not okay.

11:29:44 17              THE COURT:  Well, that seems like -- well, look,

11:29:48 18    I don't know if he just absolutely copied it.  If he did, it

11:29:52 19    seems like you would have to find on cross-examination of

11:29:58 20    him that he did that, but I'm going to deny that.  I don't

11:30:02 21    know if this is word for word copying.  I don't know if he

11:30:07 22    -- but it certainly seems to me when I read this, certainly

11:30:11 23    paragraph 310 where he says I incorporate all by reference,

11:30:12 24    here it's attached, that's all mine, no, but the rest of

11:30:12 25    this, I can't tell, it's reading.  I mean, he says it's my

11:30:23  1   understanding regarding my response to Dr. Schonfeld, he's

11:30:29  2   not saying -- I mean, and it seems like he's actually

11:30:34  3   responding to Dr. Schonfeld's report, which I don't think

11:30:38  4   the Agrawala -- the declaration was doing, so it seems like

11:30:42  5   this is different, so I'm going to deny that motion.

11:30:44  6           MR. WU:  May I address -- I believe I mentioned

11:30:47  7   there were two other items in addition to Dr. Agrawala's

11:30:53  8   opinion.  May I address those?

11:30:57  9           THE COURT:  Tell me what they are because I

11:30:59 10   might have them listed out as separate things.

11:31:03 11           MR. WU:  Sure.  So one of them is

11:31:04 12   Dr. Hernandez's adoption of TrackTime's infringement

11:31:09 13   contentions.  And I believe there is a claim chart there.

11:31:13 14   And Dr. Hernandez in this case did not copy the claim chart

11:31:18 15   into his report, instead just attached it and said in his

11:31:22 16   report that he adopts these charts.  And these are not --

11:31:27 17           THE COURT:  What paragraph are you looking at so

11:31:29 18   I can follow along?

11:31:32 19           MR. WU:  Paragraph 6.

11:31:34 20           THE COURT:  Six.

11:31:36 21           MR. WU:  Sorry, this is Dr. Hernandez's opening

11:31:39 22   report, so it's a different -- because it's an infringement

11:31:43 23   issue.

11:31:44 24           THE COURT:  So what exhibit is this?

11:31:46 25           MR. WU:  So Dr. Hernandez's opening report,

11:31:50 1    paragraph 6.

11:31:51 2                    THE COURT:  What exhibit is Dr. Hernandez's

11:31:55 3    opening report?

11:31:57 4                    MR. WU:  I believe that's Exhibit 2.

11:32:10 5                    THE COURT:  I'm sorry, what paragraph, six.

11:32:28 6    Okay.

11:32:31 7                    MR. WU:  As I mentioned, doctor --

11:32:34 8                    THE COURT:  So you're okay with the -- I

11:32:38 9    performed additional investigations and analyses to

11:32:43 10   corroborate, you're okay with his performed additional

11:32:47 11   analyses and investigations, you just don't want him to be

11:32:52 12   able to reference what's in the charts?

11:32:54 13                   MR. WU:  Exactly.

11:32:55 14                   THE COURT:  Okay.  Why is that okay to just say

11:33:00 15   look, we did contentions, he didn't do his own contentions,

11:33:03 16   he just adopted ours, why is that okay?

11:33:06 17                   MR. FLACHSBART:  I'm not sure why we would need

11:33:08 18   to do a whole new of set claims.  What I did, Your Honor,

11:33:12 19   was he looked at the claim charts while they were prepared

11:33:15 20   and then he does his own independent analysis of that --

11:33:19 21                   THE COURT:  Why does he need the charts, why

11:33:21 22   can't we just hold him to his analysis?

11:33:24 23                   MR. FLACHSBART:  Frankly, Your Honor, it's a

11:33:34 24   demonstrative to walk through the claims and help the jury.

11:33:36 25   I don't see how --

11:33:37  1          THE COURT:  He can make his own demonstrative

11:33:39  2   when he's walking through the claims and giving stuff that's

11:33:43  3   supported by his opinion.

11:33:44  4          MR. FLACHSBART:  The ruling is?

11:33:46  5          THE COURT:  You're not going to put your lawyer

11:33:49  6   made without him testifying, your lawyer made contentions up

11:33:53  7   there, are you?

11:33:54  8          MR. FLACHSBART:  No, Your Honor.

11:33:55  9          THE COURT:  I would hope not because that seems

11:33:58 10   awfully like you're putting words into your expert's mouth

11:34:01 11   as opposed to him testifying.  And I don't believe that the

11:34:04 12   jury would find that persuasive anyway.  So you don't need

11:34:08 13   your argumentative contentions.  He can testify on the

11:34:12 14   analysis that he did.

11:34:13 15          MR. FLACHSBART:  That's fine with me, Your

11:34:14 16   Honor.

11:34:14 17          THE COURT:  All right.  So that one is granted

11:34:18 18   as fine with the plaintiffs.

11:34:19 19          Okay.  What was the next issue?

11:34:22 20          MR. WU:  The next issue is Dr. Hernandez's

11:34:27 21   incorporation of TrackTime's interrogatory response and

11:34:32 22   specifically a chart comparing Mr. Evans' November 2010

11:34:40 23   patent draft with the actual patent specification to

11:34:44 24   purportedly show an earlier conception.  And that again is a

11:34:50 25   lawyer made chart.  It's a legal document which

11:34:55  1    Dr. Hernandez didn't --

11:34:57  2             THE COURT:  Can you point me to it so I can see

11:35:00  3    what I'm looking at?  I don't know which exhibit.  I don't

11:35:05  4    know what -- so can you help me out here?

11:35:09  5             MR. WU:  Yeah, so this is Dr. Hernandez's

11:35:12  6    rebuttal report, Exhibit 3, and paragraph 275.

11:35:40  7             THE COURT:  I have also reviewed in detail

11:35:42  8    TrackTime's response and supplemental response to

11:35:45  9    interrogatory number 1, and materials cited therein and

11:35:48 10    relied on.  I incorporate that response herein by reference.

11:35:54 11    Track in detail a multiyear effort and continuous effort to

11:35:57 12    successfully reduce the inventions of the '638 invention to

11:36:02 13    practice.  I don't think he can just adopt lawyer's words,

11:36:05 14    argument in an interrogatory and say look, that's fine.  To

11:36:09 15    the extent that he has also opined elsewhere about reduction

11:36:14 16    to practice or conception or whatever, he can do that, but

11:36:19 17    not 275, just incorporating by whole something that lawyers

11:36:23 18    did.

11:36:25 19             And again, Mr. Evans can testify about whatever

11:36:30 20    issues on what he did in terms of reducing it to practice

11:36:34 21    and conception.  So 275, that effort to just wholesale adopt

11:36:40 22    that into his report is not appropriate and I will grant

11:36:42 23    that motion.

11:36:42 24             All right.  So then I think we only have one

11:36:42 25    issue left on the *Dauberts* that I knew of which is

11:36:52 1   Dr. Hernandez, exclude Dr. Hernandez's testimony or preclude

11:36:57 2   him from testifying about the technology benefit comparison.

11:37:04 3   So what's the technology benefit comparison that we're

11:37:08 4   talking about?

11:37:11 5               MR. WU:   The gist of that opinion is

11:37:16 6   Dr. Hernandez's view that the accused feature is the quote

11:37:20 7   unquote most important feature in Amazon's product.

11:37:26 8               THE COURT:   Let me just -- I think it's in the

11:37:29 9   350s of his report.

11:37:37 10              MR. WU:   Yes, 351.

11:37:46 11              THE COURT:   Okay.

11:37:46 12              MR. WU:   And that opinion is improper for two

11:37:49 13  reasons.   First, Dr. Hernandez is a technical expert.   He

11:37:54 14  does not have economics or financial background, so it's

11:37:59 15  improper for him to assign economic value to a feature.   And

11:38:05 16  second, even if he is qualified, he did not do the required

11:38:11 17  analysis to reach that conclusion, to do that it would be,

11:38:18 18  at least a consumer survey asking, for example, the consumer

11:38:25 19  to rank what they find are important or not.   He did not --

11:38:33 20  he did not purport to do that survey.   And I believe he

11:38:37 21  testified in his deposition that he never did any of those

11:38:40 22  surveys in his lifetime.   So because of that, he cannot

11:38:47 23  reach the conclusion that this is the most important feature

11:38:50 24  in the accused product.

11:38:51 25              THE COURT:   He says he has experience as a

11:38:53 1  developer of customer requirements for new apps and that

11:39:00 2  he's relying on Amazon documents and testimony.  So he is a

11:39:08 3  technical expert, but he does have experience in terms of

11:39:14 4  figuring out what's important to customers; is that right?

11:39:18 5          MR. FLACHSBART:  That's correct, Your Honor.  In

11:39:19 6  fact, he's been admitted as an expert in that capacity in

11:39:22 7  the past in the Mobile Works case that we cited.

11:39:27 8          MR. WU:  Right, our response to that, first of

11:39:29 9  all, to Mr. Flachsbart's point, that case was a unique one

11:39:34 10 because that case was about his own patents, so he did have

11:39:39 11 specialized knowledge about his own patent, while here he's

11:39:42 12 opining on the third-party patent.  And I mean, the fact he

11:39:48 13 may have studied consumer requirements in some generic app

11:39:55 14 is not -- does not make him an expert in ranking the

11:40:00 15 importance of features in any app or any software.  And as

11:40:08 16 we said, he should have done a consumer survey on it, but he

11:40:12 17 did not.  And he does not purport to say oh, I have

11:40:18 18 developed a similar app and I know consumers are interested

11:40:22 19 in this tap-to-jump feature, he never did any of that.

11:40:26 20         THE COURT:  This is one where I think it would

11:40:31 21 be helpful for me to have context, so I'm going to deny your

11:40:34 22 motion right now, but I understand your concerns.  So before

11:40:37 23 this expert testifies, and I want to hear, like I want to

11:40:44 24 have an understanding as to his experience, his background,

11:40:46 25 and so you can re-raise this when you see what he's going to

11:40:57 1    testify about.  If we get slides, we can revisit this one

11:41:00 2    because I just think it would be helpful in context, because

11:41:03 3    it's hard for me in looking at this to say yes, it's fair

11:41:07 4    that you say when you develop an app, you want to have this

11:41:10 5    particular kind of customer experience, and I know that

11:41:12 6    because I have done this a million times versus my

11:41:15 7    experiences in this area and I'm just opining over here.  So

11:41:20 8    I'm going to deny it, but I will allow you to raise this

11:41:25 9    again when we have some more context.

11:41:27 10             MR. WU:  Thank you, Your Honor.

11:41:28 11             THE COURT:  All right.  Are there any additional

11:41:36 12   *Daubert* motions that I have missed?

11:41:40 13             MR. FLACHSBART:  I don't believe so, Your Honor.

11:41:42 14             MR. WU:  I don't believe so.

11:41:43 15             THE COURT:  All right.  So then we have to

11:41:46 16   discuss the trial date given the Bench and Bar.  And you all

11:42:05 17   suggested that we start the week before, and I think we can

11:42:08 18   do that.  I propose that we start on Wednesday the 13th.

11:42:19 19   I'm not sure if you all said the 14th, but I think we should

11:42:22 20   start Wednesday the 13th which would let us have five days

11:42:26 21   of trial ending the 19th, which would be before the Bench

11:42:30 22   and Bar begins.  Any issues with that?

11:42:34 23             MR. GREENSPOON:  That's fine with TrackTime,

11:42:36 24   Your Honor.

11:42:36 25             MR. HADDEN:  That's fine with Amazon, Your

11:42:39  1    Honor.

11:42:39  2            THE COURT:  So we'll plan on that.  The pretrial

11:42:42  3    conference will be September 6th at 4:30.  And lastly, as we

11:42:55  4    head towards trial, where are we on mediation?  There was a

11:42:59  5    point in time when you all tricked me into issuing a

11:43:05  6    decision while you had stayed certain aspects of the case,

11:43:08  7    which I normally wouldn't do.  And you said oh, do it

11:43:11  8    because it will help us to settle.  And that was the last I

11:43:14  9    heard of that.  So where are we on settlement efforts,

11:43:18 10    mediation, whatever?  And you don't have to tell me the

11:43:20 11    substance of them, just kind of the status.

11:43:23 12            MR. FLACHSBART:  I believe that the key issue in

11:43:24 13    the case was the 101 issue, Your Honor, which you ruled on

11:43:28 14    today.  We have not actively discussed settlement with

11:43:32 15    Amazon in quite some time.  Obviously I think given the

11:43:35 16    forthcoming trial date and your rulings today, we'll have an

11:43:40 17    exchange and see if we can't make some progress.

11:43:43 18            THE COURT:  What I am going to do is say have

11:43:45 19    that exchange.  If you cannot reach an agreement, I'm going

11:43:48 20    to require you to hire a mediator, Judge Andrews has been

11:43:52 21    doing that in all his patent cases and I think it's a sound

11:43:57 22    practice.  I'll give you guys a couple of weeks, two weeks

11:44:02 23    and if you can't make some progress on this, then -- so get

11:44:04 24    back to me by the end of the day on the 14th whether any

11:44:12 25    progress has been made.  And if not, then I will likely

11:44:15  1    require you all to engage a mediator to see if there is room

11:44:21  2    for settlement.

11:44:23  3                    All right.  Anything else that we need to talk

11:44:24  4    about while we are here?

11:44:27  5                    MR. GREENSPOON:  No, Your Honor, not from

11:44:29  6    TrackTime's point of view.

11:44:30  7                    MR. HADDEN:  No, Your Honor.  Thank you.

11:44:32  8                    THE COURT:  All right.  Thank you.  Safe

11:44:34  9    travels.

11:44:34  10                    COURT CLERK:  All rise.

          11                    (Court adjourned at 11:44 a.m.)

          12

          13                    I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.
          14

          15                                    /s/ Dale C. Hawkins
                                               Official Court Reporter
          16                                    U.S. District Court

          17

          18

          19

          20

          21

          22

          23

          24

          25